## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| **BREAD FOR THE CITY;** | ) |
|     1525 Seventh Street NW | ) |
|     Washington D.C., 20001 | ) |
|  | ) |
| **VIRGINIA ORCHARD;** | ) |
|     5425 Western Avenue NW | ) |
|     Washington, D.C., 20015 | ) |
|  | ) |
| **ALPHONSO DeSHIELDS;** | ) |
|     5425 Western Avenue NW | ) |
|     Washington, D.C., 20015 | ) |
|  | ) |
| **MARGARET MATTHEWS; and** | ) |
|     5425 Western Avenue NW | ) |
|     Washington, D.C., 20015 | ) |
|  | ) |
| **ANDREA J. SLOAN, R.N., Esq.,** | ) |
|     As legal guardian for Frederick Reeves, | ) |
|     Mildred Clayborne, Garland Little, | ) |
|     Darryl Lambert, Jessie Robertson | ) |
|     Aaron Ashley, Wilbert Malloy and | ) |
|     Olivie Johnson | ) |
|     1350 Beverly Road #115-232 | ) |
|     McLean, VA 22101 | ) |
|  | ) |
|        **Plaintiffs,** | ) |
|  | ) |
|     **v.** | ) |
|  | ) |
| **KATE JESBERG, INTERIM DIRECTOR,** | )     **Civil Action No.** |
| **DISTRICT OF COLUMBIA DEPARTMENT** | ) |
| **OF HUMAN SERVICES;** | ) |
|     64 New York Ave. NE, Sixth Floor | ) |
|     Washington D.C., 20002 | ) |
|  | ) |
| **SHARON COOPER-DeLOATCH, ACTING** | ) |
| **ADMINISTRATOR, INCOME** | ) |
| **MAINTENANCE ADMINISTRATION,** | ) |
| **DISTRICT OF COLUMBIA DEPARTMENT** | ) |
| **OF HUMAN SERVICES; and** | ) |
|     645 H Street NE | ) |

Washington D.C., 20002                    )
                                          )
**DISTRICT OF COLUMBIA**                  )
**DEPARTMENT OF HUMAN SERVICES;**         )
  64 New York Ave. NE, Sixth Floor    )
  Washington, DC, 20002                )
                                          )
               **Defendants.**    )
_____)

## COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

This is an action for declaratory and injunctive relief, including a temporary restraining order and preliminary injunction, brought against the District of Columbia Department of Human Services, its Interim Director, Kate Jesberg, and the Acting Director of its Income Maintenance Administrator, Sharon Cooper-DeLoatch (collectively, "Defendants"), to bar them from implementing certain new requirements for documenting United States citizenship as a condition to receiving, or continuing to receive, Medicaid benefits.  The proposed new requirements for documenting United States citizenship unlawfully and unreasonably burdens individual Plaintiffs' rights and status as United States citizens – effectively deeming American citizens to be non-citizens for lack of certain documents.  As such, those new citizenship documentation requirements violate (a) the citizenship clause of the Fourteenth Amendment; (b) the privileges and immunities clause of the Fourteenth Amendment, (c) the equal protection clause of the Fourteenth Amendment; (d) the due process clauses of the Fourteenth and Fifth Amendment, 42 U.S.C. §1983 (which creates a cause of action for violation of constitutional rights and makes the Fourteenth Amendment applicable to the District of Columbia), and D.C. Code Ann. § 4-204.05.

## PARTIES AND JURISDICTION

1.      Virginia Orchard is a 92 year old United States citizen, having been born on February 14, 1914 in New York City, New York.

        a.      Virginia Orchard was not born in a hospital, but was born in her parents' home in New York City.  This is known to her son, her guardian, by virtue of long understanding within the family and community.

        b.      For the last 92 years, Virginia Orchard has lived in New York, New York and Washington, D.C., and currently resides and has resided for the last 2 years at 5425 Western Avenue NW, Washington, D.C., 20015, in the Lisner-Louise-Dickson-Hurt Home (the "Lisner Home"), a skilled nursing facility.

        c.      Virginia Orchard suffers from the following health conditions: syncope, dementia, S/P hypertension, depression and psychosis.  To treat these conditions, it is medically necessary for Virginia Orchard to receive skilled nursing services in a residential, skilled nursing facility; to receive psychiatric treatment and restorative care; and to routinely take certain medications, including, but not limited to, acetaminophen, Aricept, aspirin, calcium with vitamin D, docusate sodium, lisinopril, multivitamin, Namenda, Prazosin, Risperdal, Trileptal, and Zoloft.

        d.      Virginia Orchard currently meets each of the eligibility requirements necessary to remain enrolled in the District of Columbia's Medicaid program (the "Program"), as she is a United States citizen, her income level is at or below the level of the Program's eligibility requirements, and her resource levels are at or below the Program's eligibility requirements.

        e.       Virginia Orchard has been enrolled in the Program since May 3, 2004 and continues to be so enrolled.

        f.       Because Virginia Orchard is a current Program beneficiary, the Program reimburses the health care providers that provide the skilled nursing and other services necessary to treat Virginia Orchard's aforementioned health conditions, including, but not limited to, The Lisner Home.

        g.       Because of Virginia Orchard's income and resource levels, Virginia Orchard is unable to personally reimburse The Lisner Home and the other healthcare providers that provide her with skilled nursing services and other healthcare services.

        h.       Virginia Orchard will lose access to skilled nursing services and treatment for syncope, dementia, S/P hypertension, depression and psychosis if the providers of those services are not reimbursed.

        i.       If Virginia Orchard does not receive skilled nursing services and/or treatment for syncope, dementia, S/P hypertension, depression and psychosis, her health status would quickly, irreparably and irreversibly decline.

        j.       With respect to each of the documents listed in the Guidance (the "Guidance") released by the Centers on Medicare and Medicaid Service ("CMS") on June 9, 2006, Virginia Orchard possesses neither an original of such a document nor a copy of such a document certified by the original issuing agency, whether valid or expired, if applicable. Furthermore, Virginia Orchard cannot obtain either an original document nor a copy of such a document certified by the original issuing agency within forty-five (45) days, or within any reasonable period of time.

        k.      Virginia Orchard does not know two (2) individuals that have personal knowledge of her February 14, 1914 birth in New York City, New York, United States of America.

        l.      Because Virginia Orchard does not possess and/or cannot obtain any of the documents as stated above, and further because she does not know two (2) individuals that have personal knowledge of her February 14, 1914 birth, and further as a result of the Defendants' impending actions, Virginia Orchard's Program eligibility will be terminated.

        m.     As a result of the Defendants' impending actions, Virginia Orchard's health status will quickly, irreparably and irreversibly decline.

    2.      Alphonso DeShields is a 91 year old United States Citizen, having been born on September 8, 1914 in Spartanburg, South Carolina.

        a.      Alphonso DeShields was not born in a hospital, but was born in his parents' home in Spartanburg, South Carolina.

        b.      For the last 91 years, Alphonso DeShields has lived in South Carolina and Washington, D.C., and currently resides and has resided for the last 5 years at 5425 Western Avenue NW, Washington, D.C., 20015, in the Lisner Home.

        c.      Alphonso DeShields currently suffers from the following health conditions: severe PVD, HCVD, cardiomegally, prostate cancer, left hip socket arthroplasty, and tubovillous adenome.  To treat these conditions, it is medically necessary for Alphonso DeShields to receive skilled nursing services in a residential, skilled nursing facility; to receive rehabilitation therapy and recreational therapy; and to routinely take the following medications: acetaminophen, aspirin, bisacodyl, guaifenesin, tramadol HCL, Diovan, furosemide, megestrol acetate, Nitrek, Nrvasc, Ranitidine, and Zoladex.

d.    Alphonso DeShields currently meets each of the eligibility requirements necessary to remain enrolled in the Program, as he is a United States citizen, his income level is at or below the level of the Program's eligibility requirements, and his resource levels are at or below the Program's eligibility requirements.

e.    Alphonso DeShields has been enrolled in the Program since September 4, 2001 and continues to be so enrolled.

f.    Because Alphonso DeShields is a current Program beneficiary, the Program reimburses the health care providers that provide the skilled nursing and other services necessary to treat Alphonso DeShields' aforementioned health conditions, including, but not limited to, The Lisner Home.

g.    Because of Alphonso DeShields' income and resource levels, Alphonso DeShields is unable to personally reimburse The Lisner Home and the other healthcare providers that provide him with skilled nursing services and other healthcare services.

h.    Alphonso DeShields will lose access to skilled nursing services and treatment for : severe PVD, HCVD, cardiomegally, prostate cancer, left hip socket arthroplasty, and tubovillous adenome if the providers of those services are not reimbursed.

i.    If Alphonso DeShields does not receive skilled nursing services and/or treatment for : severe PVD, HCVD, cardiomegally, prostate cancer, left hip socket arthroplasty, and tubovillous adenome, his health status would quickly, irreparably and irreversibly decline.

j.    With respect to each of the documents listed in the Guidance, Alphonso DeShields possesses neither an original of such a document nor a copy of such a document certified by the original issuing agency, whether valid or expired, if applicable.  Furthermore, Alphonso DeShields cannot obtain either an original document nor a copy of such a document

certified by the original issuing agency within forty-five (45) days, or within any reasonable period of time.

         k.      Alphonso DeShields does not know two (2) individuals that have personal knowledge of his September 8, 1914 birth in Spartanburg, South Carolina, United States of America.

         l.       Because Alphonso DeShields does not possess and/or cannot obtain any of the documents as stated above, and further because he does not know two (2) individuals that have personal knowledge of his September 8, 1914 birth, and further as a result of the Defendants' impending actions, Alphonso DeShields' Program eligibility will be terminated.

         m.     As a result of the Defendants' impending actions, Alphonso DeShields' health status will quickly, irreparably and irreversibly decline.

       3.      Margaret Matthews is an 84 year old United States Citizen, having been born on January 25, 1922 in Alberta, Virginia.

         a.      Margaret Matthews was not born in a hospital, but was born in her parents' home in Alberta, Virginia.

         b.      For the last 84 years, Margaret Matthews has lived in Virginia and Washington, D.C., and currently resides and has resided for the last 2 years at 5425 Western Avenue NW, Washington, D.C., 20015, in the Lisner Home.

         c.      Margaret Matthews currently suffers from the following health conditions: cardiovascular disease with compensated congestive heart failure, angina, Brittle diabetes, hypertension, GERD, polymyalgia artitica, CVA, dementia, and renal insufficiency.  To treat these conditions, it is medically necessary for Margaret Matthews to receive skilled nursing services in a residential, skilled nursing facility; and to routinely take the following medications:

acetaminophen, glutose, Nitroquick, prochlorperazine, clonidine HCL, colchicines, Coreg, Digitek, diltiazem HCL, gabapentin, insulin, isosorbide dinitrate, Lpitor, mirtazapine, prednisone, prilosec, Voltaren ophthalmic, warfarin, and Xalatan.

        d.     Margaret Matthews currently meets each of the eligibility requirements necessary to remain enrolled in the Program, as she is a United States citizen, her income level is at or below the level of the Program's eligibility requirements, and her resource levels are at or below the Program's eligibility requirements.

        e.     Margaret Matthews has been enrolled in the Program since October 10, 2003 and continues to be so enrolled.

        f.     Because Margaret Matthews is a current Program beneficiary, the Program reimburses the health care providers that provide the skilled nursing and other services necessary to treat Margaret Matthews' aforementioned health conditions, including, but not limited to, The Lisner Home.

        g.     Because of Margaret Matthews' income and resource levels, Margaret Matthews is unable to personally reimburse The Lisner Home and the other healthcare providers that provide her with skilled nursing services and other healthcare services.

        h.     Margaret Matthews will lose access to skilled nursing services and treatment for her aforementioned health conditions, as well as all necessary medications, if the providers of those services are not reimbursed.

        i.     If Margaret Matthews does not receive skilled nursing services and/or treatment for her aforementioned health conditions and/or her medications, her health status would quickly, irreparably and irreversibly decline.

8

j.      With respect to each of the documents listed in the Guidance, Margaret Matthews possesses neither an original of such a document nor a copy of such a document certified by the original issuing agency, whether valid or expired, if applicable.  Furthermore, Margaret Matthews cannot obtain either an original document nor a copy of such a document certified by the original issuing agency within forty-five (45) days, or within any reasonable period of time.

k.      Margaret Matthews does not know two (2) individuals that have personal knowledge of her January 25, 1922 birth in Alberta, Virginia, United States of America.

l.      Because Margaret Matthews does not possess and/or cannot obtain any of the documents as stated above, and further because she does not know two (2) individuals that have personal knowledge of her January 25, 1922 birth, and further as a result of the Defendants' impending actions, Margaret Matthews' Program eligibility will be terminated.

m.      As a result of the Defendants' impending actions, Margaret Matthews' health status will quickly, irreparably and irreversibly decline

4.      Andrea J. Sloan, R.N., Esq., is a nurse, lawyer and legal guardian for Frederick Reeves, Mildred Clayborne, Garland Little, Darryl Lambert, Jessie Robertson, Aaron Ashley, Wilbert Malloy and Olivie Johnson.

5.      Frederick Reeves is a 69 year old United States Citizen, having been born on August 3, 1936 in the vicinity of Danville, Virginia.

a.      Frederick Reeves does not know if he was born in a hospital or elsewhere.

b.      For the last 5 years, Frederick Reeves has resided at 2425 25th St. SE, Washington, D.C., 20020, in the Washington Nursing Facility, a skilled nursing facility.

c.     Frederick Reeves currently suffers from the following health conditions: dementia, impaired verbal communication, impaired cognition, history of stroke, diabetes, history head trauma, and impaired vision.  To treat these conditions, it is medically necessary for Frederick Reeves to receive skilled nursing services in a residential, skilled nursing facility; medical supervision; and to routinely take several medications.

d.     Frederick Reeves currently meets each of the eligibility requirements necessary to remain enrolled in the Program, as he is a United States citizen, his income level is at or below the level of the Program's eligibility requirements, and his resource levels are at or below the Program's eligibility requirements.

e.     Frederick Reeves has been enrolled in the Program since at least June 13, 2001 and continues to be so enrolled.

f.     Because Frederick Reeves is a current Program beneficiary, the Program reimburses the health care providers that provide the skilled nursing and other services necessary to treat Frederick Reeves' aforementioned health conditions, including, but not limited to, The Washington Nursing Facility.

g.     Because of Frederick Reeves' income and resource levels, Frederick Reeves is unable to personally reimburse The Washington Nursing Facility and the other healthcare providers that provide him with skilled nursing services and other healthcare services.

h.     Frederick Reeves will lose access to skilled nursing services and treatment for the aforementioned health conditions if the providers of those services are not reimbursed, and if discharged from The Washington Nursing Facility, would be homeless.

        i.      If Frederick Reeves does not receive skilled nursing services, medical supervision and/or treatment for the aforementioned health conditions, his health status would quickly, irreparably and irreversibly decline.

        j.      With respect to each of the documents listed in the Guidance, Frederick Reeves possesses neither an original of such a document nor a copy of such a document certified by the original issuing agency, whether valid or expired, if applicable.  Furthermore, Frederick Reeves cannot obtain either an original document nor a copy of such a document certified by the original issuing agency within forty-five (45) days, or within any reasonable period of time.

        k.      Frederick Reeves does not know two (2) individuals that have personal knowledge of his birth in the United States of America.

        l.      Because Frederick Reeves does not possess and/or cannot obtain any of the documents as stated above, and further because he does not know two (2) individuals that have personal knowledge of his birth, and further as a result of the Defendants' impending actions, Frederick Reeves' Program eligibility will be terminated.

        m.      As a result of the Defendants' impending actions, Frederick Reeves' health status will quickly, irreparably and irreversibly decline.

      6.      Mildred Clayborne is a 74 year old United States Citizen, having been born on November 30, 1931 in Virginia.

        a.      Mildred Clayborne does not know if she was born in a hospital or elsewhere.

        b.      For the last 6 years, Mildred Clayborne has resided at 2425 25th St. SE, Washington, D.C., 20020, in the Washington Nursing Facility.

c.      Mildred Clayborne currently suffers from numerous health conditions, including, but not limited to, the following: hypertension, schizophrenia, cataracts and diabetes. To treat these conditions, it is medically necessary for Mildred Clayborne to receive skilled nursing services in a residential, skilled nursing facility; medical supervision; and to routinely take several medications.

d.      Mildred Clayborne currently meets each of the eligibility requirements necessary to remain enrolled in the Program, as she is a United States citizen, her income level is at or below the level of the Program's eligibility requirements, and her resource levels are at or below the Program's eligibility requirements.

e.      Mildred Clayborne has been enrolled in the Program since at least 1999 or 2000 and continues to be so enrolled.

f.      Because Mildred Clayborne is a current Program beneficiary, the Program reimburses the health care providers that provide the skilled nursing and other services necessary to treat Mildred Clayborne's aforementioned health conditions, including, but not limited to, The Washington Nursing Facility.

g.      Because of Mildred Clayborne's income and resource levels, Mildred Clayborne is unable to personally reimburse The Washington Nursing Facility and the other healthcare providers that provide her with skilled nursing services and other healthcare services.

h.      Mildred Clayborne will lose access to skilled nursing services and treatment for the aforementioned health conditions if the providers of those services are not reimbursed, and if discharged from The Washington Nursing Facility, she would be homeless.

       i.      If Mildred Clayborne does not receive skilled nursing services, medical supervision and/or treatment for the aforementioned health conditions, her health status would quickly, irreparably and irreversibly decline.

       j.      With respect to each of the documents listed in the Guidance, Mildred Clayborne possesses neither an original of such a document nor a copy of such a document certified by the original issuing agency, whether valid or expired, if applicable.  Furthermore, Mildred Clayborne cannot obtain either an original document nor a copy of such a document certified by the original issuing agency within forty-five (45) days, or within any reasonable period of time.

       k.      Mildred Clayborne does not know two (2) individuals that have personal knowledge of her birth in the United States of America.

       l.      Because Mildred Clayborne does not possess and/or cannot obtain any of the documents as stated above, and further because she does not know two (2) individuals that have personal knowledge of her birth, and further as a result of the Defendants' impending actions, Mildred Clayborne's Program eligibility will be terminated.

       m.      As a result of the Defendants' impending actions, Mildred Clayborne's health status will quickly, irreparably and irreversibly decline

       7.      Garland Little is a 70 year old United States Citizen, having been born on January 10, 1936 in North Carolina.

       a.      Garland Little does not know if he was born in a hospital or elsewhere.

       b.      For the last 21 months, Garland Little has resided at 2425 25th St. SE, Washington, D.C., 20020, in the Washington Nursing Facility.

       c.      Garland Little currently suffers from numerous health conditions, including, but not limited to, the following: history of stroke, hypertenstion, right-sided weakness, aphasia (an inability to communicate).  To treat these conditions, it is medically necessary for Garland Little to receive skilled nursing services in a residential, skilled nursing facility; medical supervision; and to routinely take several medications.

       d.      Garland Little currently meets each of the eligibility requirements necessary to remain enrolled in the Program, as he is a United States citizen, his income level is at or below the level of the Program's eligibility requirements, and his resource levels are at or below the Program's eligibility requirements.

       e.      Garland Little has been enrolled in the Program since at least 2005 and continues to be so enrolled.

       f.      Because Garland Little is a current Program beneficiary, the Program reimburses the health care providers that provide the skilled nursing and other services necessary to treat Garland Little's aforementioned health conditions, including, but not limited to, The Washington Nursing Facility.

       g.      Because of Garland Little's income and resource levels, Garland Little is unable to personally reimburse The Washington Nursing Facility and the other healthcare providers that provide him with skilled nursing services and other healthcare services.

       h.      Garland Little will lose access to skilled nursing services and treatment for the aforementioned health conditions if the providers of those services are not reimbursed, and if discharged from The Washington Nursing Facility, he would be homeless.

i.    If Garland Little does not receive skilled nursing services, medical supervision and/or treatment for the aforementioned health conditions, his health status would quickly, irreparably and irreversibly decline.

j.    With respect to each of the documents listed in the Guidance, Garland Little possesses neither an original of such a document nor a copy of such a document certified by the original issuing agency, whether valid or expired, if applicable.  Furthermore, Garland Little cannot obtain either an original document nor a copy of such a document certified by the original issuing agency within forty-five (45) days, or within any reasonable period of time.

k.    Garland Little does not know two (2) individuals that have personal knowledge of his birth in the United States of America.

l.    Because Garland Little does not possess and/or cannot obtain any of the documents as stated above, and further because he does not know two (2) individuals that have personal knowledge of his birth, and further as a result of the Defendants' impending actions, Garland Little's Program eligibility will be terminated.

m.    As a result of the Defendants' impending actions, Garland Little's health status will quickly, irreparably and irreversibly decline.

8.    Darryl Lambert is a 69 year old United States Citizen, having been born on April 30, 1937 in North Carolina.

a.    Darryl Lambert does not know if he was born in a hospital or elsewhere.

b.    For the last 9 years, Darryl Lambert has resided at 2425 25th St. SE, Washington, D.C., 20020, in the Washington Nursing Facility, a skilled nursing facility.

c.    Darryl Lambert currently suffers from numerous health conditions, including, but not limited to, the following: stroke, aphasia, global dementia, and seizure

disorder.  To treat these conditions, it is medically necessary for Darryl Lambert to receive skilled nursing services in a residential, skilled nursing facility; medical supervision; and to routinely take several medications.

        d.    Darryl Lambert currently meets each of the eligibility requirements necessary to remain enrolled in the Program, as he is a United States citizen, his income level is at or below the level of the Program's eligibility requirements, and his resource levels are at or below the Program's eligibility requirements.

        e.    Darryl Lambert has been enrolled in the Program since at least 1996 and continues to be so enrolled.

        f.    Because Darryl Lambert is a current Program beneficiary, the Program reimburses the health care providers that provide the skilled nursing and other services necessary to treat Darryl Lambert's aforementioned health conditions, including, but not limited to, The Washington Nursing Facility.

        g.    Because of Darryl Lambert's income and resource levels, Darryl Lambert is unable to personally reimburse The Washington Nursing Facility and the other healthcare providers that provide him with skilled nursing services and other healthcare services.

        h.    Darryl Lambert will lose access to skilled nursing services and treatment for the aforementioned health conditions if the providers of those services are not reimbursed, and if discharged from The Washington Nursing Facility, he would be homeless.

        i.    If Darryl Lambert does not receive skilled nursing services, medical supervision and/or treatment for the aforementioned health conditions, his health status would quickly, irreparably and irreversibly decline.

16

j.     With respect to each of the documents listed in the Guidance, Darryl Lambert possesses neither an original of such a document nor a copy of such a document certified by the original issuing agency, whether valid or expired, if applicable.  Furthermore, Darryl Lambert cannot obtain either an original document nor a copy of such a document certified by the original issuing agency within forty-five (45) days, or within any reasonable period of time.

k.     Darryl Lambert does not know two (2) individuals that have personal knowledge of his birth in the United States of America.

l.     Because Darryl Lambert does not possess and/or cannot obtain any of the documents as stated above, and further because he does not know two (2) individuals that have personal knowledge of his birth, and further as a result of the Defendants' impending actions, Darryl Lambert's Program eligibility will be terminated.

m.     As a result of the Defendants' impending actions, Darryl Lambert's health status will quickly, irreparably and irreversibly decline.

9.     Jessie Robertson is a 78 year old United States Citizen, having been born on April 28, 1928.

a.     Jessie Robertson does not know if she was born in a hospital or elsewhere, and for that matter does not know where she was born.

b.     For the last 10 years, Jessie Robertson has resided at 2425 25th St. SE, Washington, D.C., 20020, in the Washington Nursing Facility, a skilled nursing facility.

c.     Jessie Robertson currently suffers from numerous health conditions, including, but not limited to, the following: vascular dementia, stroke, hemiparesis, hypertension, contractures, and is in a condition similar to a persistent vegetative state.  To treat these

conditions, it is medically necessary for Jessie Robertson to receive skilled nursing services in a residential, skilled nursing facility; medical supervision; and to routinely take several medications.

     d.    Jessie Robertson currently meets each of the eligibility requirements necessary to remain enrolled in the Program, as she is a United States citizen, her income level is at or below the level of the Program's eligibility requirements, and her resource levels are at or below the Program's eligibility requirements.

     e.    Jessie Robertson has been enrolled in the Program since at least 1996 and continues to be so enrolled.

     f.    Because Jessie Robertson is a current Program beneficiary, the Program reimburses the health care providers that provide the skilled nursing and other services necessary to treat Jessie Robertson's aforementioned health conditions, including, but not limited to, The Washington Nursing Facility.

     g.    Because of Jessie Robertson's income and resource levels, Jessie Robertson is unable to personally reimburse The Washington Nursing Facility and the other healthcare providers that provide her with skilled nursing services and other healthcare services.

     h.    Jessie Robertson will lose access to skilled nursing services and treatment for the aforementioned health conditions if the providers of those services are not reimbursed, and if discharged from The Washington Nursing Facility, she would be homeless.

     i.    If Jessie Robertson does not receive skilled nursing services, medical supervision and/or treatment for the aforementioned health conditions, her health status would quickly, irreparably and irreversibly decline and would likely die within days.

     j.    With respect to each of the documents listed in the Guidance, Jessie Robertson possesses neither an original of such a document nor a copy of such a document

certified by the original issuing agency, whether valid or expired, if applicable. Furthermore, Jessie Robertson cannot obtain either an original document nor a copy of such a document certified by the original issuing agency within forty-five (45) days, or within any reasonable period of time.

        k.      Jessie Robertson does not know two (2) individuals that have personal knowledge of her birth in the United States of America.

        l.      Because Jessie Robertson does not possess and/or cannot obtain any of the documents as stated above, and further because she does not know two (2) individuals that have personal knowledge of her birth, and further as a result of the Defendants' impending actions, Jessie Robertson's Program eligibility will be terminated.

        m.      As a result of the Defendants' impending actions, Jessie Robertson's health status will quickly, irreparably and irreversibly decline – and she would likely die within days.

        10.      Aaron Ashley is a 75 year old United States Citizen, having been born on January 23, 1931 in Maryland.

        a.      Aaron Ashley does not know if he was born in a hospital or elsewhere.

        b.      For the last 5 years, Aaron Ashley has resided at 2425 25th St. SE, Washington, D.C., 20020, in the Washington Nursing Facility, a skilled nursing facility.

        c.      Aaron Ashley currently suffers from numerous health conditions, including, but not limited to, the following: history of hypertenstion, schizophrenia, cardiac arrest, positive PPD (exposed to tuberculosis) and senile dementia. To treat these conditions, it is medically necessary for Aaron Ashley to receive skilled nursing services in a residential, skilled nursing facility; medical supervision; and to routinely take several medications.

      d.     Aaron Ashley currently meets each of the eligibility requirements necessary to remain enrolled in the Program, as he is a United States citizen, his income level is at or below the level of the Program's eligibility requirements, and his resource levels are at or below the Program's eligibility requirements.

      e.     Aaron Ashley has been enrolled in the Program since at least 2001 and continues to be so enrolled.

      f.     Because Aaron Ashley is a current Program beneficiary, the Program reimburses the health care providers that provide the skilled nursing and other services necessary to treat Aaron Ashley's aforementioned health conditions, including, but not limited to, The Washington Nursing Facility.

      g.     Because of Aaron Ashley's income and resource levels, Aaron Ashley is unable to personally reimburse The Washington Nursing Facility and the other healthcare providers that provide him with skilled nursing services and other healthcare services.

      h.     Aaron Ashley will lose access to skilled nursing services and treatment for the aforementioned health conditions if the providers of those services are not reimbursed, and if discharged from The Washington Nursing Facility, he would be homeless.

      i.     If Aaron Ashley does not receive skilled nursing services, medical supervision and/or treatment for the aforementioned health conditions, his health status would quickly, irreparably and irreversibly decline.

      j.     With respect to each of the documents listed in the Guidance, Aaron Ashley possesses neither an original of such a document nor a copy of such a document certified by the original issuing agency, whether valid or expired, if applicable.  Furthermore, Aaron

Ashley cannot obtain either an original document nor a copy of such a document certified by the original issuing agency within forty-five (45) days, or within any reasonable period of time.

        k.      Aaron Ashley does not know two (2) individuals that have personal knowledge of his birth in the United States of America.

        l.      Because Aaron Ashley does not possess and/or cannot obtain any of the documents as stated above, and further because he does not know two (2) individuals that have personal knowledge of his birth, and further as a result of the Defendants' impending actions, Aaron Ashley's Program eligibility will be terminated.

        m.      As a result of the Defendants' impending actions, Aaron Ashley's health status will quickly, irreparably and irreversibly decline.

11.      Wilbert Malloy is a 79 year old United States Citizen, having been born on April 12, 1927.

        a.      Wilbert Malloy does not know if he was born in a hospital or elsewhere, and for that matter does not know where he was born.

        b.      For the last 5 years, Wilbert Malloy has resided at 5000 Burrows Avenue NE, Washington, D.C., 20020, in the Grant Park Nursing Home, a skilled nursing facility.

        c.      Wilbert Malloy currently suffers from numerous health conditions, including, but not limited to, the following: alcoholic dementia, old-timers' dementia, anemia and diabetes.  To treat these conditions, it is medically necessary for Wilbert Malloy to receive skilled nursing services in a residential, skilled nursing facility; medical supervision; and to routinely take several medications.

        d.      Wilbert Malloy currently meets each of the eligibility requirements necessary to remain enrolled in the Program, as he is a United States citizen, his income level is

at or below the level of the Program's eligibility requirements, and his resource levels are at or below the Program's eligibility requirements.

      e.     Wilbert Malloy has been enrolled in the Program since at least 2001 and continues to be so enrolled.

      f.     Because Wilbert Malloy is a current Program beneficiary, the Program reimburses the health care providers that provide the skilled nursing and other services necessary to treat Wilbert Malloy's aforementioned health conditions, including, but not limited to, Grant Park Nursing Home.

      g.     Because of Wilbert Malloy's income and resource levels, Wilbert Malloy is unable to personally reimburse Grant Park Nursing Home and the other healthcare providers that provide him with skilled nursing services and other healthcare services.

      h.     Wilbert Malloy will lose access to skilled nursing services and treatment for the aforementioned health conditions if the providers of those services are not reimbursed, and if discharged from Grant Park Nursing Home, he would be homeless.

      i.     If Wilbert Malloy does not receive skilled nursing services, medical supervision and/or treatment for the aforementioned health conditions, his health status would quickly, irreparably and irreversibly decline.

      j.     With respect to each of the documents listed in the Guidance, Wilbert Malloy possesses neither an original of such a document nor a copy of such a document certified by the original issuing agency, whether valid or expired, if applicable.  Furthermore, Wilbert Malloy cannot obtain either an original document nor a copy of such a document certified by the original issuing agency within forty-five (45) days, or within any reasonable period of time.

k.      Wilbert Malloy does not know two (2) individuals that have personal knowledge of his birth in the United States of America.

l.      Because Wilbert Malloy does not possess and/or cannot obtain any of the documents as stated above, and further because he does not know two (2) individuals that have personal knowledge of his birth, and further as a result of the Defendants' impending actions, Wilbert Malloy's Program eligibility will be terminated.

m.      As a result of the Defendants' impending actions, Wilbert Malloy's health status will quickly, irreparably and irreversibly decline.

12.      Olivie Johnson is a 70 year old United States Citizen, having been born on or about April 16, 1936.

a.      Olivie Johnson does not know if she was born in a hospital or elsewhere, and for that matter does not know where she was born.

b.      For the last year, Olivie Johnson has resided at 2131 O St. NW, Washington, D.C., 20037, in the Rock Creek Manor, a skilled nursing facility.

c.      Olivie Johnson currently suffers from numerous health conditions, including, but not limited to, dementia, delusional disorder and schizophrenia. She is also legally blind. To treat these conditions, it is medically necessary for Olivie Johnson to receive skilled nursing services in a residential, skilled nursing facility; medical supervision; and to routinely take several medications.

d.      Olivie Johnson currently meets each of the eligibility requirements necessary to remain enrolled in the Program, as she is a United States citizen, her income level is at or below the level of the Program's eligibility requirements, and her resource levels are at or below the Program's eligibility requirements.

e.      Olivie Johnson has been enrolled in the Program since at least 2005 and continues to be so enrolled.

f.      Because Olivie Johnson is a current Program beneficiary, the Program reimburses the health care providers that provide the skilled nursing and other services necessary to treat Olivie Johnson's aforementioned health conditions, including, but not limited to, The Rock Creek Manor.

g.      Because of Olivie Johnson's income and resource levels, Olivie Johnson is unable to personally reimburse The Rock Creek Manor and the other healthcare providers that provide him with skilled nursing services and other healthcare services.

h.      Olivie Johnson will lose access to skilled nursing services and treatment for the aforementioned health conditions if the providers of those services are not reimbursed, and if discharged from The Rock Creek Manor, she would be homeless.

i.      If Olivie Johnson does not receive skilled nursing services, medical supervision and/or treatment for the aforementioned health conditions, her health status would quickly, irreparably and irreversibly decline.

j.      With respect to each of the documents listed in the Guidance, Olivie Johnson possesses neither an original of such a document nor a copy of such a document certified by the original issuing agency, whether valid or expired, if applicable.  Furthermore, Olivie Johnson cannot obtain either an original document nor a copy of such a document certified by the original issuing agency within forty-five (45) days, or within any reasonable period of time.

k.      Olivie Johnson does not know two (2) individuals that have personal knowledge of her birth in the United States of America.

l.      Because Olivie Johnson does not possess and/or cannot obtain any of the documents as stated above, and further because she does not know two (2) individuals that have personal knowledge of her birth, and further as a result of the Defendants' impending actions, Olivie Johnson's Program eligibility will be terminated.

m.      As a result of the Defendants' impending actions, Olivie Johnson's health status will quickly, irreparably and irreversibly decline

13.      Bread for the City ("Bread"), founded in 1974, is a District of Columbia non-profit corporation organized and operated as a charitable organization and located in both Northwest D.C. and Southeast D.C., specifically at 1525 and 1537 Seventh Street, NW, Washington D.C., 20001 and 1640 Good Hope Road, SE, Washington D.C., 20020, which are each primary places of business for Bread.

a.      Bread's mission statement is "to provide vulnerable residents of Washington, D.C., with comprehensive services, including food, clothing, medical care, and legal and social services, in an atmosphere of dignity and respect.  We recognize that all people share a common humanity, and that all are responsible to themselves and to society as a whole. Therefore, we promote the mutual collaboration of clients, volunteers, donors, staff, and other community partners to alleviate the suffering caused by poverty and to rectify the conditions that perpetuate it."

b.      As a community medical clinic, Bread provides professional medical services and other medical services on an outpatient basis – free of charge – to residents of the District of Columbia that suffer from a variety of physical and mental health conditions.

c.      Although Bread provides its services free of charge to patients, Bread receives some Medicaid compensation and Bread's patients enrolled in the Program depend on

their Medicaid benefits to afford them access to health care services that Bread is unable to provide, such as mammograms and other specialty services.

        d.      Bread's medical staff, including employed physician staff provide medical services directly to Bread's patients on a daily basis, and have established close relationships with their patients, including but not limited to the physician-patient relationship.  For the vast majority of Bread's patients, Bread's physician and health care practitioners are the patients' primary care practitioners and/or only medical service providers.

        e.      Many of Bread's patients are hindered from pursuing and protecting their own legal interests, whether as a result of physical and/or mental incapacity; lack of information or education; cost; and/or other social obstacles.

        f.      As part of the satisfaction of its mission, Bread also provides legal and social services to vulnerable D.C. residents, including, but not limited to, assisting D.C. residents apply for Program benefits, and has specifically assisted some D.C. residents locate and/or attempt to locate identification documents such as birth certificates, identification cards, school records, veterans' records, prison records, medical records, immigration records and childrens' records.  Many Bread patients depend on Bread to assist them in resolving issues of Program eligibility and enrollment requirements.

        g.      Many of Bread's patients will encounter great difficulty or will be utterly incapable of producing or locating the documentation contemplated by the Guidance, and thus will be incapable of enrolling or remaining enrolled in the Program on or after July 1, 2006.

        h.      Approximately ten percent (10%) of the patients to which Bread provides medical and other services are enrolled in the Program, and additional patients to which Bread provides medical and other services are eligible to enroll, but are not yet enrolled, in the

Program.  Of the medical services that Bread is compensated for providing to patients, approximately fifteen percent (15%) of such compensation is paid by the Program.

       i.      If Bread's patients that are Program enrollees were to lose their Medicaid benefits, the Program would, as of the date that such enrollees lose such benefits, no longer reimburse Bread (or for that matter any other health care provider) for the professional and other medical services that Bread (and the other providers) provide to such patients.  Because of their income and resource levels, such patients would be unable to personally reimburse Bread for the services that Bread provides, or reimburse other health care providers for the services that they provide.

       j.      If the Program would no longer reimburse Bread for the professional and other medical services that it provides to Program-eligible patients, Bread would continue to strive to provide medical and other services, free of charge, to Program enrollees.  However, other health care providers, including, but not limited to, specialty health care providers, would no longer provide such services to such patients.

       k.      If Bread were to suffer financial loss as a result of its patients losing Program eligibility, Bread would be required to reduce the amount of medical and other services that it renders to Program enrollees and/or all District residents.  Moreover, the quality of the medical and other services that Bread renders to Program enrollees and other District residents would be negatively impacted; for example, the provision of holistic and preventative primary care services would be negatively impacted by patients' lack of access to specialty services.

       l.      If health care providers other than Bread would no longer provide medical services that Bread is unable to provide to its patients, Bread would be unable to

successfully refer its patients to other providers for the medically necessary care that they need, and would be unable to assure that its patients receive appropriate and medically necessary care.

     m.    Bread's ability to fulfill its mission would be frustrated if:

       i.    Bread were to suffer financial loss as a result of its patients losing Program eligibility;

      ii.    Bread were required to reduce the amount of medical and other services that it renders to Program enrollees and other Program residents;

    iii.    The amount or quality of any of the services that Bread renders to Program enrollees and other District residents is reduced as a result of having to expend greater amounts of time, effort and expense in locating identification documents for Bread's patients;

    iv.    The quality of the medical and other services that Bread renders to Program enrollees and other District residents would be negatively impacted;

     v.    Bread is unable to assure that its patients receive medically necessary care; and/or

    vi.    Bread will be unable to assist the resolution of its patients' Program Medicaid enrollment and reenrollment issues.

14.    The District of Columbia Department of Human Services ("DHS") is the agency responsible for administering certain social services programs, including, but not limited to, the Program, and, through Defendant Income Maintenance Administration ("IMA"), determining the eligibility of Program applicants and, upon recertification, enrollees.

15.    Defendant Kate Jesberg is the Interim Director of DHS.

16.    Defendant Sharon Cooper-DeLoatch is the Acting Administrator, IMA.

17.    With respect to all relevant actions, each of the Defendants is and will be acting under color of law.  Because this action involves questions arising under the Constitution of the United States and federal law, jurisdiction in this court is proper pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343.

## FACTUAL BACKGROUND

### MEDICAID

18.    Medicaid is a medical assistance program for the indigent, supported jointly by state and federal funds.  Medicaid provides coverage for a wide range of essential medical services, including inpatient and outpatient hospital care, physicians' services, home health services, nursing home care and prescription drug coverage.  The District of Columbia is not required to participate in the Medicaid program, but if it does choose to participate, it receives federal funding only insofar as it complies with the requirements of the federal Social Security Act Medicaid provisions and its implementing regulations. Federal Medicaid funding is expressly provided to the States and the District of Columbia for United States citizens and aliens with certain types of legal immigration status.  Federal regulations require the District and the states to provide Medicaid to qualifying United States citizens.  42 C.F.R. §435.406(a).

19.    The District's state Medicaid plan specifically makes Medicaid coverage available to citizens who meet certain financial or other applicable eligibility criteria.  Each of the individual Plaintiffs meets all relevant criteria and is, in fact, a citizen of the United States.  (For purposes of the remainder of this brief, references to "individual Plaintiffs" are meant to refer to Ms. Orchard, Mr. DeShields, Ms. Matthews and the aforementioned individuals for whom Ms. Sloan is a legal guardian.)

20.      Medicaid benefits are essential to the health and well-being of the individual

Plaintiffs and the Medicaid covered patients of Bread.  These persons rely on Medicaid to pay

for medical care and treatment, including long-term care, nursing home coverage, doctors' visits,

life-saving medications, and surgical procedures.  Without Medicaid, the individual Plaintiffs and

patients of Bread will be unable to afford necessary treatments and services.  Even a brief

interruption of these health services could be extremely deleterious to the Individual Plaintiffs

and patients of Bread.

**THE DEFICIT REDUCTION ACT AND CMS GUIDANCE**

21.      The Deficit Reduction Act of 2005 (the "DRA"), Pub. L. No. 109-171, § 10001,

120 Stat. 4, 183, was purportedly signed into law by President George W. Bush on February 8,

2006 and becomes effective July 1, 2006.  The DRA hastily and famously passed the House and

Senate in different forms, and thus was arguably not passed into law at all – and is subject to

challenge on that basis in other lawsuits.  For purposes of Plaintiffs' affirmative case, Plaintiffs

presently assume that the DRA is valid and can be implemented in a manner consistent with the

Constitution.

22.      Section 6036 of the DRA amends the Medicaid laws to condition federal funding

of state Medicaid programs, including the District's, on the imposition of citizenship

documentation requirements for the more than 50 million U.S. citizens who are currently

covered by Medicaid, as well as for the citizens who will need the program's health and long-

term care services in the future.

23.      Specifically, Section 6036 of the DRA requires that States and the District of

Columbia verify an applicant's citizenship through a number of possible identification sources,

such as passports, birth certificates and supporting identification documentation, or such other

30

documents as the Secretary of the United States Department of Health & Human Services ("HHS") shall specify, that provide proof and a reliable means of documentation of citizenship. Federal Medicaid dollars will not be provided for individuals who cannot provide the required documentation.

24.     Prior to the DRA, most States – and the District of Columbia – allowed citizens to self-attest to their citizenship under penalty of perjury.  Some States request further proof of citizenship if there is cause to question an applicant's citizenship status.  Given the penalties for perjury and fraud arising from a false attestation, the self-attestation approach has historically provided an effective means of ensuring that only citizens (or eligible aliens) obtain Medicaid.  A few States have required additional documentation of citizenship status.  None of them has imposed documentation requirements as severe as those provided for under the DRA, as it would be implemented in accordance with the "Guidance" issued on June 9, 2006, described below.  None imposes any absolute limitation on the types of documentation that can be produced to establish citizenship.

25.     On June 9, the Centers for Medicare and Medicaid Services ("CMS"), a division of HHS responsible for administering Medicare, Medicaid and State Children's Health Insurance, issued guidance to the States and the District of Columbia on compliance with the DRA and on its current intentions for upcoming rulemaking to implement the DRA (the "Guidance").  The Guidance does not have force of law.  Regulations, which may or may not match the Guidance, have not yet been issued as of the filing of this action, just days prior to the States' and the District's July 1, 2006 effective date for implementing the DRA.

26.     Nonetheless, on information and belief, the District has made it clear that beginning on July 1, 2006, it will impose requirements upon new applicants for Medicaid, and upon those already receiving Medicaid, consistent with the Guidance.

27.     The Guidance sets forth certain documents that can be used to document citizenship.  More important, pursuant to the Guidance, if citizens cannot produce the specific documents specified in the Guidance, even if the inability to produce such documents is for good cause, no "safety net" is provided to permit citizens to otherwise document their citizenship by other means, including such means and methods as are customarily used to prove facts in courts or in business settings.  Thus, citizens who cannot meet the documentation requirements of the Guidance are deemed to be *non*-citizens for purposes of the Program by reason of a failure of documentation.  This is true even though they are citizens in fact, and could demonstrate as much by reasonable means according to ordinary and customary methods for proving facts.  They will be deemed non-citizens even if there is no evidence, or even basis for suspicion, that they are not, in fact, citizens.  The Guidance advises States to "assist" those citizens who are homeless, have amnesia, are mentally impaired or physically incapacitated, and lack anyone to act for them, but provides no explanation of how the States should assist such citizens nor any exception or relaxation from the strict documentation requirements.

28.     The Guidance does not allow exceptions for patients in comas, those with dementia, those physically unable to travel, foster children in the neglect system who were abused or abandoned by their parents or others for whom the required documentation is not available, but whose citizenship could be reliably be established, were it permitted, by other evidence.

29.     Under certain rare instances, the Guidance would permit submittal of two affidavits to prove citizenship.  However, the affidavits must be from persons (a) both of whom have personal knowledge of the applicant's birth circumstances so as to confirm the applicant's citizenship; (b) one of whom is not a relative of the applicant/recipient;  and (c) both of whom can themselves provide proof of their citizenship and identity in accordance with the Guidance.

30.     A sworn affidavit from both parents or numerous relatives and a sworn affidavit from the applicant/recipient, accompanied by birth records in a family bible, baptismal records, marriage licenses, and a driver's license for the applicant/recipient, are conclusively insufficient, in the absence of the other documentation required in the guidance, even in the absence of <u>any</u> indicia that the individual is not a citizen.

### DISTRICT OF COLUMBIA IMPLEMENTATION OF THE DOCUMENTATION REQUIREMENTS

31.     On information and belief, Defendants intend to implement new citizenship documentation requirements, effective July 1, 2006, by strictly following the Guidance.  In contrast, the State of Ohio has announced it will delay implementation of new documentation requirements for three months in order to plan for their implementation.  *Ohio Delays Enforcement of Citizenship Rule; Says More Time Needed to Issue Guidelines*, Health Law Daily, (Bureau of National Affairs June 23, 2006).

### THE IMPACT OF THE DISTRICT'S IMPOSITION OF THE NEW DOCUMENTATION REQUIREMENTS

32.     Defendants' new citizenship documentation requirements will result in loss of essential Medicaid benefits for the individual Plaintiffs and patients of Plaintiff Bread for the City.  Based on a recent study, on a nationwide basis, the new requirements would put at risk the ability of as many as 3.2 to 4.6 million U.S. born citizens now receiving Medicaid to continue

receiving Medicaid benefits.  ("Survey Indicates the [DRA] Jeopardizes Medicaid Coverage for 3 to 5 Million U.S. Citizens," Centers on Budget and Policy Priorities (Feb. 17, 2006) (http://www.cbpp.,org)).

33.    For some citizens, including each of the individual Plaintiffs, the requirements as described in the Guidance, simply cannot be met.  For others, the new requirements, as described in the Guidance, impose insuperable practical obstacles.  As a result, the individual Plaintiffs and other District residents/United States citizens most in need of health services will lose their Medicaid coverage, or be denied it, and lose access to health care critical to their health and even their survival.  The new documentation requirements will have a particularly harsh impact on foster children, nursing home residents, group home residents with mental retardation, the mentally ill, and the homeless.

34.    The new documentation requirements will also have a disproportionate impact on poor, African-American citizens, and others who by reasons of poverty, background and difficult living conditions simply do not have, and do not have access to, formal documents of the kind contemplated by the Guidance.  For various reasons, including racial discrimination and persistent poverty, many African-American women, especially those in the rural South, did not deliver their children in hospitals.  This, in turn, meant that issuance of birth certificates in the first half of the 20th century was spotty for many minority American citizens.  One study estimates that roughly one in five African Americans born during the period of 1939-1940 lacks a birth certificate because of poor access to hospital delivery services due to racial discrimination or poverty.  ("Population Studies," Population Investigation Committee's Report, Vol. IV, No. 1, p. 99 (June 1950)).

35.    The Guidance acknowledges that some individuals are in coma, have amnesia, are physically or mentally incapacitated, or are homeless and may have difficulty satisfying the documentation requirements.  Such problems are endemic for thousands of residents of the District with limited cognitive ability or physical impairment that limit their communications, many of whom have few, if any, involved family members.  The Guidance's exhortation for States to "assist" such clients, without providing any relaxation of the documentation requirements, is thus unhelpful.

36.    Where a mentally or physically impaired citizen, for example, lacks the proper documentation and cannot recall or communicate the date or location of his or her birth, if he or she has outlived parents or older siblings or other relatives, or such relatives and a non-relative are not available to validate the circumstances of birth, the citizen will be unable to demonstrate his or her citizenship status via affidavits and will lose Medicaid benefits or be denied benefits. Since one of the affiants must be a non-relative, moreover, recipients/applicants without a non-relative who can swear to personal knowledge of the applicant/recipient's birth circumstances will be unable to escape the extrinsic documentation requirements.

37.    There are thousands of Medicaid recipients in the District who are at least 86 years old.  Few of them have birth certificates on file.  Unless these citizens are able to produce a passport, or birth certificate and other documentation, or the limited alternative documentation permitted, they will not be recertified for Program benefits.

38.    Although the DRA requires the HHS to undertake an outreach program to educate beneficiaries about the new citizenship documentation requirement and what they need to do to comply, upon information and belief, CMS has yet to even start this outreach program.

35

39.     Each of the individual Plaintiffs is unable to provide the relevant documentation.  Each is a citizen and could so demonstrate according to means and methods long established for the proof of such facts in similar circumstances.

40.     Plaintiff Orchard is 92 years old and suffers from dementia, hypertension, depression and psychosis, has little cognitive or communicative ability, and is not fully able to communicate with her caregivers.  It would be utterly impossible for Ms. Orchard to procure any of the Guidance's documents, whether within 45 days or not.

41.     Plaintiff DeShields is 91 years old and of extremely limited mobility, suffers from multiple heart problems and prostate cancer.  Mr. DeShields' previous attempt to procure a birth certificate failed when he discovered that the Spartanburg, South Carolina government office which would have stored it was destroyed in a fire.  Nonetheless, by providing old pictures of his childhood, Mr. DeShields once successfully procured a U.S. Passport, which has since been lost.  Even if Mr. DeShields' physical condition would permit him to navigate state and local bureaucracies, Mr. DeShields could not reinstate that passport or procure a new one within the required 45 day time period, as he could not, for example, present himself to the nearest Passport agency or afford to pay a $157 fee.

42.     Plaintiff Matthews is 84 years old and suffers from dementia, cardiovascular disease, congestive heart failure, coronary artery disease, diabetes and hypertension.  She is not able to make all decisions on her own behalf, and her communicative ability is diminished.  It would be nearly impossible for Ms. Matthews to procure any of the Guidance's documents, whether within 45 days or not.

43.     Frederick Reeves is 69 years old, institutionalized, and suffers from dementia, impaired verbal communication ability, impaired cognition, history of stroke, diabetes, prior

head trauma and impaired vision. He is unable to provide the information or assistance necessary to enable Plaintiff Andrea Sloan, his guardian, to obtain the Guidance's documents. Plaintiff Sloan has no practical means of obtaining the required documents for Frederick Reeves.

44.    Mildred Clayborne is 74 years old, institutionalized and suffers from hypertension, schizophrenia, cataracts and diabetes. She is unable to provide the information or assistance necessary to enable Plaintiff Andrea Sloan, her guardian, to obtain the Guidance's documents. Plaintiff Sloan has no practical means of obtaining the required documents for Mildred Clayborne.

45.    Garland Little is 70 years old, institutionalized and suffers from stroke, hypertension, and aphasia (inability to communicate). He is unable to provide the information or assistance necessary to enable Plaintiff Andrea Sloan, his guardian, to obtain the Guidance's documents. Plaintiff Sloan has no practical means of obtaining the required documents for Garland Little.

46.    Darryl Lambert is 69 years old, institutionalized and suffers from stroke, aphasia, global dementia and seizure disorder. He is unable to provide the information or assistance necessary to enable Plaintiff Andrea Sloan, his guardian, to obtain the Guidance's documents. Plaintiff Sloan has no practical means of obtaining the required documents for Darryl Lambert.

47.    Jessie Robertson is 78 years old, institutionalized, suffers from vascular dementia, stroke, hemiparesis, hypertension, contractures, and is in a condition similar to a persistent vegetative state. She is unable to provide the information or assistance necessary to enable

Plaintiff Andrea Sloan, her guardian, to obtain the Guidance's documents.  Plaintiff Sloan has no practical means of obtaining the required documents for Jessie Robertson.

48.     Aaron Ashley is 75 years old, institutionalized, and suffers from hypertension, schizophrenia, and senile dementia.  He is unable to provide the information or assistance necessary to enable Plaintiff Andrea Sloan, his guardian, to obtain the Guidance's documents. Plaintiff Sloan has no practical means of obtaining the required documents for Aaron Ashley.

49.     Wilbert Malloy is 79 years old, institutionalized, and suffers from alcoholic dementia, old-timers' dementia, anemia and diabetes.  He is unable to provide the information or assistance necessary to enable Plaintiff Andrea Sloan, his guardian, to obtain the Guidance's documents.  Plaintiff Sloan has no practical means of obtaining the required documents for Wilbert Malloy.

50.     Olivie Johnson is 70 years old, institutionalized and summers from dementia, delusional disorder, schizophrenia and blindness.  She is unable to provide the information or assistance necessary to enable Plaintiff Andrea Sloan, her guardian, to obtain the Guidance's documents. Plaintiff Sloan has no practical means of obtaining the required documents for Olivie Johnson.

51.     In addition to imposing an insurmountable burden on the individual Plaintiffs and all other Medicaid recipients and applicants, these citizenship documentation requirements impose substantial administrative burdens on the Defendants, already burdened by the weight of administrative requirements under Medicaid.  The burden of implementing these new citizenship documentation requirements is likely to add to and compound existing difficulties in  processing Medicaid eligibility determinations, causing further improper denials of benefits both directly and indirectly in connection with citizenship requirements.  The Defendants

themselves have substantial interest in not imposing documentation requirements beyond those necessary – and constitutional – under federal law.

**IRREPARABLE INJURY TO PLAINTIFFS**

52.    The new documentation requirements will make it harder for our most vulnerable citizens to get healthcare.  These individuals are the precise people that Medicaid was created to protect.

53.    The individual Plaintiffs and other individuals who are patients of Bread are U.S. citizens and D.C. residents that currently receive Program benefits.

54.    The individual Plaintiffs and other individual citizens who are patients of Bread are unable to comply with the proposed Medicaid citizenship and identification documentation requirements.

55.    If the District of Columbia enforces the new requirements, the individual Plaintiffs and patients of Bread risk loss of their Program benefits.

56.    Other individual citizens who are patients of Broad will be seeking to apply for Program benefits.  If the District of Columbia enforces the new requirements, such individuals will not be able to obtain Program benefits.

57.    Without Program benefits, the individual Plaintiffs and patients of Bread risk loss of critically necessary medical care.

58.    If Defendants enforce the new requirements, Bread will lose Medicaid funding for many of the patients it treats and will be hindered in its ability to fulfill its charitable mission of providing or assuring the provision of health care and other services to District residents in need.

## THE PUBLIC INTEREST AND ABSENCE OF HARM TO DEFENDANTS

59.     The public interest lies in ensuring that the requirements of the Constitution are met.

60.     The public interest will be served by granting the injunctive relief sought by Plaintiffs because it will prevent imminent risk to the health of the individual Plaintiffs and patients of Bread.

61.     Moreover, these burdensome documentation requirements will severely  burden Defendants in their ability to provide effective Medicaid administration.  The Defendants have an interest in not adding improperly to that administrative burden because of the impact that such improper requirements will have on their ability to perform other administrative duties.  Thus, the imposition of these improper documentation requirements may have an effect on the rights and interests of third-parties, applicants and recipients of Medicaid, beyond the documentation requirements themselves, because it may affect the ability of Defendants to efficiently fulfill other duties.  Moreover, Defendants and the public have an interest in ensuring that any documentation requirements that Defendants do impose be proper so that Defendants will not have to correct errors caused by the imposition of improper requirements.

62.     Defendants will not be harmed by an injunction.  As explained above, Defendants will actually be relieved of onerous and costly burdens by an appropriate delay of implementation designed to ensure that any implementation of the documentation requirements is lawful and appropriate.  Moreover, there is no substantial evidence that material numbers of non-U.S. citizens are obtaining Medicaid benefits in the District by falsely claiming citizenship and no evidence whatsoever that this is true of the individual Plaintiffs.

**FEDERAL LAW PROVIDES NO JUSTIFICATION FOR THE DEFENDANTS' ACTIONS**

**63.**    To the extent that the Defendants were to claim that their actions are being driven by the DRA and the Guidance, the DRA and the Guidance do not provide legal justification.  Citizenship through birth is conferred by the Constitution and it is beyond the power of the Executive Branch of the National Government to create additional requirements for citizenship, or authorize the States or the District to impair federal citizenship conferred by the Constitution, or to impose unreasonable restrictions on the Plaintiffs' ability demonstrate their citizenship for purposes of securing Medicaid benefits.  Moreover, the DRA itself, while requiring documentation of citizenship, does not itself impose or require the onerous and insurmountable requirements that the Guidance sets forth and that the District intends to implement

**Count 1 – Violation of the District of Columbia Medicaid Law**

64.    Plaintiffs incorporate the preceding paragraphs of this Complaint herein by reference.

65.    D.C. Ann. § 4-204.05 provides that the District's "state Medicaid plan" shall provide "full Medicaid benefits" to all persons in specified eligibility categories that meet the other applicable eligibility requirements.  One such eligibility category under the District's state Medicaid plan is citizens.  Federal regulations require the District to provide Medicaid benefits to otherwise eligible individuals who are citizens.  42 C.F.R. § 435.406(a).

66.    The individual Plaintiffs and many patients of Bread are citizens of the United States and are eligible for and receive Medicaid benefits in the District of Columbia.

67.    Imposition by the Defendants of the new citizenship documentation requirements contemplated by the Guidance would deprive the individual Plaintiffs and patients

of Bread of Medicaid benefits to which they are entitled under District of Columbia law as citizens who meet the applicable eligibility requirements for Medicaid benefits.

## Count 2 – 42 U.S.C. § 1983

68.    Plaintiffs incorporate the preceding paragraphs of this Complaint herein by reference.

69.    By statute, 42 U.S.C. § 1983, the District of Columbia and Defendants are fully subject to the Fourteenth Amendment.

70.    All of the Defendants are acting under color of law with respect to the imposition of the new citizenship documentation requirements at issue here.

71.    Defendants are thus required to conform their actions to the Citizenship Clause of the Fourteenth Amendment, the privileges and immunities clause of that Amendment, the equal protection clause of that Amendment, and the due process clause of that Amendment (and the Fifth Amendment).  As set forth above and below, each of these provisions is violated by the Defendants' implementation of the documentation of citizenship requirements at issue here.

## Count III – Unlawful Burden On Citizenship Status

72.    Plaintiffs incorporate the preceding paragraphs of this Complaint herein by reference.

73.    The Fourteenth Amendment, of its own force, bestows citizenship on anyone born within the United States.  Natural-born citizens do not need to apply for or seek citizenship.  They are citizens by direct operation of the Constitution.  It is beyond the power of any State, the District of Columbia, or the federal government, to impose any different or additional requirements for citizenship.

74.    Citizenship by birth is a constitutional fact which may be demonstrated by such forms of evidence as is appropriate for the proof of any other fact.

75.    The new documentation requirements that Defendants have threatened to impose would unreasonably limit the manner of proof of citizenship in a manner that would deny a right or benefit of citizenship conferred by statute – the right of citizens to obtain Medicaid as created by federal statute and District of Columbia law – by deeming certain citizens to be non-citizens for purposes of Medicaid by reason of the fact that they cannot produce certain specified forms of documentation, while denying them the ability to prove it by other means.

76.    Defendants' imposition of the new citizenship documentation requirements effectively creates irrebuttable and conclusive presumptions against a determination of citizenship for individual Plaintiffs or patients of Bread who are unable, through no fault of their own, to meet the specified inflexible documentation requirements, but who could, through other documentation and evidence, establish their citizenship status.

## Count IV – Privileges And Immunities Clause

77.    Plaintiffs incorporate the preceding paragraphs of this Complaint herein by reference.

78.    The privileges and immunities clause of the Fourteenth Amendment prohibits a State (or the District of Columbia) from denying any citizen of the United States any privilege or immunity bestowed by that citizenship. Among those benefits of citizenship as prescribed by statute is the right and ability of any citizen, otherwise eligible, to obtain Medicaid benefits.

79.    The new documentation requirements that the Defendants threaten to implement deny individual Plaintiffs and patients of Bread the privileges or immunities of a citizen of the

United States by treating persons that are citizens as if they were not citizens and failing to

provide them with appropriate means to demonstrate their citizenship.

### Count V – Equal Protection Under The
### Fourteenth and Fifth Amendment  (Strict Scrutiny)

80.    Plaintiffs incorporate the preceding paragraphs of this Complaint herein by

reference.

81.    The documentation requirements that the District of Columbia threatens to

impose create improper classifications between those citizens who are possessed of certain

documents, or who can obtain them, and those who cannot.

82.    Because these requirements directly affect a fundamental right or interest – the

interest in citizenship possessed by those born in the United States – the classification created by

the documentation requirements cannot be justified except as a narrowly tailored classification

designed to meet a compelling government interest.

83.    Defendants lack a compelling government interest in these classifications.

Defendants have no legitimate government interest in denying Medicaid to otherwise eligible

citizens.  Any interest in weeding out non-citizens from the Medicaid program can be satisfied

by appropriate documentation requirements that do not arbitrarily limit the types of proofs that

may be submitted establishing or attesting to citizenship.  Moreover, such documentation

requirements and attestation, subject to criminal penalties for falsely certifying one's citizenship,

is an effective means of weeding out non-citizens from Medicaid.

84.    Because there is no proper justification for these documentation requirements,

and they are not narrowly tailored, they fail the test of equal protection of the laws.

## Count VI - Due Process Under The
## Fourteenth and Fifth Amendments

85.     Plaintiffs incorporate the preceding paragraphs of this Complaint herein by reference.

86.     The right to acknowledgment of one's citizenship and to the rights afforded a citizen – a special status under the Constitution – is itself a protected liberty interest under the due process clause that has historically been protected where it provides access to any form of benefit.  Moreover, to the extent individual Plaintiffs and patients of Bread are currently receiving Medicaid, they have a property interest in their continued benefits which may not be denied without due process of law.

87.     The Defendants' imposition of the new documentation requirements will arbitrarily deny individual Plaintiffs and patients of Bread their rights as citizens, and strip them of property and liberty, without due process of law.

88.     The limitations on documentation reflected in Defendants' new citizenship documentation requirements will arbitrarily and unnecessarily deprive citizens of well-established means of demonstrating citizenship, without any countervailing interest of the Defendants in doing so.  The arbitrary limitations on the sources of available proof will result in improperly deeming citizens of the United States to be non-citizens, and thus deprive them of Medicaid benefits.  A citizen must have the ability to demonstrate citizenship through all ordinary and – indeed, given the importance of the right – extraordinary means.  This is especially so given the severe consequences and harm to individual Plaintiffs and affected patients of Bread from loss of Medicaid benefits.  Defendants have no countervailing interest in denying Medicaid applicants and recipients the ability to document their citizenship by all available means.

45

89.     Thus, the new documentation requirements will deprive the individual Plaintiffs and affected patients of Bread of due process of law.

## Count VII – Violation Of Due Process And Equal Protection
## (As Irrational Under Whatever Level Of Scrutiny)

90.     Plaintiffs incorporate the preceding paragraphs of this Complaint herein by reference.

91.     Whether or not it is acknowledged that the new documentation requirements impair a fundamental right or interest, the limitations on the manner of proof  that  Defendants intend to accept as proof of citizenship are arbitrary, artificial and unduly restrictive. Defendants have no legitimate interest in denying any citizen, otherwise eligible, Medicaid benefits.  They have no interest, therefore, in arbitrarily limiting the forms of proof that may be tendered, or at least in limiting them to the extent and in the manner at issue here, to demonstrate citizenship where the effect will be to deem citizens to be non-citizens and deny Medicaid benefits to vulnerable individuals, including the individual Plaintiffs, with respect to whom there is no basis for even a suspicion that they are not citizens.

92.     Therefore, the new documentation requirements are arbitrary, capricious and irrational, and thus in violation of the requirements of equal protection and due process.

WHEREFORE, Plaintiffs pray for:

(A)     A temporary restraining order enjoining the implementation of the new documentation requirements;

(B)     A preliminary and a permanent injunction barring implementation of the new documentation requirements;

(C)     A declaration that implementation of the new documentation requirements would be unlawful for the reasons set forth herein;

(D)    Such other relief, including attorneys fees pursuant to 42 U.S.C. §1988, as may be just and proper.

Respectfully submitted,


_/s/ Barry Parsons_____

CROWELL & MORING LLP
Arthur N. Lerner (D. C. Bar # 311449)
Clifton S. Elgarten (D.C. Bar # 366898)
Barry M. Parsons (D. C. Bar # 454788)
Michael W. Paddock (D. C. Bar # 496254)
Portia R. Brown (D. C. Bar # 482494)
Michael J. Goecke (D. C. Bar # 485999)
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2595
(202) 624-2500

*Attorneys for Plaintiffs*

Dated:  June 29, 2006