**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **BREAD FOR THE CITY,** *et al.,* ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | |
| ) | **Civil Action No.** |
| **KATE JESBERG, Interim Director, District of** ) | |
| **Columbia Department of Human Services** *et al.,* ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## APPLICATION FOR TEMPORARY RESTRAINING ORDER

Pursuant to Federal Rule of Civil Procedure 65(b) and Local Rule 65.1, Plaintiffs Bread

for the City, *et al.*, hereby apply for a Temporary Restraining Order to maintain the status quo

for 10 days, enjoining Defendants Kate Jesberg, *et al.*, from implementing new citizenship

documentation requirements for Medicaid applicants and beneficiaries in recertification,

including any documentation requirements based on the June 9, 2006, Guidance issued by the

United States Department of Health & Human Services' Centers for Medicare & Medicaid

Services.

Plaintiffs represent, by and through their counsel, that in the days prior to this filing,

they provided notice of their intention to file to the Defendants and spoke about the intention

to file to the Deputy Attorney General, Civil Litigation Division, for the District of Columbia.

Before filing the Complaint, this Application for Temporary Restraining Order, and associated

papers, Plaintiffs sent copies of all papers by "PDF" to the Civil Litigation Division, Office of

the Attorney General for the District of Columbia and initiated hand service of all papers filed

in the action to date upon each of the Defendants.

In support of this Application, the Court is referred to the attached memorandum and points and authorities, declarations and exhibits.  A proposed order is also attached.  Plaintiffs request a hearing on this Application on an expedited basis.

Respectfully submitted,

/s/Barry Parsons
CROWELL & MORING LLP
Arthur N. Lerner (D. C. Bar # 311449)
Clifton S. Elgarten (D.C. Bar # 366898)
Barry M. Parsons (D. C. Bar # 454788)
Michael W. Paddock (D. C. Bar # 496254)
Portia R. Brown (D. C. Bar # 482494)
Michael J. Goecke (D. C. Bar # 485999)
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2595
Phone:  (202) 624-2500
Fax:  (202) 628-5116

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of June 2006, I caused a copy of the foregoing

Plaintiffs' Application for a Temporary Restraining Order and accompanying Proposed Order

and Memorandum of Points and Authorities in Support, to be served by hand delivery upon:

George Valentine, Esq.
Deputy Attorney General
Civil Litigation Division
District of Columbia Office of Attorney General
1350 Pennsylvania Avenue NW, Suite 409
Washington, D.C.  20004
george.valentine@dc.gov

Richard Love, Esq.
Civil Litigation Division
District of Columbia Office of Attorney General
1350 Pennsylvania Avenue NW, Suite 409
Washington, D.C.  20004
richard.love@dc.gov

*Counsel for Defendants*

　　　　　　　　　　　　　　　 /s/ Barry Parsons

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BREAD FOR THE CITY, *et al.*,        )
                                     )
            Plaintiffs,              )
                                     )
    v.                               )        Civil Action No.
                                     )
KATE JESBERG, Interim Director, District of )
Columbia Department of Human Services *et al.*, )
                                     )
            Defendants.              )

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF THEIR MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION

CROWELL & MORING LLP
Arthur N. Lerner (D. C. Bar # 311449)
Clifton S. Elgarten (D.C. Bar # 366898)
Barry M. Parsons (D. C. Bar # 454788)
Michael Paddock (D. C. Bar # 496254)
Portia R. Brown (D. C. Bar # 482494)
Michael J. Goecke (D. C. Bar # 485999)
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2595
(202) 624-2500

*Attorneys for Plaintiffs*

TABLE OF CONTENTS

INTRODUCTION………………………………………………………………………………1

I.  STATUTORY, REGULATORY, AND FACTUAL STATEMENT.......................................7

    A.  Medicaid and the Eligibility of Citizens ................................................7

        1.  The Medicaid Program ........................................................7
        2.  Eligibility Requirements.......................................................8

    B.  Section 6036 of the Deficit Reduction Act .................................... 10

    C.  CMS Guidance .......................................................................... 12

    D.  The District's Medicaid Program ............................................... 14

II. MANY CITIZEN/MEDICAID RECIPIENTS OR
    APPLICANTS CANNOT SATISFY THESE REQUIREMENTS ................................. 15

III. PLAINTIFFS ARE ENTITLED TO A TEMPORARY
     RESTRAINING ORDER AND PRELIMINARY INJUNCTION ................................ 20

    A.  Plaintiffs Are Likely To Succeed On The Merits........................................ 20

        1.  The Citizenship Clause Of The Fourteenth Amendment............................ 27
        2.  Defendants' Proposed Action Would Deny Plaintiffs
            Privileges and Immunities of Citizenship Guaranteed
            by the Fourteenth Amendment, in Violation of
            42 U.S.C. § 1983................................................................. 28
        3.  Equal Protection.................................................................. 31
        4.  The District's Proposed Documentation Requirements
            Violate Due Process ............................................................. 34
        5.  The Defendants' Documentation Requirements Violate
            Equal Protection and Due Process Even Under Rational
            Basis Review...................................................................... 38

    B.  Plaintiffs Will Suffer Irreparable Harm If Injunctive Relief Is Denied................... 40

    C.  Balance Of Harms Weighs Heavily In Favor Of Plaintiffs...................................... 41

    D.  The Public Interest Will Be Served By Granting Injunctive Relief.......................... 42

CONCLUSION………………………………………………………………………………44

## INTRODUCTION

This is an action to enjoin District of Columbia Medicaid officials and the District's Department of Health from instituting new citizenship documentation requirements, to be imposed on Medicaid applicants and recipients as a condition to receiving benefits. These requirements would mandate that citizens demonstrate citizenship exclusively through certain types of documents. For many Medicaid eligible citizens, these new citizenship documentation requirements will eliminate all reasonably possible means of demonstrating that they are citizens for Medicaid purposes. The effect will be that citizens will be deemed **non**-citizens for lack of certain forms of documentation – documentation which they cannot reasonably be asked to provide because they do not have it, cannot feasibly obtain it, or because it does not exist. On that basis, they will be denied Medicaid benefits.

The named individual plaintiffs in this action, and patients of Plaintiff Bread for the City, on whose behalf that organization is suing, are all native born citizens of the United States. Each is eligible for, and in fact have been receiving, Medicaid benefits. Many suffer from significant mental or physical disabilities and other health problems requiring consistent medical care. Each is poor. Without Medicaid coverage, each is likely to lose access to essential medical services.

Pursuant to the Social Security Act, and the Medicaid program adopted by the District under that law, United States citizens are entitled to receive Medicaid if they meet certain eligibility requirements. Federal regulations require the District, if it seeks to qualify for federal funding, to provide Medicaid to otherwise eligible residents of the United States who are citizens. 42 C.F.R. § 435.406(a). The District has, in fact, adopted a plan that affords the right to Medicaid to United States citizens.

On February 8, 2006, President Bush purportedly signed into law the Deficit Reduction Act ("DRA") of 2005.[1] Section 6036 of the DRA requires, States and the District of Columbia, as a condition of federal funding, to verify the citizenship of Medicaid recipients and applicants. Section 6036 outlines certain specific documents that may be accepted as proof. Section 6036 also provides that the Secretary of the Department of Health and Human Services ("DHHS") may further specify by regulation additional documentation regarded as sufficiently reliable to demonstrate citizenship.

An implementing organization within DHHS – the Centers for Medicare & Medicaid Services ("CMS") – has recently issued an informal "Guidance" to the States and the District about what it anticipates incorporating into future regulations. That "Guidance" is described more fully below. In limiting the ways in which citizens can show that they are citizens, those documentation requirements are onerous, irrational, and will have the effect of deeming many persons to be *non-citizens* when, in fact, they are native born citizens of the United States, thus depriving them of Medicaid benefits to which they are entitled by law. That is because many persons, including plaintiffs here – in poverty, old age, and in poor mental or physical condition, even in comas, physically incapable of communication, or with dementia – do not have, and are incapable of procuring, the documentation that will allow them to satisfy the precise "proof of citizenship" documents specified by the Guidance.

Nonetheless, the District of Columbia has made clear its intention to follow this Guidance beginning July 1, 2006. Accordingly, Plaintiffs stand to lose Medicaid benefits, to which they are entitled, and which in most cases they have been receiving for some time – as recognized citizens of the United States – and which are critical to their well-being and health. Moreover, these new

---

[1]    As noted in a lawsuit filed in this Court by Public Citizen, the Senate and House did not pass identical versions of the DRA. *See Public Citizen v. Clerk, U.S. District Court,* Civ. Act. No. 1:06-cv-00523-JDB, ¶¶ 7-16 (filed Mar. 31, 2006). Public Citizen has therefore alleged that DRA violated the bicameralism clause of the Constitution. *Id.* at 22-23.

documentation of citizenship requirements which the District has taken on, will themselves severely impact the District's ability to properly and expeditiously process applications and renewals of other Medicaid eligible persons in a prompt and efficient manner. [2]

In limiting the types of proof that may be tendered to show citizenship, the new documentation requirements are unconstitutional, patently so. By the terms of the Constitution, citizenship is granted to all persons born in the United States. That special status is created and conferred by the Constitution. Neither States, nor the District, nor the National Government, may create additional requirements as a condition of citizenship, nor deny anyone the rights or benefits of citizenship by declining to recognize that status if it exists. *See United States v. Wong Kim Ark*, 169 U.S. 649, 702 (1898) ("Citizenship by naturalization can only be acquired by naturalization under the authority and in the forms of law. *But citizenship by birth is established by the mere fact of birth under the circumstances defined in the Constitution.*") (emphasis added). Citizenship exists *without* papers, formal proof, or special documentation. It is a birthright outside the control of the political branches, resting on an objective fact, proved as fact, just as other constitutional facts, by whatever evidence may bear on the issue. *Cf.* 8 U.S.C. § 1503 (permitting any person who claims a right or privilege as a national of the United States but who is denied such right or privilege by any department or independent agency, or official thereof, upon the ground that he is not a national of the United States, to institute an action for a judgment declaring him to be a national of the United States).

Neither Congress nor the District of Columbia can make possession of particular documentation – a citizenship card, a drivers license, a passport – the *equivalent* of citizenship. One is **not** a citizen by having the proper documentation; one is a citizen – and may prove oneself a

---

[2]    The District's historic difficulties in timely processing Medicaid eligibility requirements have been well documented. *See Salazar v. District of Columbia,* 954 F. Supp. 278, 282 (D.D.C. 1996). Section 6036 of the Deficit Reduction Act requires every Medicaid applicant and recipient to provide proof of citizenship, in addition to meeting all other requirements.

citizen – by whatever means may be available for the proof of facts. In fact, this has historically been the practice with respect to proof of citizenship: So as not to deprive a person of their citizenship for lack of certain papers, citizens have been given the broadest latitude to demonstrate their citizenship.

Efforts to burden rights of citizenship are scrutinized strictly. They have been found unconstitutional under a number of constitutional headings: As an interference with citizenship under the Citizenship Clause; as a violation of equal protection; as a violation of due process; as a violation of the privileges and immunities clause. Under each of these constitutional provisions, the documentation requirements that the District has threatened to impose here cannot stand.

This does **not** mean that as a matter of administrative convenience, a state or federal agency might not ask for proof of citizenship to demonstrate qualification for a public benefit. It surely can. Government agencies can decide to grant benefits only to citizens, and can, of course ask for some proof to ensure that non-citizens do not avail themselves of benefits intended only for citizens. Most agencies dealing with citizenship have developed flexible procedures to allow citizens to demonstrate their citizenship by whatever means available. What the Government cannot do is demand that United States citizens provide particular forms of documents that would effectively cause individuals who **ARE** citizens of the United States, as defined by the Constitution, to be deemed non-citizens, and thus denied the benefits afforded to citizens of the United States.

That is unfortunately what Defendants threaten here. The proposed documentation requirements that Defendants will impose as of July 1, 2006 will make it impossible, or at least insuperably difficult, for thousands of citizens to show it. Not everyone has been issued birth certificates, or can access them, or knows where they would be found, or can afford to procure them. For many Americans, in fact, particularly African-Americans born before World War II in rural areas of southern states, birth outside the hospital was common and no birth certificate may have been issued at all. Not everyone – particularly older folks with mental deficiencies or physical

limitations on their ability to communicate, who have outlived their family and friends, or persons who have moved over the course of a long life – is in a position to find someone – two persons, one not a relative, each of whom must themselves prove he or she is a citizen – who can provide a verification from personal knowledge that the individual in question was born in the United States. Many American citizens who are otherwise eligible for Medicaid lack the mental or physical capacity, or funds, to procure the required documentation.   Individual Plaintiffs are among these.

As shown below, a temporary restraining order and preliminary injunction are warranted and critical.  Plaintiffs will demonstrate below that they will likely prevail on the merits.  Moreover, the need for relief is urgent.  It was not until CMS issued its Guidance only a few weeks ago, and the District made clear that it will begin implementing that Guidance (without any further study, rulemaking, or consideration) as of July 1, without affording any alternative course for those unable to produce the specified documentation, that the harsh nature of these new requirements became patent.  In this regard, Plaintiffs note that while the District will begin implementing these new documentation requirements on July 1, at least one other State, Ohio, has announced it will postpone implementation of enhanced documentation requirements for three months while it studies what it can feasibly – and presumably constitutionally – require.[3]

The equities tip decidedly in favor of an injunction.[4]  Loss of Medicaid benefits is irreparable harm, for it is often accompanied by loss of access to needed medical care.  Death and disease, and loss of medical treatment, is irrevocable harm.  There is no available remedy at law.  There is no harm to the District in temporarily enjoining the implementation of these provisions.  And the

---

[3]    *See Ohio Delays Enforcement of Citizenship Rule; Says More Time Needed to Issue Guidelines,* BNA's Health Care Daily, Vol. 11, No. 121 (June 23, 2006) (Tab A).

[4]    Plaintiffs believe that the case can be finally resolved on an expedited basis after a brief period of discovery.  The merits can likely be addressed on cross-motions for summary judgment in the same general time frame as the Court might otherwise hear a preliminary injunction.

public interest is clearly served by postponing implementation of these new requirements for at least three reasons:  **First**, the public interest is always served by insisting that the Constitution be observed.  **Second**, loss of Medicaid benefits for many current recipients will impose severe burdens on the District's hospital emergency rooms, on those few health care providers willing to treat substantial numbers of uninsured patients, and on the District itself to the extent it ends up having to pay for care to some of these patients through District dollars not matched by the federal government.  **Third,** these new documentation requirements are sufficiently burdensome in an administrative sense that they are likely to affect the administration of D.C. Medicaid program beyond even those persons intended to be affected by the new documentation, and thus harm "innocent bystanders" as well. [5]

By way of introduction, Plaintiffs venture one final observation.  Issues concerning illegal immigration are in the news.  We are all mindful that it is politically popular to declare that illegal aliens should not be receiving public benefits, e.g. Medicaid.  Studies have been done to address the strength of the protections against illegal aliens falsely claiming citizenship status to secure Medicaid benefits.  While potential gaps in this protection have been identified, we are aware of no reported evidence of widespread resort to false claims of citizenship by illegal aliens as a means of obtaining Medicaid benefits.[6]

It would be ironic, and tragic, if a scheme to prevent aliens unlawfully in this country from getting Medicaid benefit serves instead to cut off from Medicaid large numbers of the most

---

[5]    *See* n.2, *supra*.

[6]    *See* Apr. 8, 2005 letter from Mark B. McClellan, Administrator, CMS, to Daniel R. Levinson, Acting Inspector General, OIG, re: "OIG Draft Report: Self-Declaration of U.S. Citizenship for Medicaid" (OEI-02-03-00190) (Tab B); Self-Declaration of U.S. Citizenship for Medicaid at 11 (Department of Health and Human Services, Office of Inspector General July 2005) ("OIG Report") (reporting that a survey of State Medicaid Directors did not identify any "problem with self-declaration of citizenship.") (Tab C).

vulnerable American citizens, who cannot come forward with particular documentation required to prove their citizenship. These may include elderly African-Americans whose difficulties in producing the required documentation may be a byproduct of prior discrimination and poverty. Indeed, such persons may be in the very position that the Citizenship Clause – making United States citizenship "automatic," and a matter of constitutional birth right for those born in the United States – was designed to protect. To illustrate, under the new standards, an individual born in Alabama in 1920 may be unable to produce the required documentation because he or she was never given a birth certificate. If an American citizen were to come forward with a sworn affidavit of birth in this country based on having been told he was born in this country and held himself out as such for all of his life, accompanied by a family Bible showing birth in this country, a marriage license, and even with a certificate of circumcision, that American citizen would not, under the Defendants' proposed approach, be regarded as a citizen despite the absence of *any* indication that the individual is *not* a citizen. The Defendants' proposed documentation requirements lack any adequate "safety valve" to allow citizens to show their citizenship by such means as may be available to them. As such, they are unconstitutional.

## I.    STATUTORY, REGULATORY, AND FACTUAL STATEMENT

### A.    Medicaid and the Eligibility of Citizens

#### 1.    The Medicaid Program

As this Court is aware, Medicaid was created in 1965 as Title XIX of the Social Security Act to help provide medical treatment for low-income people, by "enabl[ing] each State, as far as practicable, to furnish medical assistance to individuals whose income and resources are insufficient to meet the costs of necessary medical services." *Elizabeth Blackwell Health Center for Women v. Knoll*, 61 F.3d 170, 173 (3d. Cir. 1995) (citing *Beal v. Doe*, 432 U.S. 438, 444 (1977)); 42 U.S.C. §1396 *et seq.*; *see Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 502 (1990). State participation is voluntary. *Salazar v. District of Columbia*, 954 F. Supp 278, 280 n.3 (D.D.C. 1996). But once a State agrees to participate, it

must comply with the federal statutes and regulations governing Medicaid in order to receive federal reimbursements.[7]  *Id.* All States and the District of Columbia currently participate.

Over its forty-year history, Medicaid has provided significant health care benefits for millions, particularly children, the elderly and people with disabilities.  Medicaid covers approximately 50 million U.S. citizens.  Leighton Ku & Matthew Broaddus, *New Requirement for Birth Certificates or Passports Could Threaten Medicaid Coverage for Vulnerable Beneficiaries: A State by State Analysis*, Ctr. On Budget and Pol'y Priorities Rep., February 17, 2006 *available at* http://cbpp.org.  (Tab D).  Millions rely exclusively on Medicaid for health care.

### 2.    Eligibility Requirements

Each State participating in the Medicaid program develops a plan containing "reasonable standards . . . for determining eligibility for and the extent of medical assistance."  *Schweiker v. Gray Panthers*, 453 U.S. 34, 36 (1981) (quoting 42 U.S.C. § 1396a(a)(17)).  Under this rubric, States have latitude to develop certain eligibility criteria, which generally center on an applicant's income, assets, property, and available resources.

It has long been the case, however, that one must be either a citizen or fall within a particular class of resident alien to be eligible.  States must provide Medicaid to qualifying citizens.  42 C.F.R. §435.406 (2006) ("must provide Medicaid to otherwise eligible residents of the United States who are …Citizens").  The District's plan does indeed recognize that citizenship is one criterion of eligibility for receipt of benefits.  District of Columbia State Plan, Section 2.1.

Prior to enactment of Section 6036, Medicaid applicants typically established citizenship for purposes of Medicaid eligibility simply by making a written declaration, under the penalty of perjury, that he or she was a national or citizen of the United States.  42 U.S.C. §1320b-7(b)(2) and (d)(1)(A).

---

[7]    For certain of these descriptive passages pertaining to Medicaid generally, we will simply refer to the District of Columbia as a participating "State."

The District followed this approach.  *See* Government of the District of Columbia, Department of Human Services, Application for Benefits at 5 (Tab E).  Whereas States were entitled to demand corroboration for the declaration where there was reason to question the applicant's citizenship, States were not required to demand documentation in the first instance, and in fact most did not find it necessary.  *See* Office of Inspector Gen. Rep., p. 9 (2005) (noting that forty-seven states permit or sometimes permit self-declaration of U.S. citizenship).  In the event that States chose to ask an applicant for further documentation of citizenship, the type of documentation that could be used to prove citizenship was <u>not</u> ultimately limited – and could include documents such as baptismal records.  New York, New Hampshire and Montana, three States that imposed upfront documentation beyond the applicant's own statement, provided that if all listed types of documentation were unavailable, for some flexibility to permit alternative documentation appropriate for the individual in question.[8]

Once an applicant satisfied the citizenship and other "reasonable" eligibility requirements, he or she was entitled to Medicaid benefits.[9]  This entitlement created a legal obligation for the federal government and participating states to pay for and administer medial assistance.  *See Schweiker*, 453 U.S. at 36-37 (noting that "[a]n individual is entitled to Medicaid if he fulfills the criteria established by the State in which he lives.").  Not only is an otherwise eligible individual entitled to receive benefits, the "agency must … (b) [c]ontinue to furnish Medicaid regularly to all eligible individuals until they are *found to be ineligible*."  42 C.F.R. 435.930 (emphasis added).  Although state agencies must  "redetermine the eligibility of Medicaid recipients, with respect to circumstances that may

---

[8]    *See* NY Dept. of Health, Administrative Director, Transmittal 04 OMM / ADM – 7 (Oct. 26, 2004) at pg. 9 (Tab F); NH Admin. Code He-W §606.02 (Tab G); MT Dept. of Public Health and Human Service, Medicaid Manual, FMA 301-1 (Tab H).

[9]    The period of eligibility generally lasts for one year, and at the end of that year of eligibility, an applicant must be recertified to retain Medicaid eligibility.  *Salazar*, 954 F. Supp. at 292.

change, at least every 12 months," 42 C.F.R. 435.916, there is no defined certification period associated with Medicaid benefits, and no process that requires recipients to re-apply. Significantly, "citizenship" is not a "circumstance that may change." Thus, once citizenship was established, it would ordinarily remain unchallenged. Section 6036 of the DRA requires that it again be examined.

**B.    Section 6036 of the Deficit Reduction Act**

Section 6036 of the Deficit Reduction Act of 2005 amends the Medicaid statute by creating a new subsection §1903(x). That new subsection requires individuals asserting United States citizenship to provide documentation to support that claim. Under Section 6036, such documentation must be shown upon an initial application for Medicaid by new applicants, and at the time of a recipient's first Medicaid re-determination on or after July 1, 2006.

Specifically, Section 6036 amends 42 U.S.C. § 1396b to deny federal matching funds for any Medicaid program costs spent on behalf of a recipient who previously made a declaration of United States citizenship or nationality pursuant to 42 U.S.C. § 1320b-7(b)(2) and (d)(1)(A), and for whom new documentation rules have not been met. 42 U.S.C. § 1396b(a)(22) (new). Section 6036 does not change eligibility requirements – Medicaid is still, in theory, available to citizens – but rather requires changes to the procedures heretofore used to demonstrate citizenship.

As to specific documentation, Section 6036 amends the Medicaid statute to require that persons "declaring themselves to be citizens or nationals of the United States" pursuant to 42 U.S.C. §1320b-7(b)(2) and (d)(1)(A) provide specific additional documentation, namely:

(1)    Both citizenship or nationality and personal identity may be proven by submission of a United States passport, a Certificate of Naturalization, a Certificate of United States Citizenship, a valid state driver's license from a state that requires proof of citizenship for issuance of the license, or any other document the Secretary identifies by rule that provides both proof of citizenship or nationality and proof of personal identity, 42 U.S.C. § 1396b(x)(3)(B) (new), or

(2)      one of each of the following types of documents: (i) Citizenship or nationality (but personal identity) may be proven by submission of a United States birth certificate, a Certification of Birth Abroad, a United States Citizen Identification Card, a Report of Birth Abroad of a Citizen of the United States, or any other document that the Secretary may identify by rule that establishes United States citizenship or nationality,  42 U.S.C. §1396b(x)(3)(C) (new), and (ii) "any identity document described in section 274A(b)(1)(D) of the Immigration and Nationality Act," or  any other reliable documentation of personal identity that the Secretary specifies by rule.  42 U.S.C. §1396b(x)(3)(D) (new).

42 U.S.C. §1396b(x)(3)(A) (new) (setting forth above-described documentation alternatives).[10]

The statute does, however, empower the Secretary to prescribe other forms of documentation that the Secretary deems acceptable.  *See* 42 U.S.C. §  1396b(x)(3)(B)(v) ("Such other document as the Secretary may specify, by regulation, that provides proof of United States citizenship or nationality and that provides a reliable means of documents of personal identity."). This provision saves the statute itself from unconstitutionality because it apparently allows the Secretary to authorize additional forms of proof where preferred forms of proof are not available and thus render the documentation requirement reasonable.  As shown below, however, under the District's current proposed approach, the forms of documentary proof being required are strictly limited, barring recourse to other means of proof, even when the preferred forms of documentation are unavailable.

---

[10]    While the list of acceptable documentation appears at first blush broad, many of the listed documents are irrelevant to most Medicaid beneficiaries.  A Certificate of United States Citizenship, for example, is available as proof of citizenship for persons whose citizenship is derived from a parent's citizenship.  Citizenship Identification Cards were issued for a ten year period into the 1980s to persons living near either the Mexican or Canadian border who needed to cross frequently. Neither is particularly relevant to District Medicaid beneficiaries.

Section 6036(b) makes the documentation requirements effective with respect to all initial determinations of eligibility for Medicaid health coverage made on or after July 1, 2006, and it is made applicable to all re-determinations of eligibility for existing beneficiaries of Medicaid health coverage made on or after July 1, 2006. Under the new regulations, all current recipients of Medicaid health coverage will have their next re-determination no less than one year after July 1, 2006. As such, States will have to check citizenship documents for more than 50 million Medicaid recipients in the following six to twelve months. Judith Solomon and Andy Schneider, *HHS Guidance Will Exacerbate Problems Caused By New Medicaid Documentation Requirement,* Ctr. on Budget and Pol'y Priorities Rep. June 16, 2006 *available at* http://cbpp.org. (Tab I). For the District, this could mean at least scores of thousands of detailed citizenship reviews.

### C.    CMS Guidance

On June 9, 2006, the Secretary issued a State Medicaid Director letter to every state, and the District, through the Centers for Medicare & Medicaid Services ("CMS"). The June 9 Letter provides implementation guidance for the states regarding Section 6036. The June 9 Letter promises forthcoming regulations, but also suggests that compliance with its terms "will assure compliance with this [documentary evidence] requirement." Letter from Dennis G. Smith, Director, Centers for Medicare & Medicaid Services, to State Medicaid Directors 13 (June 9, 2006) (on file with author, *available at* http://www.cms.hhs.gov/smdl/downloads/SMD06012.pdf) ("CMS Guidance") (Tab J).

The CMS Guidance outlines a complicated four-tier hierarchy of documents that for proof of citizenship. That Guidance actually narrows Section 6036 and gives more weight to some documents than others. For example, states are required to request and obtain U.S. passports as proof of citizenship before inquiring or using any other accepted document. *Id.* at 2. The Guidance, among other things, provides:

(a)    Self-attestation is no longer sufficient, apparently in any circumstance, even when there is no other reasonably available means for the applicant to prove citizenship. *Id.* at 1.

(b)    Five "charts" list documents that may constitute acceptable proof of citizenship. Chart 1 is titled "Primary Documents," and lists the documents that prove both citizenship and identity: U.S. passports and certificates of citizenship and naturalization  While Section 6036 authorizes the Secretary to specify additional documents, the Guidance does not do so. *See generally* CMS Guidance.

(c)    Charts 2 through 4 set up a hierarchy of documents to prove citizenship or nationality. If a person does not possess a document from Chart 1, but does have a document from Charts 2 through 4, the person must also present a document from Chart 5 to establish identity. *Id.* at 2.

(d)    Chart 2 is titled "Secondary Documents." These documents are used only if the "primary documents" in Chart 1 are not available. Chart 2 documents include U.S. birth certificates or official military records. *Id.* at 4-5.

(e)    Chart 3 consists of "Third Level Documents." These documents are permissible only if documents from Charts 1 and 2 are demonstrably not available. An example of a third level document is a hospital record of the person's birth that was created at least five years prior to the initial application for Medicaid, and also indicates a U.S. place of birth. *Id.* at 6.

(f)    Chart 4 is titled "Fourth Level Documents." Chart 4 documents "should ONLY be used in the rarest of circumstances," i*d.* at 6, and only in the event that the documents in the prior charts are not available. Examples of documents in this category include census records for those born between 1900 and 1950, and various medical records created at least five years prior to the initial application. *Id.* at 6-7.

Chart 4 also includes, as a last resort, the possibility of written affidavits. The affidavits must be "by at least two individuals of whom one is not related to the applicant/recipient and who have *personal knowledge* of the event(s) establishing the applicant's or recipient's claim of citizenship." *Id.* at 7 (emphasis added).

(g)      Chart 5 contains options for establishing identity, and specifies photo identification from Native American tribal sources. It generally limits permissible documents to official government identity cards such as a driver's license. *Id.* at 8-9.

(h)      The "reasonable opportunity" given to a recipient or applicant to produce the documents cannot exceed the period states are otherwise limited to for the processing of applications under 42 C.F.R. §435.911 (45 days for most applications, and 90 days for applications requiring a determination of disability). States may create exceptions to these limits where applicants have tried in "good faith" to obtain documentation and should "assist" where needed, but these terms are not defined. *Id.* at 10.

(i)      Moreover, the Guidance insists that states require only "authentic" documents, ruling out photocopies. *Id.* at 11.

**D.      The District's Medicaid Program**

The District of Columbia has chosen to participate in Medicaid since 1965. Federal Medicaid funding is expressly provided to the District of Columbia for its citizens. As a result of the 1997 District of Columbia Revitalization provisions of the 1997 Balanced Budget Act, this federal funding represents $900 million of the $1.26 billion, or 70%, of total Medicaid spending on D.C. residents. Federal regulations require the District to provide Medicaid to otherwise eligible citizens of the United States who are D.C. residents. 42 C.F.R. § 435.406(a).

Medicaid is the largest public assistance program in the District of Columbia, serving 142,000 District residents, *see D.C. Medicaid Annual Report, FY 2005* ("Annual Report") (Tab K), pg.

-14-

2, *i.e.*, in excess of 25% of the 2005 estimate of the District's total population.  *See Salazar*, 954 F.

Supp. at 281 (recognizing that, as of 1996, Medicaid was the District's "largest public assistance

program . . . serving slightly over 25% of all District residents"); U.S. Census Data, D.C.,

http://quickfacts.census.gov/qfd/states/11000.html, last visited June 26, 2006.  D.C. Medicaid

covers over 44% of D.C. residents 18 years old or younger.  Eighty-seven percent (87%) of D.C.

Medicaid enrollees are African-American.  D.C. Medicaid Ann. Report, FY 2005 *supra* at 6.

The D.C. Medicaid program is administered by the Medical Assistance Administration

("MAA") of the Department of Health.  While the MAA is responsible for policy regarding

eligibility and overseeing program operations and service delivery, eligibility determinations and

enrollment are the responsibility of the Income Maintenance Administration ("IMA").

Defendants have announced their intention to implement the new citizenship

documentation requirements effective July 1, 2006, and intend to do so in accordance with the

Guidance.  In contrast, the State of Ohio has announced it will delay implementation of new

documentation requirements for three months in order to plan for their implementation.[11]

## II.    Many Citizen/Medicaid Recipients Or Applicants Cannot Satisfy These Requirements

Defendants' imposition of the new documentation requirements will result in loss of

essential Medicaid benefits for District residents, will prevent other District residents from

obtaining Medicaid benefits, and therefore will ensure that tens of thousands of District residents

go without receiving proper and medically necessary care.  A recent nationwide study concludes

that given the social circumstances of many Medicaid recipients, the new requirements would put at

risk the ability of as many as 3.2 to 4.6 million U.S. born citizens now receiving Medicaid to continue

receiving benefits.  Judith Solomon *et al., HHS Guidance Will Exacerbate Problems Caused By New*

---

[11] See n.3, *supra*.

*Medicaid Documentation Requirement,* Ctr. on Budget and Pol'y Priorities Rep. *citing* Leighton Ku *et al.,*

*Survey Indicates Deficit Reduction Act Jeopardizes Medicaid Coverage for 3 to 5 Million U.S. Citizens*, Ctr. on

Budget and Pol'y Priorities Rep.

  For many citizens living in the District, the requirements of the Guidance cannot be met; for

others, the requirements impose severe practical obstacles.  By reasons of poverty, background,

health and mental conditions and/or difficult living conditions, many citizens do not have, and do

not have access to, the formal documents contemplated by the CMS Guidance.  Taking one example

that will impact countless District residents:  Racial discrimination and persistent poverty prevented

many African-American women, especially those in the rural South, from delivering their children in

hospitals and, in turn, from being issued a birth certificate for their child.  One study estimates that,

as a result of limited access to hospital delivery services due to discrimination and/or poverty,

roughly one in five African-Americans born during the period of 1939-1940 lacks a birth certificate.

*Population Studies*, Population Investigation Comm.'s Rep., Vol. IV, No. 1, 99 (June 1950) (Tab L).

Eighty-seven percent (87%) of the D.C. Medicaid program's participants are African-American.

D.C. Medicaid Ann. Rep., FY 2005, *supra* at 6.

  In addition, District residents that suffer from severe physical and mental health conditions

will be severely impacted by the District's impending actions.  The Guidance itself acknowledges

that individuals in a coma, that suffer from amnesia, that are physically or mentally incapacitated,

and/or that are homeless, will have "difficulty" satisfying the new documentation requirements.

Many eligible Medicaid recipients suffer from dementia and, as a result, are unable to recall their

name or maiden name – let alone date and place of birth.  These residents will certainly find locating

an identification document to be more than "difficult"; it will be outright impossible.  Moreover,

these conditions are not rare:  many recipients suffer from limited cognitive or communicative

ability and often have few, if any, involved family members to assist them.  Compliance with the

Guidance's documentation requirements will be particularly difficult, if not impossible, for foster

children, nursing home residents, group home residents with mental retardation, the mentally ill, and the homeless.

Therefore, unless thousands of citizens in the District are miraculously able to produce a passport, birth certificate or other rare form of documentation to be required by D.C., these District residents will either not be enrolled in Medicaid or will have their Medicaid benefits improperly terminated. As a result, American citizens most in need of health services will lose their Medicaid coverage and, when D.C. Medicaid stops paying for their medical care and treatment – including, but not limited to, long-term care, skilled nursing services, doctors' visits, life-saving medications and surgical procedures, just to name a few – they will lose access to the very health care services critical to their health and even their survival.

The plaintiffs in this case are United States citizens who currently receive health coverage from the Medicaid program. They have already established their citizenship as required for Medicaid eligibility. Their circumstances highlight the nature of the burden and the loss that the Defendants' new documentation requirements will impose. For example, Plaintiff Virginia Orchard, a 92-year old Program enrollee and resident of the Lisner-Louise-Dickson-Hurt Home (the "Lisner Home") in NW Washington, D.C., suffers from dementia, hypertension, depression and psychosis. Plaintiff Alphonso DeShields, a 91-year old Program enrollee and resident of the Lisner Home, suffers from prostate cancer and severe heart conditions. *See* Declaration of Valeria S. DeShields ("DeShields Dec.") ¶¶ 5-10. (Tab M). Plaintiff Margaret Matthews, an 84-year old Program enrollee and resident of the Lisner Home, suffers from congestive heart failure, coronary artery disease, diabetes, hypertension, arthritis, dementia, and the effects of a cerebral vascular accident. *See* Declaration of Margaret Matthews ("Matthews Dec.") ¶¶ 3-8. (Tab N).

Neither Ms. Orchard, Mr. DeShields nor Ms. Matthews have any of the documentation that the District will require and, for each of their own following reasons, it would be exceedingly difficult if not utterly impossible for any of them to obtain such documentation – within any time

period, let alone 45 days. *See* DeShields Dec. ¶¶ 19-20; Matthews Dec. ¶¶ 17-18. Both Ms.

Matthews' and Ms. Orchard's fragile physical and mental conditions and loss of cognitive and

communicative abilities make it absolutely impossible for them to navigate the bureaucratic mazes of

obtaining or procuring a birth certificate or other form of state or federal identification. *See*

Matthews Dec. ¶¶ 17-19. Several years ago, when Mr. DeShields previously attempted to procure

his birth certificate, he learned that the government office in Spartanburg, South Carolina, his place

of birth, was destroyed by fire – along with any hope he had of "proving his citizenship" for

Medicaid benefits in 2006. *See* DeShields Dec. ¶ 22. Nonetheless, the United States Government

once granted him a passport (long since lost) when he provided to them "old pictures of his

childhood." *Id.* ¶ 23. Travel across national borders now will be easier than applying for Medicaid

in the District.

  As contemplated, the Defendants will terminate Ms. Orchard's, Mr. DeShields' and Ms.

Matthews' Program eligibility once they fail to provide documentation that they simply will be

unable to procure. Once their Program eligibility is terminated, Ms. Orchard, Mr. DeShields and

Ms. Mathews will lose access to the skilled nursing home services that they receive, as well as their

prescription medications and other treatments. *See* DeShields Dec. ¶ 17; Matthews Dec. ¶ 15. If

Ms. Orchard, Mr. DeShields or Ms. Matthews were to lose access to these services, their health

status – and likely their chance at survival – would each quickly, irreversibly and irreparably decline.

*See* DeShields Dec. ¶ 18; Matthews Dec. ¶ 16.

  Plaintiff Bread for the City ("Bread"), founded in 1974, is a D.C. non-profit corporation and

medical clinic that provides professional and other medical services on an outpatient basis – free of

charge – to District residents that suffer from a variety of physical and mental health conditions. *See*

Declaration of George A. Jones ("Jones Dec.") ¶¶ 4-10 (Tab O). Although Bread provides its

services free of charge, its patients' Medicaid benefits afford them access to health care that Bread is

unable to provide, such as mammograms, psychiatric and other specialty services. *Id.* at ¶ 11. Bread

-18-

also provides legal and social services, has assisted District residents apply for Program benefits, and has assisted residents locate and/or attempt to locate various identification documents, including birth certificates. *Id.* ¶ 20.

Because of their physical, mental, financial or other social condition, many of Bread's patients – similar to the Individual Plaintiffs – will encounter great difficulty or will be utterly incapable of producing or locating any of the documentation contemplated by the Guidance, and thus will be incapable of enrolling or remaining enrolled in the D.C. Medicaid Program on or after July 1, 2006. *Id.* ¶ 22. In addition, approximately fifteen percent (15%) of the medical services for which Bread receives compensation is paid by Medicaid. *Id.* ¶ 27. Of course, if the D.C. Medicaid Program would no longer reimburse Bread for the services that it provides to Program-eligible patients, Bread would continue to strive to provide those services, free of charge, to D.C. Medicaid Program enrollees. *Id.* ¶ 30. However, other health care providers, including, but not limited to, specialty health care providers, would no longer provide such services to such patients. *Id.*

If Bread were to suffer financial loss as a result of the Defendants' impending action, it would be required to reduce the amount of services that it renders to D.C. Medicaid Program enrollees or, for that matter, all District residents. *Id.* ¶ 31. Moreover, the quality of the services that Bread renders would be negatively impacted. *Id.* ¶ 32. In addition, if health care providers other than Bread would no longer provide services that Bread is unable to provide, Bread would be unable to successfully refer its patients to other providers for medically necessary care, and thus could not assure that its patients receive appropriate and medically necessary care. *Id.* ¶ 33. Finally, Bread would be required to divert scarce resources to further assist its patients' D.C. Medicaid Program enrollment and reenrollment concerns. *Id.* ¶ 36. For each of these reasons, the Defendants' impending actions would frustrate Bread's ability to fulfill its mission. *Id.* ¶¶ 34-38.

### III. PLAINTIFFS ARE ENTITLED TO A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

In considering whether to grant a temporary restraining order and/or a preliminary injunction, this Court must consider whether:  (1) the party seeking the injunction has a substantial likelihood of success on the merits; (2) the party seeking the injunction will be irreparably injured if relief is withheld; (3) and injunction will not substantially harm other parties; and (4) and injunction would further the public interest.  *CSX Transp., Inc. v. Williams,* 406 F.3d 667, 670 (D.C. Cir. 2005). Plaintiffs easily satisfy all of these requirements.

#### A. Plaintiffs Are Likely To Succeed On The Merits

This case, at bottom, addresses the right and status of citizenship created by the Constitution.  The relevant constitutional provision, enacted after the Civil War, was designed to remove the definition of citizenship forever from the political fray and establish it as a matter of constitutional right – a birth right – automatically conferred on persons born within this country.[12]

Section 1, cl. 1, of the Fourteenth Amendment states that "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."  U.S. Const. amend. XIV, § 1.  The next sentence goes on to proscribe, in the clearest terms, any state efforts to deny United States citizens their rights.  "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of

---

[12]    The citizenship clause conferred the rights of United States citizenship most especially on former slaves who had been born in this country.  One can easily imagine how a set of requirements such as those at issue here would have been regarded by the Framers of the Fourteenth Amendment, given the Citizenship Clause's lofty purpose.  For example, if the United States had conferred upon its citizens a right to free education, one can well imagine the response to the assertion by a State:  "We will give citizens free education, but you have to show your citizenship by producing a birth certificate, which we know you don't have."  Such requirements as "proof" of birth would have been a marked departure from the historic standards for proof of birth.  Proof of birth, and thus of citizenship, has long been demonstrated through testimony and reputation, through personal documents (such as Bible entries, or personal records) and through a wide variety of means.

the United States. . . ." *Id.* The federal civil rights laws, particularly, 42 U.S.C. § 1983, confirm that the District of Columbia may be sued for constitutional violations. *Salazar v. District of Columbia,* 954 F. Supp. 278, 324 (D.D.C. 1996) (quoting *Monell v. Dep't. of Social Servs.,* 436 U.S. 658, 690-91 (1978)).

United States citizenship is, of course, special in many ways. This is true in connection with the benefits it confers. *See Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 159 (1963) ("Citizenship is a most precious right. It is expressly guaranteed by the Fourteenth Amendment to the Constitution, which speaks in the most positive terms.").

But it is equally special in the manner of its creation. Unlike citizenship by naturalization, which is based on standards set by Congress and thus subject to control by the political branches of the National Government, citizenship by birth is a constitutional status. It is wholly outside the control of the political branches; it is subject to the direct supervision of the Third Branch, the courts, as guardians of the Constitution.

As a status created and conferred by the Constitution itself, United States citizenship is unique. The point was made more than one hundred years ago in *United States v. Wong Kim Ark*, 169 U.S. 649 (1898) : "Citizenship by naturalization can only be acquired by naturalization under the authority and in the forms of law**.** *But citizenship by birth is established by the mere fact of birth under the circumstances defined in the Constitution*." *Id.* at 702 (emphasis added).

Citizenship by birth is not bestowed or granted by the federal government, let alone by a State or the District of Columbia. It exists, as a status, without papers, proof, or documentation. It exists without any bureaucratic acknowledgment. It is not marked by a card or accreditation. Rather, it is a fact of birth, to be proved as fact, just as any other constitutional fact, by (at a minimum) whatever evidence may be received in support of any other matter of constitutional fact. Indeed, statutes have long granted an explicit cause of action that allows a party to demonstrate his or her citizenship whenever a *federal* officer or official denies that party a benefit based on the assertion that he or she is not a United States citizen. *See* 8 U.S.C. § 1503 (permitting any person

who claims a right or privilege as United States national but who is denied such right or privilege by any department or independent agency, or official thereof, upon the ground that he is not a national, to institute an action for a declaration that he is a national of the United States).

At issue here is Defendants' attempt to impose requirements for *documentation* of citizenship that will, in effect, deny the benefits of citizenship to many individuals by requiring forms of documentation that cannot, reasonably or even possibly, be provided, while denying the opportunity to demonstrate that citizenship by other appropriate means. But neither the District (nor Congress) can make possession of particular documentation – a citizenship card, a license, a passport – the *sine qua non* of citizenship. The "Citizenship Clause of [the Fourteenth Amendment] is a limitation on the powers of the National Government as well as the States." *Saenz v. Roe*, 526 U.S. at 489, 508 (1999). Just as a State (or the District) cannot deny a citizen his or her citizenship rights, the federal government cannot authorize a State (or the District) to violate the citizenship clause.

This does *not* mean that an agency of the federal government, or an organ of a State, cannot ask for appropriate documentation of citizenship in a proper circumstance. It can, of course. Just as the federal government can properly limit the grant of benefits to citizens, it can ask for some degree of documentation to quickly determine and ensure that *non*-citizens are not improperly trying to avail themselves of benefits intended only for citizens. But the citizen of the United States must *ultimately* be afforded some fair procedure that will allow the citizen to demonstrate – in the ordinary way that facts are shown – that he or she is a citizen. The Government cannot insist upon degrees or levels of proof that would effectively – and *absolutely* – cause individuals who ARE in fact citizens to be denied the benefits of that status without being given every opportunity to establish that they are, in fact, citizens, by whatever means of proof reasonable persons would ordinarily rely on in demonstrating the existence of facts.

Yet that is what the Defendants' proposed approach to the documentation of citizenship will not allow. Medicaid is, by statute, a benefit granted to citizens. It appears that concern for the

possibility that some non-citizens may be sneaking into the Medicaid system has now led the federal government to prompt the District to create documentation requirements that will certainly cause *citizens* to be denied the benefits of citizenship – without affording them the ability to demonstrate their citizenship through all the means and mechanisms that are available for the proof of any other fact.

In some respects, for some persons, the requirements Defendants propose may be reasonable. For those segments of society that travel abroad, it is not unreasonable to require them to provide a copy of a current passport if they want to obtain Medicaid. For some segments of society, born in hospitals, not in poverty, capable of keeping records over long periods of time, it may not be unreasonable to require a birth certificate. But for others, such requirements are wholly impractical. Many have never traveled abroad; they have no passport. Many were born out of hospitals, and have no birth certificate. Many may have been born in hospitals, but have long lost track of where and when. Some lack the physical or mental abilities, or financial or family resources, to track down such documentation.

This is not, of course, the only situation in which a requirement of proof of citizenship has been mandated. To the contrary, citizenship has long been demonstrated in courts and agencies. But in no respect have the sources of proof of this precious status been limited in the manner proposed here. For example, 8 USC § 1503 allows any person within the United States to bring an action against the head of any federal department or agency that denies that person a right or privilege entitled to him as a national of the United States to obtain a judgment declaring him to be a national of the United States. 8 USC §1503(a). In such a court proceeding, all forms of evidence ordinarily admissible in a court proceeding may presumably be tendered in support of establishing citizenship. Particularly when there is no contrary evidence, testimonial evidence may be persuasive. To that end, it bears noting that hearsay rules have traditionally been liberalized to assist in establishing date of birth. Fed. R. Evid. 803(19).

The State Department has long been required to look at the issue of citizenship in connection with issuing passports. The State Department has traditionally accepted a wide range of proof and gives its highest attention to consideration of issues of citizenship, given the importance of that status. *E.g., Magnuson v. Baker*, 911 F.2d 330, 331-32 (9th Cir. 1990). Likewise, in connection with the provision of Social Security benefits for the aged, blind and disabled, it has long been necessary to demonstrate citizenship. To that end, the relevant regulations specify how "to prove you are a citizen or a national of the United States." 20 CFR 406.1610. The regulations go on to specify various forms of acceptable documentation of citizenship, including a passport or a religious record of birth or baptism. Most important, the regulations go on to provide a fail safe means of documenting citizenship when specified means of proof fail. The regulations describe:

> What to do if you cannot give us the information listed in paragraph (a) or (b). If you cannot give us any of the documents listed in paragraph (a) or (b), we may find you to be a citizen or a national of the United States if you--
>
> (1) Explain why you cannot give us any of the documents; and
>
> (2) *Give us any information you have which shows or results in proof that you are a citizen or a national of the United States.* The kind of information we are most concerned about shows--
>
> (i) The date and place of your birth in the United States;
>
> (ii) That you have voted or are otherwise known to be a citizen or national of the United States; or
>
> (iii) The relationship to you and the citizenship of any person through whom you obtain citizenship.

*Id.* (emphasis added).

Finally, the Department of Homeland Security's U.S. Citizenship and Immigration Services states that when a citizen wishes to be documented as a citizen, he or she must prove his citizenship but allows proof by "other evidence" beyond documentary evidence. 8 C.F.R. § 301.1(a)(1). Even

the documentary evidence it requires includes documents such as marriage and divorce certificates that are not allowed under the CMS Guidance. *Id.*[13]

In contrast, to these flexible standards of proving citizenship, Defendants' new citizenship documentation requirements insist on the production of particular documents. They would demand such documents even from those who cannot reasonably be asked to produce such documents, and would thus deny them other reasonable means of documenting their citizenship. The result is citizens will be denied the benefits of citizenship – and treated as non-citizens – when they are in fact citizens of the United States.

Because they impair the citizenship rights of native born American citizens, Defendants' proposed documentation requirements are unconstitutional. As shown below, this unconstitutionality may be found under a number of constitutional provisions. That is because the courts, most especially the Supreme Court, have addressed rights arising out of United States citizenship in various ways.

For example, one of the most commonly addressed aspects of United States citizenship is the "right to travel." That aspect of citizenship has required invalidation of residency requirements for access to public benefits under the equal protection clause, *see Shapiro v. Thompson*, 394 U.S. 618, 638 (1969), with the Court holding that the impact of the requirement on this "fundamental" aspect of citizenship required strict scrutiny of the classification at issue. In other cases, the Court has apparently relied on the Citizenship Clause directly, noting that the Constitution does not allow for different categories of citizenship, *Zobel v. Williams*, 457 U.S. 55, 64 (1982), while noting that the analysis is usually conducted under equal protection clause. *Id.* at 60 n.6. Another Justice in the same

---

[13] *See also* N-600, Application for Certificate of Citizenship at 3 (listing only examples of documents that could be used to determine citizenship), 4 (recognizing that not all citizens might have birth certificates or passports and allowing baptismal, church, and school records, as well as affidavits from non-citizens, to establish any evidence required for the application).

case would have relied on privileges and immunities as the source of the right to travel. *Id.* at 76 (O'Connor, J., concurring). More recently, the Court itself applied strict scrutiny to address a state interference with the right of citizenship, resting squarely on the Privileges and Immunities Clauses of the 14th Amendment. *See Saenz* 526 U.S. at 504. Other courts addressing documentation requirements associated with proof of citizenship have applied the due process clause in issuing a detailed injunction prescribing procedures for expeditiously determining citizenship. *See Hernandez v. Cremer*, 913 F.2d 230, 241 (5th Cir. 1990) (upholding injunction addressing proof of citizenship at the border for someone seeking reentry to the United States).

Plaintiffs do not suggest that there are cases squarely on point, but the absence of cases squarely on point actually confirms the strength of the underlying principle upon which Plaintiffs rely: The Fourteenth Amendment has been on the books for nearly a century and a half, yet this is apparently one of the first times the ability of citizens to document their status has been limited in this way. To the contrary, it has long been widely accepted that persons must be afforded the broadest opportunity to demonstrate their place of birth, and thus citizenship, lest any citizen wrongly be denied that status and the benefits that go along with it.

Finally, we note that each of the relevant constitutional provisions applies equally to the District of Columbia. The Fifth Amendment, of course, applies to the District of Columbia. But, by statute, so does the Fourteenth Amendment. Section 1983 of Title 42 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

42 U.S.C. § 1983 (1996). This Court has held that, "a local government may be held liable under § 1983 'when execution of a government's policy or custom . . . inflicts the injury." *Salazar*, 954 F.

Supp. at 324 (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978)).  Plaintiffs have a

likelihood of succeeding on each argument, and they will be addressed in turn.

### 1.    The Citizenship Clause Of The Fourteenth Amendment

As described above, the Citizenship Clause of the Fourteenth Amendment itself prescribes

what automatically makes someone a citizen of the United States:  Birth within the United States.

Unlike matters of naturalization, assigned to the political branches, a determination of citizenship by

birth is entrusted to the Courts.  Citizenship is thus proved as a matter of constitutional fact just as

any other constitutional fact.  It seems plain that no citizen can be denied the benefits of United

States citizenship without being afforded an opportunity to demonstrate that citizenship by

whatever means are available under the Constitution for proving a fact.

There is, of course, nothing wrong with requesting appropriate documentation of citizenship

for administrative purposes.  Plaintiffs do not  object to the general requirement that citizenship be

documented in a reasonable manner.  The District is free to ask for passports, or birth certificates,

and help people to track them down.

But where the individual in question cannot reasonably be asked to provide that form of

documentation, the District must be open to receiving proof of citizenship through whatever forms

of evidence may be available to them:  this may be done by evidence of long acceptance, family

history via sworn testimony or affidavit, or whatever form of proof may provide reasonable

assurance of citizenship, separately or in combination, with other information as is reasonable under

the circumstances.  Any blanket limit on what is or is not acceptable, if the evidence is probative and

uncontested, is simply unacceptable.  Any other approach effectively makes the availability of pre-

specified forms of documentation the equivalent of citizenship itself.  The failure to afford anyone

with a plausible claim of citizenship the ability to prove citizenship through all competent means

creates the very real possibility – indeed the certainty – that citizens will be mistakenly deemed non-

citizens on account of artificial and arbitrary proof requirements.  The District lacks the power to

establish such absolute and arbitrary limitations on the proof of a constitutional fact, regardless of federal government prompting.

Finally, it bears observing that it is simply not possible to assert that Plaintiffs may be citizens for certain purposes, but they are not citizens for purposes of Medicaid because they do not possess adequate documentation.   In the United States, there are no classes of citizenship.  *Saenz*, 526 U.S. at 506-07; *Zobel*, 457 U.S. at 64.  One is a citizen, or one is not.  Thus it is simply not proper to suggest that plaintiffs may be citizens according to the proofs that would be acceptable in a court of law, to avoid deportation, but are not citizens for purposes of receiving Medicaid benefits.  Either one is a citizen or one is not.

### 2.    Defendants' Proposed Action Would Deny Plaintiffs  Privileges and Immunities of Citizenship Guaranteed by the Fourteenth Amendment, in Violation of 42 U.S.C. §  1983

The Privileges and Immunities Clause of the 14th Amendment, following the Citizenship Clause, provides in relevant part, "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States."  U.S. Const.. amend. XIV, § 1.  Because it expressly mentions "citizens," the Privileges and Immunities Clause is a logical place to look for a prohibition on state interference with citizenship.  That prohibition has been stated clearly and absolutely in that clause.  And while the precise scope of the clause is open to much scholarly debate – generally arising in connection with questions about whether the citizens of one state can do certain things in another state – the privileges and immunities clause must mean at least this much: If the Constitution itself renders someone a citizen of the United States, and a benefit is affirmatively granted by statute to United States citizens, no State can deem that person *not* to be a citizen of the United States as a basis for denying that benefit.

To be sure, most cases addressing privileges and immunities have focused on "state citizenship" and, in particular, one particular attribute of citizenship, "an implied right" under the Constitution, the right to travel.   The controversy over the Privileges and Immunities Clause

focuses on the difficulties in determining what are the *implied* rights of United States citizenship and whether restrictions on actions imposed by States interfere with such rights. In contrast, this case addresses a right afforded by statute to United States citizens, and a practice that *by its express terms* purports to address United States citizenship and how to prove it. The Supreme Court has made clear that the right to travel is merely one attribute of *national*, as well as state, citizenship. *See Saenz*, 526 U.S. at 502 (recognizing that the right to travel is protected by one's "status as a citizen of the United States," grounded in the Fourteenth Amendment).

Where a state law impairs a right of citizenship, and thus the privileges and immunities clause, the law must be closely scrutinized. This is true even though statutory provisions that govern the right to public benefits are ordinarily given only cursory review. Where a right of citizenship is implicated, restrictions on obtaining benefits must be justified by compelling need. *Cf. Shapiro*, 394 U.S. at 630 (one year waiting period for welfare benefits found unconstitutional in part because of impact on citizenship/travel rights).

Most recently, in *Saenz*, decided in 1999, the Supreme Court expressly considered whether California's decision to afford Medicaid benefits to new state residents only at the levels provided by the State those new residents had left, violated the privileges and immunities clause. The Court held that it did. *Saenz*, 526 U.S. at 506-07. The California law effectively created a subclass of citizens within the State of California. Moreover, the Court rejected California's effort to defend the law based on the fact that the federal government had apparently authorized the State to create a classification of this type. The Court noted that even the "National Government" is bound by the Citizenship Clause of the Fourteenth Amendment and may not authorize a State to violate it. *Id.* at 507-08. While *Saenz* deals *mostly* with *state* citizenship – the treatment that California gives to its own citizens – the principles it expresses, including the particular importance afforded to questions involving national citizenship, come through quite clearly.

The Defendants' impending documentation requirements do not meet privileges and immunities standards. We can assume that the basic forms of proof that are requested present no particular constitutional problem. But the plain fact of the matter is that these forms and methods of proof are not readily available to some – indeed, many – Medicaid recipients.

The problem thus arises from the failure to afford applicants and recipients the right to rely on alternative forms of proof where the specified forms cannot feasibly be provided. A sworn affidavit, based on personal knowledge, has long been understood as the type of evidence that is admissible in a court of law to demonstrate any matter of fact – and unless contradicted, it would presumably be conclusive. For those who show that they are incapable of providing documentation in other forms, there is simply no reason why such proof cannot suffice. There is no compelling need to reject such proof. There is no reason to believe that there will be a plethora of false and fictitious affidavits – under penalty of perjury, with attendant criminal sanctions – from persons who are not citizens, swearing that they are. There is no reason to reject such evidence, particularly when supported by other evidence such as an affidavit, family Bible record, family correspondence, school records, familiarity with the locale of one's birth and childhood, merely because certain listed forms of documentation cannot be found, and there are no longer two living persons, one unrelated, available to swear to the individual's birth circumstances from "personal knowledge". It is, indeed, wholly offensive that, even in the absence of <u>any</u> fact or indication that a person is <u>not</u> a citizen, such a showing would be deemed categorically and absolutely insufficient to establish citizenship.

Heritage, birth and nationality have historically been proven by various means, precisely because of the difficulties associated with documenting place of birth. Indeed, even a hearsay is allowed. *See* Fed. R. Evid. 803 (19) (Allowing hearsay evidence of "Reputation among members of a person's family by blood, adoption, or marriage, or among a person's associates, or in the community, concerning a person's birth . . . ."). Such means of proof, accepted in court, reflect the acknowledged difficulties often associated with proving place of birth. If such proof is good enough

for the courts in connection with the proof of matters of all sorts, such proof should certainly be available in connection with the Medicaid process when no other form of documentation is available.

The District has no *bona fide* interest in denying Medicaid to *citizens* on the erroneous theory that they must not be citizens if they do not possess certain limited types of documents. And while it is true that throwing folks off Medicaid will save money, there is absolutely no rational basis for cutting back on Medicaid costs by targeting persons in need who happen to lack certain forms of documentation. *See Saenz*, 526 U.S. at 507. In Plaintiffs view, the right and ability to demonstrate citizenship by every and all reasonable means is absolute. But, at a minimum, the primary right of a citizen to be recognized as such by his or her Government must be balanced against any interest the District may have in keeping non-citizens off the rolls. The Defendants' proposed approach would not come close to prevailing in that balance.

### 3.    Equal Protection

The Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Defendants' proposed documentation requirements impermissibly create two classes of otherwise similarly situated citizens: those who can provide the required documentation to prove citizenship, and those who cannot. One is granted a benefit; the other is denied it. *See Saenz* at 505-506 (noting the classifications reflected in a welfare scheme where differential benefits are provided); *Shapiro*, 394 U.S. at 633 (State may not attempt to save money by dividing its citizens into different classes for purposes of benefit eligibility). Such classifications are subject to strict scrutiny in two circumstances. Where the classification is based on race or nationality or other invidious distinctions, the classification must be strictly scrutinized. More important for present purposes, when the classification impinges upon a fundamental right, including the status of United States citizenship, it must be reviewed under strict scrutiny standards to ensure that it meets a compelling

-31-

government interest:  in this instance it must, at a minimum, serve to accurately weed out the non-citizens from the citizens, without excluding those who are citizens.  *See Common Cause/Georgia v. Billups*, 406 F. Supp. 2d 1326 (N.D. Ga. 2005) (explaining that strict scrutiny is often applied in voting rights cases); *Shapiro,* 394 U.S. at 634 (finding statute that created two classes of Medicare recipients based on length of time in state touched upon fundamental right related to citizenship unconstitutional because it did not satisfy a compelling state interest); *Saenz,* 526 U.S. at 507 (holding that a State's "legitimate interest in saving money provides no justification for its decision to discriminate among equally eligible citizens").

The Supreme Court has strictly scrutinized state laws that create alienage classifications for the distribution of economic benefits.  Most notably, in *Shapiro*, the Court reviewed a Connecticut statute that denied public assistance to residents who had been in the state for less than one year.  394 U.S. at 626.  In analyzing the statute, the Court noted that "the effect of the waiting-period requirement . . . is to create two classes of needy resident families indistinguishable from each other except that one is composed of residents who have resided a year or more, and the second of residents who have resided less than a year."  *Id.* at 627.  Ultimately, the Court concluded that the statute was unlawful in denying residents of less than one year equal protection of the laws.  *Id.*  In reaching this conclusion, the Court noted that residents of less than one year were otherwise eligible for public assistance, but for the residence requirement.  *Id.* at 642.  Because the statute impinged upon the applicants' fundamental right to travel without furthering a compelling government interest, *id.* at 627, the Court struck the statute as denying equal protection.  *See, e.g., Bernal v. Fainter*, 467 U.S. 216, 227-28 (1984) (invalidating Texas statute requiring citizenship for notaries public); *Memorial Hosp. v. Maricopa County*, 415 U.S. 250, 269-70 (1974); (finding that Arizona's durational residence requirement for free medical care did not promote a compelling state interest and was unconstitutional); *Dunn v. Blumstein*, 405 U.S. 330, 360 (1972); (striking down Tennessee law that required residency for one year and three months to be eligible to vote); *Graham v. Richardson,* 403

U.S. 365, 370-76 (1971) (invalidating Arizona and Pennsylvania statutes that limited welfare benefits based on citizenship).

While many of these cases have focused on the "right to travel" as providing the "fundamental right" that warrants strict scrutiny, it bears emphasis that later cases have emphasized that the "right to travel" is only important because it is an aspect of citizenship. *See, e.g. Saenz,* 526 U.S. at 507 (state's interest in saving money was not a justification for discriminating among equally eligible citizens); *Zobel,* 457 U.S. at 72-73 (O'Connor, J., concurring).

Similarly, a federal district court struck down a Georgia statute requiring identification for those voting in-person, by use of limited forms of proof. In *Billups,* 406 F. Supp. 2d at 1331, the court reviewed a statute requiring registered voters to identify themselves at the polls by presenting one of seventeen forms of identification. In analyzing the statute, the court recognized that the right to vote is fundamental – another aspect of citizenship. *Id.* at 1359 (quoting *Dunn,* 405 U.S. at 336). The court also acknowledged that states may impose reasonable voter qualifications. *Billups,* 406 F. Supp. 2d at 1359. However, the court was quick to point out that "those qualifications and access regulations . . . cannot unduly burden or abridge the right to vote." *Id.* The court recognized that the statute created two classes: those who could meet the identification requirements, and those who could not. After determining that the statute in *Billups* unduly infringed upon the right to vote, the court invalidated the statute. *Id.* at 1362.

Here, the Defendants would require all Medicaid applicants and recipients to document their citizenship. Just as in *Shapiro* and *Billups,* the government creates two classes of citizens: here it is those who can supply documentary evidence of their citizenship in the form the District would requires, and those who cannot. The classification discriminates against the latter group by denying them access to Medicaid, to which they have a right as U.S. citizens. As previously stated, a requirement that ferrets out non-citizens is constitutionally permissible. However, a requirement

that eliminates Medicaid eligibility for legitimate United States citizens, where there is no compelling

reason to do so, must fail.

As in *Shapiro*, the proposed documentation requirements, in their current form, advance no

compelling government interest.  Here, the statute claims to be preserving Medicaid benefits for

citizens, but would have the effect of denying benefits to citizens who are rightfully entitled to

receive Medicaid.  It does so by limiting the types of proofs that may be submitted to demonstrate

citizenship, particularly where other, common forms of documentation are not, as a practical matter,

available.

> **4.  The District's Proposed Documentation Requirements Violate Due Process**

The due process clauses of the Fifth and Fourteenth Amendments are likewise applicable

here.  All that is needed to initiate a due process analysis is a showing that a law deprives individuals

of life, liberty or property.   For those who are currently receiving benefits based on the prior

acceptance of the fact that they are citizens, the receipt of benefits provides a "property right" that

cannot be taken away without due process of law.  Numerous courts have found that Medicaid

recipients have the same property interests in their Medicaid benefits as other recipients of public

benefits.  *See, e.g., Catanzano v. Dowling,* 60 F.3d 113, 117 (2d Cir. 1995); *Ortiz v. Eichler,* 794 F.2d 889,

893-94 (3d Cir. 1986); *Salazar,*  954 F. Supp. at 327; *Cherry v. Tompkins*, 1995 U.S. Dist. LEXIS 21989

at *5 (S.D. Ohio, 1995); *Weaver v. Colorado Dep't of Social Servs.*, 791 P.2d 1230, 1235 (Colo. Ct. App.

1990).  Indeed, federal regulations and the District's own Medicaid program require that Medicaid

must be provided to all eligible recipients of Medicaid, and before any adverse action can be taken

against a recipient of Medicaid, the agency must provide the cause for taking such action and give

the recipient adequate notice.  42 C.F.R. 435.210; 42 C.F.R. 435.930.  Therefore, once an individual

has been determined to be eligible for Medicaid benefits, due process prevents a termination of

those benefits absent a demonstration of a change in circumstance or other good cause. *Cardinale v. Mathews,* 399 F. Supp. 1163, 1175 (D.D.C. 1975).

Moreover, the right to recognition of one's citizenship – a special status under the law – may independently be understood as a liberty interest protected by the due process clause in itself, given the basic association between that status and the full range of rights and privileges that it bestows. Thus, the statute books have long reflected that a citizen who is denied any benefit by a federal official on account of ostensible non-citizenship, has a cause of action to affirm his status as citizen. 8 U.S.C. § 1503. Indeed, whether or not any specific or immediate consequences were expected to flow from it, there is no doubt that if the Government were to try to strip a person of this status, that person would have to be afforded due process. Thus, beyond those currently receiving benefits – who have a property interest in the continuation of those benefits – all applicants for Medicaid who are citizens have a life and liberty interest in receiving due process before benefits are denied on the peculiar grounds of non-citizenship.

Once it is shown that an action under color law deprives individuals of life, liberty or property, the question arises whether it does so without due process of law. That inquiry has two components. The first is known as substantive due process – and it has been held to bar wholly irrational laws that deprive a party of a property right, or some aspect of life or liberty – without appropriate process. *Tulsa Prof'l Collection Servs., Inc. v. Pope*, 485 U.S. 478, 485 (1988); *Logan v. Zimmerman Brush*, 455 U.S. 422, 429 (1982). In some respects, the due process analysis mirrors the equal protection analysis. *See id.,* 429-35 (striking down Illinois law depriving appellant of right to use employer's adjudicatory process under 14th Amendment due process analysis); 438-42 (reaching same conclusion under equal protection analysis) (Blackmun, J. concurring). Therefore, we will not dwell on it here.

Second, the due process clause addresses procedure. Courts have had little difficulty recognizing that the determination of citizenship is a matter that can be amenable to reasoned

procedures even in an administrative context – and even in the exigent circumstances of a border

crossing.  *See e.g.*, *Hernandez*, 913 F.2d 230.  In *Hernandez*, the Fifth Circuit considered what

procedures were required before a border officer could deny admission into the country to someone

claiming United States citizenship.  Such a person is, of course, entitled to a full scale hearing before

an immigration judge.  But the question arose about what standards had to be employed before

temporarily excluding someone claiming citizenship at the border, pending that hearing.   The Fifth

Circuit held that due process required certain procedures even for the temporary denial of entry,

pending the immigration hearing.  *Id.* at 239-41.  In contrast, in connection with this case, the

impending scheme would absolutely deny Medicaid benefits to the individual plaintiffs without due

process at any stage.

    The basic test of adequate procedural due process is, of course, derived from the same three

factor test established long ago in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); *see Wilkinson v. Austin*,

125 S. Ct. 2384, 2395 (2005) (applying *Mathews*' factors to due process analysis); *City of Los Angeles v.

David*, 538 U.S. 715, 716 (2003) (per curiam) (same); *Lassiter v. Dep't of Social Servs. of Durham County,

N.C.,* 452 U.S. 18, 26 (1981) (same).  Those three factors reflect:

> First, the private interest that will be affected by the official action; second, the risk
> of an erroneous deprivation of such interest through the procedures used, and the
> probable value, if any, of additional or substitute procedural safeguards; and finally,
> the Government's interest, including the function involved and the fiscal and
> administrative burdens that the additional or substitute procedural requirement
> would entail.

*Mathews,* 424 U.S. at 335.   Here the analysis is easy, given the facts.  The private interest is both in

the recognition of citizenship and access to vitally needed medical benefits.  The risk resulting from

an erroneous deprivation is great.

    The risk that the procedures to be implemented by Defendants will wrongly deem persons

who are citizens to be non-citizens by virtue on the limitation of proof allowed is likewise extreme.

As demonstrated above, the documentary "proofs" of citizenship that the Defendants propose to

accept are limited, and often unavailable to the very persons that Medicaid is designed to serve. Defendants demand documents that simply do not exist or are not practically available for the named Plaintiffs – and may not exist for a large percentage of persons receiving, or eligible for, Medicaid.   Arbitrarily excluding other forms of proof commonly accepted in courts and in other related circumstances creates a significant risk of erroneous deprivation:  It is as if one were to conduct a trial in which it was determined arbitrarily, and without any regard for the items that needed to be proved, that the only evidence that could be received would be "official documents" issued by the government.  Under Defendants plan, sure citizens are deemed non-citizens and denied benefits on that basis.

And finally, the burden of allowing additional forms of proof is small.  Presumably, some persons will be able to provide the type of documentation that Defendants most desire.  It is only where they cannot do so that there is a need to consider other forms of proof, and the consideration of such proofs will be no more difficult than the consideration of the types of documents that Defendants are clearly willingly to accept.

In this respect, it is significant that this entire enterprise, requiring review of all Medicaid recipients to insist that they provide documentation, will impose enormous burdens on Defendants. The new documentation requirements appear to provide the benefit of certainty – *i.e.*, if this is produced, citizenship is established, if it is not, citizenship status is deemed unproven, and Medicaid benefits will be denied.  This administrative convenience is plainly insufficient as a justification for an absolute refusal to consider alternative grounds for proving citizenship, given the uniquely important constitutional rights and critical access to health care benefits that are at stake.

Every citizen denied a benefit on the theory that they are not really a citizen is entitled to a fair opportunity to show otherwise.  Defendants' plan does not provide it, or acceptably address the circumstance where the preferred documentation are unavailable.  As such it violates due process.

**5.     The Defendants' Documentation Requirements Violate  Equal Protection and Due Process Even Under Rational Basis Review**

Even were we to ignore the fundamental interest in citizenship at stake here, the Defendants' documentation requirements would fail to meet equal protection and due process requirements in that they irrationally limit the type of proof of citizenship that may be used to qualify, or retain, benefits.

The courts have "consistently . . . required that legislation classify the person it affects in a manner rationally related to legitimate governmental objectives." *Schweiker*, 450 U.S. at 230; *accord Logan,* 455 U.S. at 439.  The classificatory scheme must "rationally [advance] a reasonable and identifiable governmental objective." *Id.* at 235.   Although rational basis review is currently quite limited, it is not yet a dead letter – especially in a case in which important interests beyond mere economic interests – are implicated.

In *Logan*, 455 U.S. 422, a plaintiff filed a discrimination charge with the Illinois Fair Employment Practices Commission.  Under the applicable statute, the Commission was required to convene a fact-finding conference and conduct an investigation on the charge within 120 days after the complaint was filed.  The Commission did not meet that deadline and the Illinois Supreme Court terminated the plaintiff's claim.  The Illinois Supreme Court reasoned that the statute's purpose was to bring efficient resolutions to disputes, so if the Commission did not meet its deadline, the dismissal of the complaint comported with the statute's purpose.  *Id.* at 427.  The United States Supreme Court held that the express purpose of the applicable statute was to eliminate employment discrimination.  Enforcing a deadline provision did not support that purpose and instead arbitrarily divided complainants into two categories: those whose cases the Commission got around to addressing and those the Commission did not.  Complainants had no control over which category they would fall into and the Court found on a rational basis that such a division was a violation of equal protection.  *Id.* at 436-37.  The law was irrational.

In *United States Department of Agriculture v. Moreno*, a plaintiff class of applicants and recipients of Food Stamps challenged an amendment to the Food Stamp Act that excluded households that contained unrelated individuals from receiving Food Stamp benefits. 413 U.S. 528, 531 (1973). The amendment effectively split Food Stamp applicants and recipients into two classes: those whose households contained unrelated persons, and those that did not. *Id.* at 534. The Court struck down the amendment as a violation of equal protection, for the Court found there was no rational basis for the amendment. The government defendant argued that the purpose of the amendment was to minimize fraud. *Id.* at 535. However, the Court rejected the argument, stating, "we still could not agree with the Government's conclusion that the denial of essential federal food assistance to *all* otherwise eligible households containing unrelated members constitutes a rational effort to deal with these concerns." *Id.* (emphasis in original).

Plaintiffs here are in a similar situation to those in *Logan* and *Moreno*. The Defendants have failed to approach the issue of documentation of citizenship in a rational way. They have created a list of requirements that irrationally demands documents that the individual Plaintiffs and many of the other persons that the program is intended to serve cannot produce. Defendants have arbitrarily excluded forms of proof that are commonly regarded as acceptable in providing at least prima facie proof of a fact.

The Defendants have no interest in denying citizens their benefits. They may have an interest in saving money, but no rational interest in choosing persons who do not have access to particular forms of documentation as the ones to bear the burden of their cost-saving efforts.

The alleged purpose of the new document requirements is to make sure non-U.S. citizens or nationals do not receive Medicaid benefits for which they are ineligible. However, studies have not shown any significant problem, if indeed a problem exists at all, with non-U.S. citizens and nationals obtaining Medicaid benefits. For example, the Office of Inspector General for the Department of Health and Human Services recently found no substantial evidence that large numbers of non-US.

citizens or nationals were obtaining Medicaid by falsely claiming citizenship. *See* Office of the Inspector General, "Self-Declaration of U.S. Citizenship Requirements for Medicaid," July 2005. In particular, in the state of Oregon it was found that fewer than three percent of Medicaid beneficiaries are non-U.S. citizens or nationals. *Id.* [14]

Just as the Court in *Moreno* found that, "in practical effect, the challenged classification simply does not operate so as rationally to further the prevention of fraud," 413 U.S. at 537, so can this Court hold with respect to Defendants' new document requirements. The current Medicaid regulations already address fraud prevention and authorize states to re-determine eligibility if it suspects that a recipient or applicant is actually not eligible. 42 C.F.R. 435.916(c)(1). Instead of preventing fraud, the Defendants' approach here will unconstitutionally deprive the individual Plaintiffs of a fair chance to show their citizenship – even as no one, the District included, really doubts their citizenship at all.

### B.    Plaintiffs Will Suffer Irreparable Harm If Injunctive Relief Is Denied

The failure to grant injunctive relief *ad interim* will result in irreparable harm to the plaintiffs, and others. The very reason that Medicaid was created, and the very reason that plaintiffs seek medical care, is because it provides their sole likely means of obtaining medical care. The Defendants' new documentation requirements will result in loss or non-receipt of Medicaid benefits. Absent that medical care they will suffer immediate harm. Deprivation of medical care can result in pain, suffering, deterioration, loss of life. All such harm is irreparable in the classic sense. Plaintiffs do not have an obvious damages remedy to recover for such harm, even if such harm were

---

[14]    The reason why there are few illegal immigrants on the Medicaid roles is logically explained by existing requirements. Illegal immigrants are none too likely to wish to subject themselves to a bureaucratic inquiry. Moreover, it is highly unlikely that an oath of citizenship, under penalty of perjury – a criminal offense, even irrespective of the possibility of prosecution for fraud and false claims – would not suffice to dissuade illegal immigrants from obtaining benefits.

measurable.  Thus, the harm to plaintiffs that will follow if the Defendants are allowed to implement these documentation requirements, as they intend to do on July 1, is irreparable.

### C.    Balance Of Harms Weighs Heavily In Favor Of Plaintiffs

In contrast to the harm to plaintiffs if an injunction against these new documentation requirements is denied, Defendants will suffer no harm from the issuance of an injunction against these documentation requirements.  Indeed, all of these requirements will be difficult and costly to administer. [15]  The effort to administer them could very well impact Defendants' ability to administer other aspects of the Medicaid program.  Finally, Defendants have an interest in ensuring that any documentation program that they initiate be determined at the outset to be lawful.  The burdens and the costs of re-doing such a program, including undoing determinations based on improper standards and procedures, could be costly and harmful to the overall administration of the Medicaid program.

In this respect we note that notwithstanding the DRA, at least one State, Ohio, has agreed to delay implementation of any new documentation requirements for several months while it gives thought and study to how such documentation requirements can be effectively, and presumably lawfully, implemented.  *See* n.3, *supra.*  The District of Columbia can do the same.  Moreover, Defendants have no legitimate interest whatsoever in implementing documentation requirements that will cause *citizens* to lose their Medicaid benefits, which is what these documentation requirements will cause.  To the contrary, it is Defendants' obligation to ensure that such citizens, otherwise qualified for Medicaid, are in fact afforded coverage.

---

[15]    The Medicaid Director for Connecticut has observed that attempting to meet the documentation requirements of Section 6036 "would be an enormous administrative burden." John Reichard, *Critics Say New Documentation Rules for Medicaid Would Reduce Enrollment*, CQ HealthBeat, November 8, 2005.

The only harm that has ever been suggested as flowing from an injunction against these new documentation procedures is the possibility that by delay, some non-citizens will be able to improperly receive Medicaid benefits because their fraud, in claiming to be citizens, will go undetected. But this "harm" is speculative at best; there is no assurance that there are any, or many, such individuals currently on the Medicaid rolls. And there is certainly no suggestion that by implementing these requirements on July 1, any substantial number will be unearthed in the short run. Moreover, the objective evidence is to the contrary: The Office of Inspector General for the Department of Health and Human Services found insubstantial evidence that non-U.S. citizens or nationals have been, or will be, obtaining Medicaid by falsely claiming citizenship. *See* McClellan, *supra* n.6.

### D.    The Public Interest Will Be Served By Granting Injunctive Relief

The public interest will be served by granting the injunction.

First, it is always in the public interest to ensure that laws are implemented in a manner consistent with the Constitution. *Buckhanon v. Percy*, 533 F. Supp. 822 (E.D. Wis. 1982) ("Compliance with due process benefits not only those whose benefits were wrongfully terminated or reduced. All citizens benefit when the Constitution is upheld.").

Second, implementation of these requirements will be costly – a cost which the public will bear.

Third, improperly removing citizens entitled to Medicaid from the Medicaid rolls because of the inability to provide documentation is inconsistent with the public interest. That public interest is expressed in those provisions of the Medicaid Act that require Medicaid to be afforded to citizens. Society's intention and desire to afford these benefits to citizens is thus in the public interest. The failure to provide Medicaid coverage to those entitled to it will be a detriment to society, imposing costs on family members, charitable organizations, emergency rooms, and others who may try or be forced to, in some small way, take up the slack.

While we do not have statistics directly applicable to the District, there is every indication that vast numbers of Medicaid recipients – far beyond the named plaintiffs – will be affected by these documentation requirements.   A study commissioned by the Center for Budget and Policy Priorities and conducted by the Opinion Research Corporation conducted earlier this year found that if severe documentation requirements were implanted, between  3.2 and 4.6 million U.S.-born citizens now receiving Medicaid would be at risk of losing their Medicaid benefits.[16]  Of those recipients at risk of losing their benefits, 1.4 to 2.9 million are children.[17]  The study found that African-Americans, senior citizens, adults without a high school diploma, and adults living in rural areas are less likely to have the documents required under Section 6036 than other groups.[18]  In particular, low-income elderly African-Americans may be particularly hard hit by such documentation requirements because a significant number of these individuals were never issues birth certificates.[19]  As noted  in *Salazar,* 954 F. Supp. at 281, "this case is about people-children and adults who are sick, poor, and vulnerable-for whom life, in the memorable words of poet Langston Hughes, 'ain't been no crystal stair.'"

Finally, it bears noting that "innocent civilians" – Medicaid applicants and recipients who may have no difficulty proving citizenship – are also likely to be adversely affected by the immediate implementation of these citizenship documentation requirements.   That is because the type of documentation program that the Defendants are about to embark on will require an enormous bureaucratic undertaking.  Given the limited resources and staff available to Defendants, the

---

[16]    Judith Solomon, *et al., HHS Guidance Will Exacerbate Problems Caused By New Medicaid Documentation Requirement,* Ctr. on Budget and Pol'y Priorities Rep. (Tab I) *citing* Leighton Ku, *et al., Survey Indicates the Deficit Reduction Act Jeopardizes Medicaid Coverage for 3 to 5 Million U.S. Citizens*, Ctr. on Budget and Pol'y Priorities Rep.

[17]    Id.

[18]    Id.

[19]    Id.

attention to these documentation requirements will certainly have an impact on Defendants' ability to effectively manage other aspects of the Medicaid program. Thus, the failure to enjoin these new documentation requirements will likely have a direct and significant negative impact on third parties who are not even directly put at risk by these new requirements.

To be sure, Plaintiffs do not, at this time, have before them, specific statistical information to allow an offer of proof about the effects of these new citizenship documentation requirements on the administration of the Medicaid program overall. Neither do they have information about the extent of "citizenship" fraud in the District of Columbia Medicaid program, or about the number of citizens in the Medicaid program likely to be affected. Plaintiffs do believe that some or all of that information is in the possession of Defendants. Therefore, Plaintiffs will seek expedited discovery to establish a firm and satisfactory record upon which a final judgment declaring such requirements unconstitutional can rest. In the meantime, Plaintiffs themselves face the most egregious of harms – a bureaucratic nightmare of the worst sort – being denied by their own government a fair opportunity to show that they are United States citizens and, thereupon, to lose their health benefits.

## CONCLUSION

This Court should grant Plaintiffs' Motion for Temporary Restraining Order and/or Preliminary Injunction, and establish a schedule under which discovery can be conducted, and the issues briefed and argued to the Court in contemplation of final judgment.

Respectfully submitted,


/s/ Barry Parsons
 CROWELL & MORING LLP
 Arthur N. Lerner (D. C. Bar # 311449)
 Clifton S. Elgarten (D.C. Bar # 366898)
 Barry M. Parsons (D. C. Bar # 454788)
 Michael Paddock (D. C. Bar # 496254)
 Portia R. Brown (D. C. Bar # 482494)
 Michael J. Goecke (D. C. Bar # 485999)
 1001 Pennsylvania Avenue, N.W.
 Washington, D.C.  20004-2595
 (202) 624-2500

 *Attorneys for Plaintiffs*


Dated:  June 29, 2006


2794416