TAB L

# POPULATION INVESTIGATION COMMITTEE

at the

London School of Economics and Political Science
Aldwych, London, W.C.2

*Chairman:*
SIR ALEXANDER CARR-SAUNDERS, M.A., LL.D.

*Vice-Chairman:*
D. V. GLASS, B.Sc. (Econ.), Ph.D.

*Honorary Treasurer:*
L. J. CADBURY, O.B.E., M.A.

*Honorary Secretary:*
C. P. BLACKER, M.A., M.D.

*Research Secretary:*
E. GREBENIK, M.Sc. (Econ.)

*Committee:*

Professor R. G. D. ALLEN, M.A., D.Sc. (Econ.) (representing the London School of Economics)
Mr. A. M. T. BARNES, M.R.C.S., F.R.C.S., M.R.C.O.G. (representing the Royal College of Obstetricians and Gynaecologists)
Mrs. W. FLOUD, S.C.M., A.I.H.A. (representing the Society of Medical Officers of Health)
Professor D. G. CHAMPERNOWNE, M.A.
Miss E. CHARLES-KERNIG, M.D., B.S.I., B.C.M. (Vice-Chairman, The Eugenics Society)
Professor R. C. DAVIE, M.D., B.S., M.F.C.H., D.P.H. (representing the Society of Medical Officers of Health)
J. A. FRASER ROBERTS, M.D., D.Sc., M.R.C.P., F.R.S.E.
Professor W. O. JAMES, M.A., D.Phil. (representing the Royal Society)
Professor SIR ROBERT B. HENDERSON, M.A. (representing the Royal Statistical Society)

Professor W. O. TOTHOUS, M.A., A.R.I.B.A., M.R.St
SIR ARTHUR HOLLAND, M.D., F.R.C.S., F.R.C.P., D.P.H. (O.St.J., D.D.)
Professor D. G. KENDALL, M.A., Sc.D. (representing the Royal Statistical Society)
Professor AUBREY LEWIS, M.D., D.P.C.P. (representing the B.H.M.A.)
Sir GEORGE M. PILE, K.B.E., F.B.A.
Professor T. H. MARSHALL, C.Mg., M.A. (representing the London School of Economics)
EDWARD G. J. PEDLOW, M.A., M.B., M.R.C.S., L.R.C.P. (representing the Medical Research Council)
Professor GODFREY THOMSON, D.C., Ph.D., D.Sc.
R. R. KUCZYNSKI, D.Sc.
Professor M. YOUNG, D.S.O., M.D., F.R.C.S. (Edin.), F.R.C.O.G.

———

*Population Studies* is issued by the Population Investigation Committee in four parts to each volume, and it is intended that a volume shall appear each year.

The subscription price per volume, payable in advance, is 30s. net, post free, or $5.00. Drafts in American currency can be accepted. The price of single copies is 10s. plus postage.

Subscriptions should be sent to the

CAMBRIDGE UNIVERSITY PRESS
BENTLEY HOUSE, LONDON, N.W.1.

or to any bookseller. U.S.A. subscriptions may be sent to Cambridge University Press, American Branch, 51 Madison Avenue, New York 10.

Papers for publication, and other editorial correspondence, should be sent to the Editor,
D. V. GLASS, LONDON SCHOOL OF ECONOMICS AND POLITICAL SCIENCE,
HOUGHTON STREET, ALDWYCH, W.C.2

or to the Foreign Editors in the countries concerned.

# Development of Birth Registration and Birth Statistics in the United States

## By S. Shapiro

The development of adequate national birth statistics in the United States is closely linked with the long and difficult task of establishing effective registration systems throughout the country. The registration of vital events has always been under the authority of State and local areas. For many years, the formation of registration systems progressed independently in various States with virtually no unifying force present. It was not until the early part of this century that national standards for the registration of births were recommended. The voluntary adoption by the States of the major features of these standards has made it possible for the Federal Government to collect, tabulate, and publish an annual series of national birth statistics.

The historical movement for sound registration systems in the United States and the formation and growth of the national birth-registration area are briefly reviewed in this paper. A major portion of the article is devoted to nation-wide tests of birth-registration completeness. The final section discusses national statistics derived from birth records.

## I. Developments prior to 1900[1]

### Registration

The history of the registration of vital events in the United States dates back to early colonial days. In 1632, the Grand Assembly of Virginia required ministers or wardens from every parish to present themselves annually at court on 1 June to provide a register of all burials, christenings and marriages. Several years later (1639), the Massachusetts Bay Colony passed a law which marked a departure from past practice by requiring government officers to record births, deaths and marriages instead of the ecclesiastical ceremonies of baptisms, burials and weddings. This formed the pattern for the laws adopted by Connecticut and New Plymouth, and as time went on, other colonies placed similar measures into effect.

These acts were found to be ineffectual, and additional regulations were passed to fix the responsibility for registering vital events. In 1692, Massachusetts enacted what proved to be the most comprehensive registration law of the period. Important features were the reinforcement of an earlier penalty clause (1644 law) against the next of kin for failure to register a birth or death and authorization of town clerks

[1] Much of the material in this section is based on an unpublished report prepared by Mr Jack Ogus, Bureau of the Census. For further discussion of the early development of registration in the United States, see: Cressy L. Wilbur, *The Federal Registration Service of the United States: Its Development, Problems, and Defects*, Government Printing Office, Washington, D.C., 1916; John W. Trask, *Vital Statistics*, Government Printing Office, Washington, D.C., 1914; R. R. Kuczynski, 'The registration laws in the colonies of Massachusetts Bay and New Plymouth', *J. Amer. Statist. Ass.*, vol. VII, no. 51, September 1900; Walter F. Willcox, *Studies in American Demography*, chapters 4, 13, 17, Cornell University Press, Ithaca, New York, 1940.

to collect sixpence for a 'fair certificate' issued to anyone desiring such a record. Despite the relatively stringent regulations, important deficiencies still existed in the registration system.

It was more than 100 years later, in 1795, when the next significant step was taken toward promoting complete registration, with Massachusetts again being the innovator. The law, in addition to requiring parents to notify the town clerk of the births and deaths of children, made householders responsible for reporting births and deaths that occurred in their households, and institutions for those occurring in them.

Progress in other parts of the country was slow. This was not entirely surprising, since until the early 1800's practically the entire justification for maintaining a registration system was the legal and historical use that could be made of the records. Registration did not seem very important to a population undergoing rapid changes through immigration and subsequent migration within the country.

With the growing realization of the importance of vital statistics (particularly data on death) for health purposes, a new impetus was given to the establishment of strong registration systems. In 1841, Massachusetts passed what has been termed the first State registration law of modern type. Major advances made by this law (as revised in 1842 and 1844) were the provision for uniform certificates to be used throughout the State, and the establishment of a state-wide file of copies of the records. In addition, specific steps were taken to reinforce the authority of the registration system.

For the first time, national organizations took a direct interest in registration. In 1847, the American Medical Association during the initial year of its organization appointed a committee to study ways and means of improving the registration of births, deaths and marriages. Several years later, the Association formally urged physicians throughout the country to request their States to establish offices for the collection of vital statistics.

A number of States acted in rapid succession, and by 1859, eight had established registration systems. The Civil War halted the progress of such legislation, but it was resumed almost immediately afterwards, with each State substantially taking its own course. In some States it was necessary to report births within 30 days after the occurrence, whereas in a few areas, reporting was on an annual basis. Responsibility for filing birth certificates was not uniform, although the new concept of requiring the attendant at birth to file the certificate was gaining acceptance. Furthermore, the content of the birth certificates varied, and the legal status of the registration system in many areas remained weak.[1]

### Statistics

Statistical reporting of births and deaths by States followed the centralized collection of the original certificates or certified copies of the records. The earliest reports were issued in Massachusetts.[2] The accuracy and reliability of the data, however, were seriously questioned by the officials themselves. It was not uncommon

---

[1] John S. Billings, 'The registration of vital statistics', *Amer. J. Med. Sci.* New Series, vol. LXXXV, pp. 33–59, 1883.

[2] *Massachusetts State Registration Reports*, The Office of the Secretary, Commonwealth of Massachusetts, 1841–3.

88                          S. SHAPIRO

to find in some communities that very few or no birth records at all were filed for the entire year. With the passage of time, the situation improved in Massachusetts and other States, but a marked degree of under-registration continued to be the rule rather than the exception.

The inadequacies of the registration system fixed attention on the decennial census of the population as a means for collecting facts concerning vital events. The Constitution had provided for a regular periodic enumeration of the inhabitants of the United States for the purpose of apportionment of representatives in Congress and direct taxes. It was recognized very early that the census offered a unique method for obtaining additional useful information about the population, and the first census (1790) showed some slight expansion of the original plan.

In 1800 two groups unsuccessfully urged Congress to broaden the field of the census to a much larger number of facts than had been obtained in 1790. One of the memorials submitted was signed by Thomas Jefferson, then president of the American Philosophical Society. It included a suggestion that the number of births occurring during the previous year be enumerated and tabulated. The special birth tabulation was advocated as a means of distinguishing between the population increase due to births and that due to immigration, and also to serve as a component in the construction of an American life table.[1]

The first effort to collect national vital statistics, through the census method, occurred in 1850. Major emphasis was placed on obtaining mortality statistics, but tabulations were prepared showing the number of enumerated children who were under 1 year of age as of census date. No correction of State data was made for infants who were born during the year preceding the census but who had died prior to the date of enumeration. An adjustment for the country as a whole, which took this factor into account, was based on a special study in one State of reported infant deaths.[2] The United States crude birth rate was estimated at 28 per 1000 population, as compared with the uncorrected rate of 27. Even the higher figure cannot be taken as representing the actual birth rate for the period, in view of the marked under-enumeration of children less than 1 year old that undoubtedly occurred, and the failure to report many infant deaths.

A different adjustment was made in the 1860 count of infants under 1 year of age to arrive at a total birth figure for the United States. It was found that, during the year, births registered in two States, Connecticut and Massachusetts, totalled 11·7% more than the number of infants enumerated. This figure was arbitrarily raised to the ratio one-eighth, to correct for under-registration, and applied to the enumerated population less than 1 year of age. The crude birth rate was then set at about 33·5.[3] However, this is probably an understatement, since the basis for the correction factor assumes a higher degree of registration completeness in the two States than

[1] Carroll D. Wright and William C. Hunt, *History and Growth of the United States Census*, 1790–1890, pp. 18–20, Government Printing Office, Washington, D.C., 1900.
[2] U.S. Census Office, *7th Census*, 1850, 'Statistical view of the United States', p. 57, A. O. P. Nicholson, Public Printer, Washington, D.C., 1854.
[3] U.S. Census Office, *8th Census of the United States*, 1860, 'Population, Statistics of Birth', p. xxxviii, Government Printing Office, Washington, D.C., 1862.

would appear justified. It is also questionable whether enumeration completeness in the two States could be taken as the average for the entire country. The 1870 census made no further progress in arriving at a close estimate of the crude birth rate, although a careful study was made to determine the extent of underenumeration of infants and errors in reporting age of infants.[1]

In 1880 enumerators were required for the first time to determine the number of infants who were born and had died in the year preceding the census. This figure, added to the population under 1 year of age, resulted in a birth rate of 31. The method was repeated in 1890 and 1900, giving birth rates of about 27 for each year. Underenumeration and incorrect age classifications continued to be strong deterrents to the acceptance of the data as reliable.[2] Working from the population increase and allowing for deaths and immigration led to estimates of average annual crude birth rates for the United States that were much higher than those determined from enumeration data (e.g. the rate was 36 for the decade 1870–80 and 35 for 1890–1900).

After the 1900 census, all attempts to obtain vital statistics through the enumeration method were completely abandoned.[3] This came as the culmination of careful experimental work which had started with the 1880 census. Activity was centred around two approaches for improving mortality statistics.[4] Deaths rather than births were the focus of attention because of their direct relationship to health problems and the greater possibility of controlling the registration of such events.

Prior to the 1880 census, 'registers of deaths' were mailed to physicians throughout the country. The physician was asked to specify the place of death, date of death, various identifying items concerning the deceased, and the cause of death, covering deaths that occurred in the year preceding the census. Nation-wide publicity campaigns and appeals to medical associations requesting co-operation helped to secure a return of about 37 % of the registers. It was found that, of the 167,000 deaths reported, 61,000 had not been enumerated. These were added to the census returns to make the statistics more complete.

The other experimental approach involved the use of death records filed in the States of New Jersey, Massachusetts, the District of Columbia, and nineteen cities as substitutes for the enumerators' collection of information concerning deaths. The crude death rate for this area was 19·8 per 1000 population, as compared with a rate of 13·5 obtained by enumeration for the rest of the country. In the 1890 census, death records in eight States, the District of Columbia and eighty-three cities outside the States were used in this manner.

[1] U.S. Census Office, *9th Census of the United States*, 1870, vol. II, 'Vital Statistics', pp. 515–24, Government Printing Office, Washington, D.C., 1872.

[2] U.S. Census Office, Government Printing Office, Washington, D.C.: *10th Census of the United States*, 1880, vol. XII, 'Mortality and vital statistics', part II, p. cxl (1886); *11th Census of the United States*, 1890, 'Vital and Social Statistics in the United States', part I, Analysis and Rate Tables, p. 481 (1896); *12th Census of the United States*, 1900, vol. III, 'Vital Statistics', part I, Analysis and Ratio Tables, pp. xlix–lv (1902).

[3] Lack of confidence in the reliability and completeness of vital statistics collected through the enumeration procedure had been expressed by census statisticians as early as 1850. The method was used as the alternative to having no data at all.

[4] U.S. Census Office, *Mortality and Vital Statistics of the United States*, part I, 1880, pp. xi–xxiii, Government Printing Office, Washington, D.C., 1885.

Encouraged by the results of these experiments, the Census Office surveyed all States and each city of 5000 or more population shortly before the 1900 census to determine the adequacy of their registration systems. Completeness of death registration was measured for many of these States and localities by comparing names on the enumerators' schedules against the files of registered deaths. Although registration was found 'satisfactory' in only a few States, the prospects for rapid improvement in the situation seemed better than ever before. It was inevitable that birth registration and statistics should also benefit from many of the events that followed.

## II. THE NATIONAL BIRTH-REGISTRATION AREA

### *Events immediately preceding formation*

Years of discussion and agitation finally resulted in a quick succession of actions with far-reaching effects on the development of national vital statistics. The foremost was the establishment of the Bureau of the Census as a permanent office in 1902. Certainly, one of the strong deterrents to the Federal Government's participation in promoting vital registration had been the absence of a permanent agency which could maintain continuous interest in the subject. The Census Office was responsible for the collection and analysis of national vital statistics, but its span of life was long enough only to plan, conduct and publish the results of each census.

In forming the permanent Bureau of the Census, Congress provided for the collection of statistics on births and deaths in registration areas annually. The Director of the Bureau was authorized to obtain data from registration records of such States and cities as, in his discretion, could provide satisfactory data. The attitude of the Bureau towards State and local organizations which had been expressed a little earlier was unchanged: 'It (i.e. the Census Office) cannot direct or control local officers, nor dictate the methods to be employed; it can only advise and assist in the matter (of effective registration), and crown the movement with final success by making its published statistics as useful as possible.'[1]

The next step taken by Congress was to adopt a resolution in 1903 which stressed the importance of a complete and uniform system of registration throughout the country. Favourable consideration and action of State authorities were requested. The resolution stimulated widespread discussion and facilitated census plans already initiated for obtaining uniform vital statistics.

In preparation for the decennial collection of mortality statistics in 1900, the Bureau had obtained copies of State laws, municipal ordinances, forms and instructions governing vital registration. A comprehensive study of the materials placed the inadequacies of many of the laws in sharp relief. The next order of business was to formulate the requirements for sound registration practices and adequate legislation. For this task, the Bureau joined forces with the Committee on Demography and Statistics of the American Public Health Association which had also been considering the problem. Their recommendations included a basic set of principles to guide States

---

[1] U.S. Census Office, *Registration of Deaths*, Vital Statistics Circular no. 71, p. 2, Washington, D.C., 1902.

in preparing laws for the registration of deaths and the collection of mortality statistics. An integral part of the circular containing the principles was a standard certificate of death which it was hoped the States would use as a basis for revising their certificates. Copies of the circular were sent to the Governor of each State, medical societies, journals and others interested in effective registration. The document was then extended to cover the registration of births and a standard certificate of birth was issued.[1]

The need for more specific guidance to the States in preparing legislation soon became apparent. Broad principles were not enough, and through the joint efforts of the Census Bureau, American Medical Association, American Public Health Association and other organizations there emerged in 1905 a working draft of the Model Law.[2] As the name implied, this 'law' was designed only as a model for legislative action in the States, but behind it was the force of many national and State groups. The Model Law clearly specified the central authority of the State boards of health over registration matters, provided for the establishment of a strong local apparatus, fixed responsibility for registering births on the attendant at birth (physician, midwife), called for rigid enforcement of the law, and listed a minimum set of items for inclusion on State certificates.

The first test of the adequacy of the recommended bill occurred in Pennsylvania, which passed a law in 1905 patterned after the Model Act. Striking improvement in birth and death registration was almost immediately apparent. This success led several other States shortly thereafter to adopt similar Acts, or to amend existing laws to conform to it.

The Bureau of the Census, while co-operating with various organizations on the legal aspects of registration, was also conducting an energetic campaign to increase the coverage of the recently formed death-registration area. The prerequisite of 90% completeness for admittance had been established, and considerable prestige was associated with being part of the area. Furthermore, the American Medical Association, the American Public Health Association, and many other groups were actively engaged in publicizing the importance of registering all deaths. Between 1900 and 1915, the death-registration area increased from ten States and the District of Columbia to twenty-four States.

Steps were taken to create a birth-registration area several years before the 1910 census. For the calendar year 1908, the Bureau of the Census collected, from every possible source, transcripts of all births registered in the United States. The collection was believed to be almost exhaustive, but the birth rate based on these records was only 19·8 for the area making returns. Transcripts of births occurring in 1909 and 1910 were obtained from eight States, New York City, and the District of Columbia, where birth registration seemed to be most efficient. The birth rate for the area was 24·9 in 1909 and 25·4 in 1910.[3]

---

[1] Bureau of the Census, *Registration of Births and Deaths*, Vital Statistics Circular no. 104, Government Printing Office, Washington, D.C., 1903.

[2] A final draft was published in 1907. The Act underwent a basic revision in 1942 and was superseded by the Uniform Vital Statistics Act of that year. This is now being reviewed for necessary change.

[3] Cressy Wilbur, op. cit. pp. 18–19.

92                                 S. SHAPIRO

The huge task of conducting the 1910 census caused the Bureau to relax its efforts in forming a birth-registration area. Fortunately, other factors developed which tended to promote registration. Interest in reducing infant mortality in the United States was gaining momentum, and the need for accurate birth and death statistics to measure the problem became acute. In 1912, the United States Children's Bureau was created, one of its major responsibilities being the investigation of infant mortality. The new Bureau took the initiative and enlisted the support of a wide variety of organizations to help States improve registration. Not only were the statistical values of birth records receiving attention, but the personal value of the certificate itself increased. The birth record in some places became the primary document for verifying age in entering school and in obtaining work permits.

Despite the marked improvement in birth registration that followed these events, its status on a national scale in 1915 was described by leading statisticians of the day as very poor. It was recognized that the formation of a birth-registration area would act as a stimulus to further activity.

*The expanding birth-registration area, 1915–1933*

In 1915, the national birth-registration area (b.r.a.) was established by the Bureau of the Census. It consisted of the District of Columbia and ten States located in the north-eastern and north central parts of the country. The method used for judging which States were to form the area is not clear from available literature. However, all the selected States were among the first to enter the death-registration area, and they undoubtedly also represented the most developed areas from the birth-registration standpoint. Subsequent admittance to the b.r.a. was based on findings of objective tests. The same standard that was being used in the death-registration area (i.e. 90% registration completeness) was adopted. States already admitted were subject to re-testing, and the possibility of being dropped from the b.r.a. was always present.

By 1917, ten new States had been added to the b.r.a. Progress was much slower after this year, and the entire United States was included for the first time in 1933. Fig. 1 shows how the area's coverage spread from the urban north, across the mid-west and west, and finally through the rural south. This was the main pattern, although there were some exceptions. Generally the order of admittance to the b.r.a. was similar to the experience in the expanding death-registration area. In some cases, States were admitted to both areas during the same year. Table 1 indicates the number of States and the proportion of the United States population included each year in the b.r.a.

The effort that went into building the birth-registration area was very great. The Bureau of the Census, American Public Health Association, United States Children's Bureau and the Public Health Service maintained field representatives on a full-time basis in various States to assist them in establishing efficient registration systems. Newspapers, theatres, physicians and midwives were enlisted by State and local registrars to promote registration. Civic organizations of the most diverse types (e.g. Federation of Women's Clubs, Boy Scouts of America, American Legion)

participated in specific phases of the drive. Prominent persons and organizations were solicited for statements concerning the importance of birth registration for child welfare and public health purposes.

Table 1. *The expanding birth-registration area: United States*

| Year | Estimated mid-year population of continental United States | Birth-registration States | | |
|---|---|---|---|---|
| | | No. of States | Estimated mid-year population | |
| | | | No. | Percentage of total |
| 1933 | 125,578,763 | 48 | 125,578,763 | 100·0 |
| 1932 | 124,840,471 | 47 | 118,903,899 | 95·2 |
| 1931 | 124,039,648 | 46 | 117,455,229 | 94·7 |
| 1930 | 123,076,741 | 46 | 116,544,946 | 94·7 |
| 1929 | 121,769,939 | 46 | 115,317,450 | 94·7 |
| 1928 | 120,501,115 | 44 | 113,636,160 | 94·3 |
| 1927 | 119,038,062 | 40 | 104,320,830 | 87·6 |
| 1926 | 117,399,225 | 35 | 90,400,590 | 77·0 |
| 1925 | 115,831,963 | 33 | 88,294,564 | 76·2 |
| 1924 | 114,113,463 | 33 | 87,000,295 | 76·2 |
| 1923 | 111,949,945 | 30 | 81,072,123 | 72·4 |
| 1922 | 110,054,778 | 30 | 79,560,746 | 72·3 |
| 1921 | 108,541,489 | 27 | 70,807,690 | 65·2 |
| 1920 | 106,466,420 | 23 | 63,597,307 | 59·7 |
| 1919 | 104,512,110 | 22 | 61,212,076 | 58·6 |
| 1918 | 103,202,801 | 20 | 55,153,782 | 53·4 |
| 1917 | 103,265,913 | 20 | 55,197,952 | 53·5 |
| 1916 | 101,965,984 | 11 | 32,944,013 | 32·3 |
| 1915 | 100,549,013 | 10 | 31,096,697 | 30·9 |

*Note.* The area included the District of Columbia each year.

When a State office felt that its promotional activities had progressed far enough, the Bureau of the Census was requested to carry out a test of registration completeness. In the early years of the B.R.A., the test was based on names of newborn infants collected from a variety of sources such as newspaper listings, infant death records, school censuses, etc. The listing was accepted as a representative sample of births that occurred, and an attempt was made to match the names against the birth record file. If a State failed to meet the 90% criterion, provision would be made to concentrate on the more backward areas and a re-test given shortly afterwards.

A more systematic method for obtaining a list of newborn infants was adopted in the early 1920's. The new technique called for distribution of postcards to every household in the State via the postal delivery service. The family was requested to fill out the card if a child had been born during a specified period of time, usually the preceding year. If a State-wide distribution was not feasible, sample areas were covered. A widespread publicity campaign would usually precede the test to impress the community with the importance of co-operation in the survey.

The response rate in the postcard tests varied considerably from State to State, but returns usually totalled only between 30 and 50% of the number of birth records on file. However, the method was considered more accurate than any other procedure that could be devised at the time. Although all of the known biases were in

94                                    S. SHAPIRO



YEAR EACH STATE ADMITTED TO AREA

Legend

1915–Initial Area
1916–1917
1919–1922
1924–1927
1928–1935

Fig. 1. Growth of birth-registration area: United States, 1915–33. Note: Rhode Island dropped from the area in 1919; readmitted in 1921. South Carolina dropped from the area in 1925; readmitted in 1928.

the direction of inflating the percentage of registration completeness, the results were considered sufficiently accurate to serve as a basis for admitting States to the area.

Some of the biases arose through selective distribution of the postcards. More inaccessible areas which did not receive mail frequently were the most likely to be missed in the survey. Furthermore, the response rate from the least literate portion of the population was lower than that for the others. As later tests showed, registration was less complete in these groups.[1] Another factor which served to inflate the completeness figure was the overlapping between publicity campaigns and the tests. Sometimes this made it possible for attendants to file birth records which they ordinarily would not have recorded.

Fortunately, the Bureau of the Census did not permit these problems to create an obstacle in testing and admitting States to the B.R.A. Otherwise, a substantial delay in completing the area would almost certainly have occurred. This, in turn, would have retarded some of the advances in registration practice and statistics achieved since 1933.

Following the completion of the B.R.A., the Bureau of the Census (Division of Vital Statistics) defined as its future responsibilities, the improvement of basic data and the broadening of research in the field of vital statistics. Methods for controlling the accuracy of information obtained through the birth record received greater attention (see Part IV). Furthermore, the Division's approach to the problem of registration completeness underwent a fundamental change:

'The need for new methods of testing completeness of registration is one of the most vital problems confronting the vital statistician. The future policy of the Division will be that the object of such checks will be to help the State in its problems of registration, rather than to threaten its removal from the registration area. Regardless of whether a State measures above or below the accepted standard of 90% registration completeness, all data should be published for scientific investigators, and the users of vital statistics may then correct the data for each State according to the relative completeness of the registration.'[2]

Activities directed at the solution of these problems have been joint enterprises between the Federal Government and the State offices of vital statistics. In more recent years, this has taken organizational form. The present structure is the Public Health Conference on Records and Statistics. Its membership includes representatives of the registration and statistical activities from State, territory and independent registration areas. The purpose of the Conference is to serve as a medium for the interchange of information and viewpoints, and for the development and promotion of procedures relating to all phases of public health statistical and record activities which are interstate and national in scope.

[1] A. W. Hedrich, John Collinson, and F. D. Rhoads, *Comparison of Birth Tests by Several Methods in Georgia and Maryland*, Vital Statistics, Special Reports, vol. VII, no. 60, Bureau of the Census, Washington, D.C., 10 November 1939.

[2] Halbert L. Dunn, 'Vital Statistics Collected by the Government', *Ann. Amer. Acad. Polit. Soc. Sci.* November 1936.

### III. COMPLETENESS OF BIRTH REGISTRATION IN THE UNITED STATES

*The 1940 test of registration completeness*

Prior to 1933, the function of the tests of birth-registration completeness conducted by the Bureau of the Census was to determine whether a State met the 90% criterion for inclusion in the B.R.A. and to help plan campaigns to improve registration. As previously mentioned, the precision of the results was not very high, and tests administered in the various States differed greatly in time. It was therefore never possible to combine the results to secure a reliable picture of birth-registration completeness for the country as a whole.

The first uniform nation-wide birth-registration test in the United States was conducted in conjunction with the 1940 Decennial Census of Population and Housing. The primary purpose of the test was to obtain measures of registration completeness on a comparable basis for all States and minor sub-divisions. The results were expected to help registrars localize problem areas for registration promotion and to determine reasons for failure to register births.

Briefly, the procedure for carrying out the test was as follows:[1] During the Population Census of 1940, enumerators were instructed to fill out special infant cards for all infants who were born during the period 1 December 1939 to 31 March 1940, and who were alive on 1 April 1940. State offices of vital statistics provided copies of birth records for infants born during the same period and copies of death records for infants who were born and had died during the test period. The death records and infant cards formed the population against which birth records had to be matched. These totalled 687,457 records, of which 662,614 were infant cards and 24,843 were copies of death records.

Matching was based on varying combinations of common identifying items appearing on the records. In the initial stages, all but about 20% of the infant cards were matched. The 125,000 families represented by this residual group were sent letters requesting data needed to clarify or complete the unmatched infant cards. With the aid of a follow-up letter to non-respondents and hospitals, information was received for 75% of the group surveyed. Between one-quarter and one-third of the 125,000 unmatched infant cards were eliminated from the test because replies from the parents clearly indicated that the children were born outside the test period.

Following the mail survey, a field agent from the Bureau of the Census was sent to almost every State office with abstracts from the unmatched infant cards. With the assistance of State employees, a third of the corresponding birth records were located. The additional matches were made principally because of (*a*) greater familiarity of State employees with handwriting on records and searching problems, and (*b*) the availability of special files for adopted children, records from foundling homes, etc.

Final results of the test showed that birth registration was 92·5% complete throughout the country. Registration completeness was above 97·5% in eleven

[1] Robert D. Grove, *Studies in the Completeness of Birth Registration*, Bureau of the Census, Vital Statistics, Special Reports, vol. XVII, no. 18, 20 April 1943.

Case 1:06-cv-01197-ESH   Document 3-13   Filed 06/29/2006   Page 14 of 28



Fig. 2.  Percent completeness of birth registration: each State, 1 December 1939 to 31 March 1940.

States, but it was below 90% in sixteen States. The percentage for each area was derived by relating the matched number of records to the total number of infant cards and death records in the area.

Fig. 2 indicates the variability in the degree of under-registration among the States. It is interesting to note that the States which had formed the original B.R.A. had high completeness records in 1940, and many of those which were admitted late still had very difficult situations to overcome.

The matched and unmatched sets of cards resulting from the test were also utilized to derive measures of registration completeness for a variety of characteristics. These tabulations were based on samples consisting of 20% of matched infant cards for white infants, 50% of the matched infant cards for non-white infants, and 100% of the unmatched infant cards for all races. The sample figures were expanded and adjusted to agree with recorded State totals by race determined from a hand count of the infant cards.[1]

Some of the statistical findings in the test are given below. Their significance is many-sided. In the first place, they point to the population groups in which registration is poor, and thereby help direct promotional and educational campaigns aimed at the attendants who serve them. In addition, it is of the utmost importance to establish which groups in a community would not be reached if the public health programmes were to depend exclusively on the birth record for control purposes. Efforts to cover an entire community are facilitated by a knowledge of the characteristics of families where under-registration is significant. Finally, the usefulness of regularly tabulated data for overall planning of school and hospital facilities, housing, etc., is increased by the availability of correction factors for under-registration.

Space limitations make it possible to present data in this paper only for the entire country, but comparable breakdowns are available for various geographic groupings of States, and, in some instances, for individual States. Except in the few cases noted, the percentages shown have relative sampling errors of less than 1%.

*Registration completeness by:*

(a) *Race.* In practically every section of the country, white births were much more completely registered than non-white. For the nation as a whole, the percentages in these two race groups were 94·0 and 81·5 respectively.[2] Similar differences between the race groups were found in all major classifications of the test data.

(b) *Urban-rural areas and occurrences in or out of hospitals* (Table 2). The test verified the hypothesis that under-registration was most severe among births occurring in rural areas, and also demonstrated that the problem decreased in successively larger urban areas. Of greater significance was the finding that most of these differences were considerably reduced when registration of births in hospitals or institutions was studied separately from that of births at home. Thus, while the absolute

---

[1] Special problems connected with unmatched infant death records made it advisable to exclude the entire group of infant deaths from the sample. This is estimated to have introduced only a very minor bias in the registration completeness figures.

[2] Registration completeness figures based on matched infant cards and death records were 94·0% for the white race and 82·0% for the non-white.

difference between the percentages of registration completeness for urban and rural areas as a whole was 9·5%, the urban-rural difference for events occurring in hospitals was only 2·0% and for occurrences not in hospitals 2·8%.

Table 2. *Percentage completeness of birth registration by race, urban-rural areas, occurrence in or out of hospitals: United States, 1 December 1939 to 31 March 1940*

(By place of occurrence)

| Area | Total | | | In hospital | | | Out of hospital | | |
|---|---|---|---|---|---|---|---|---|---|
| | All races | White | Non-white | All races | White | Non-white | All races | White | Non-white |
| United States | 92·5 | 94·0 | 81·5 | 98·5 | 98·6 | 96·3 | 86·1 | 88·2 | 77·2 |
| Urban Places of: | 96·0 | 96·7 | 88·4 | 98·6 | 98·7 | 96·6 | 88·0 | 89·5 | 81·6 |
| 100,000 and over | 97·7 | 98·1 | 94·3 | 98·9 | 99·1 | 97·0 | 90·7 | 91·2 | 88·9 |
| 10,000–100,000 | 96·0 | 96·8 | 86·5 | 98·7 | 98·7 | 96·2 | 88·3 | 89·7 | 82·0 |
| 2500–10,000 | 92·0 | 93·5 | 76·2 | 97·5 | 97·6 | 92·1 | 85·8 | 88·1 | 74·1 |
| Rural | 86·5 | 88·9 | 75·8 | 96·6 | 96·8 | 93·5 | 85·2 | 87·6 | 75·2 |

In the non-white group, close to 23% of the births occurring out of hospitals were unregistered. This was particularly serious, since about three in four of the non-white infants were born at home. Even in cities of 100,000 or more population, there existed a problem of under-registration of home deliveries affecting both white and non-white births. The test demonstrated that the registration of births occurring in hospitals could not be taken entirely for granted. Although the percentages for such occurrences were generally high, there was need for improvement, especially among non-white births in smaller cities and rural areas.

(c) *Age of mother* (Table 3). The completeness with which births to women in various age groups are registered has direct meaning for fertility analyses based on age-specific birth rates. The test showed that registration was more complete for the infants born to women 20–34 years of age than for those to older mothers or to very young women, 5·2% separating the high from the low.

A somewhat different picture is obtained when completeness figures for the

Table 3. *Percentage completeness of birth registration by race, age of mother, occurrence in or out of hospitals: United States, 1 December 1939 to 31 March 1940*

| Age of mother | Total | | | In hospital | | | Out of hospital | | |
|---|---|---|---|---|---|---|---|---|---|
| | All races | White | Non-white | All races | White | Non-white | All races | White | Non-white |
| All ages | 92·5 | 94·0 | 81·5 | 98·5 | 98·6 | 96·3 | 86·1 | 88·2 | 77·2 |
| Under 20 | 90·9 | 93·1 | 83·5 | 98·1 | 98·3 | 97·0 | 85·6 | 88·4 | 78·5 |
| 20–24 | 92·8 | 94·3 | 81·9 | 98·5 | 98·6 | 96·9 | 86·5 | 88·7 | 77·2 |
| 25–29 | 93·5 | 94·7 | 82·0 | 98·7 | 98·8 | 96·5 | 86·6 | 88·4 | 78·1 |
| 30–34 | 93·1 | 94·3 | 81·0 | 98·5 | 98·6 | 94·9 | 86·6 | 88·3 | 77·5 |
| 35–39 | 91·0 | 92·5 | 78·7 | 98·1 | 98·3 | 94·0 | 85·0 | 87·0 | 75·5 |
| 40 and over | 88·3 | 90·6 | 70·9 | 96·9 | 97·1 | 92·7 | 83·0 | 86·1 | 67·3 |

7-2

non-white races are examined. In this group, the highest percentage was found for births to women under 20 years of age, and the difference between high and low percentages was substantial (12·6%). The difference was 4·1% in the white race.

The influence of place of birth (i.e. in or out of hospitals) on measures of registration completeness by age of mother is clearly demonstrated in Table 3. Births occurring in hospitals, regardless of age of mother or race, had a very high likelihood of being registered. The figures for births occurring at home were, of course, much lower.

(d) *Highest grade of school completed by mother* (Table 4). One of the most striking relationships to be found in the test was that between educational level of mother and birth-registration completeness. By far the poorest registration situation (79·3%) existed among births to women with less than 5 years of grade-school education. The corresponding proportion for the college group was 18·1% higher. Considering registration in each race group and in urban-rural areas separately reduced the completeness differential effectively only for urban residents. This probably could be traced to the more general use of hospitals for confinement among all groups in cities as compared with rural residents.

Another interesting feature of the data is the marked difference in registration completeness between the two races in all categories shown. Part of this might also be due to the 'in or out of hospital confinement' factor.

It will be noted in the table that the registration-completeness problem was more acute among the births to farm residents than among those to non-farm. This was

Table 4. *Percentage completeness of birth registration by race, urban-rural area: years of school completed by mother, United States, 1 December 1939 to 31 March 1940*

(By place of residence)

| Area and Race | Total | Grade school | | | High school | | College |
|---|---|---|---|---|---|---|---|
| | | 0–4 years | 5–6 years | 7–8 years | 1–3 years | 4 years | 1 year or more |
| United States | 92·5 | 79·3 | 85·1 | 92·4 | 94·6 | 96·8 | 97·4 |
| White | 94·0 | 82·7 | 87·3 | 93·4 | 95·3 | 97·0 | 97·5 |
| Non-white | 81·5 | 73·6 | 79·7 | 83·5 | 87·8 | 91·4 | 92·7 |
| Urban | 96·2* | 88·4 | 91·7 | 96·0 | 96·7 | 97·9 | 98·0 |
| White | 96·8* | 90·3 | 93·2 | 96·6 | 97·2 | 98·1 | 98·1 |
| Non-white | 89·8* | 83·4 | 87·3 | 90·2 | 92·3 | 93·4 | 94·8 |
| Rural | 88·4* | 75·1 | 81·5 | 89·3 | 91·6 | 94·9 | 96·3 |
| White | 90·6* | 78·3 | 83·8 | 90·6 | 92·6 | 95·1 | 96·5 |
| Non-white | 75·7* | 70·6 | 76·5 | 78·6 | 80·5 | 85·6 | 86·8† |
| Rural farm | 85·6 | 72·6 | 79·4 | 87·7 | 89·6 | 93·7 | 95·5 |
| White | 88·6 | 76·1 | 81·9 | 89·3 | 91·0 | 94·1 | 95·9 |
| Non-white | 73·4 | 68·9 | 75·3 | 76·7 | 76·6 | 81·7† | 81·1† |
| Rural non-farm | 91·8 | 80·4 | 85·2 | 91·5 | 93·5 | 95·7 | 96·8 |
| White | 92·8 | 81·7 | 86·6 | 92·3 | 94·1 | 95·9 | 96·9 |
| Non-white | 81·6 | 77·2 | 80·1 | 82·6 | 85·6 | 89·3† | 92·0† |

\* Differ from comparable figures in Table 2. The above data are by place of residence of child's mother; in Table 2, data are on a place of occurrence basis.

† Relative sampling error is 1% or more.

true for both the white and non-white groups and at each educational level. The worst situation of all (31 % incompleteness) existed in the group of non-white births to farm residents with little or no education (i.e. under 5 years).

### Errors in the 1940 birth-registration test

In any large-scale operation, situations inevitably arise which result in biases despite the most strenuous efforts to control them. The 1940 test was no exception, although the net effect of such biases is believed to have been minor. The nature of several sources of error and the direction in which they probably influenced the test figures are given below.

(1) The most important bias in the test arose from the fact that not all infants alive at the time of the census were enumerated. This would not have affected the test results if the missed infants were just as likely to have been registered as the children who were enumerated. But the more reasonable conclusion to draw was that some correlation existed.

In the absence of an opportunity to re-canvass selected areas, tables were prepared to determine the limits of the bias under certain assumptions of the degree of positive correlation between the unregistered and unenumerated events. A recent article by Drs Chandra Sekar and Deming[1] appears to present a more direct method for estimating this type of bias. The basic objective in the method is to sub-divide an area (either geographically or by a combination of characteristics) into sub-groups each of which is highly homogeneous with respect to enumeration completeness. In terms of the article, a completely homogeneous population would be one in which each event had an equal probability of being enumerated.

Within such sub-groups, the correlation between unregistered and unenumerated events would be very low. An estimate of the total number of registered and un-registered births in the area, approximating the unbiased estimate, could then be derived by cumulating the 'total number of births' corrected for under-registration in each sub-group.

This method was applied to data derived from the 1940 birth-registration test. For each State, comparisons were made between (1) the percentage of registration completeness derived from matched and unmatched records for the State as a whole, and (2) the percentage obtained by cumulating estimates of the total number of births (registered and unregistered combined) in minor civil sub-divisions of the State by race.[2]

The effect of cumulating sub-totals was to decrease the United States figure by

---

[1] 'A method of estimating birth- and death-rates and the extent of registration', *J. Amer. Statist. Ass.* vol. XLIV, no. 245, March 1949.

[2] In method (2), it was known how many white and non-white births were registered in individual cities of 10,000 or more population within each county of a State and in the balance of the county. Percentages of registration completeness available from the birth-registration test for each of these sub-groups were divided into the corresponding registered birth figures. The quotients represented estimates of the total number of births corrected for under-registration in specific sub-divisions of the counties. These were cumulated to obtain the total number of births for the State. Finally, the number of registered births in the State was divided by this figure. The result was taken as the new measure of registration completeness in the State.

0·7%. In practically all States with registration completeness of over 90%, the effect was minor. A difference of 1% or more between the two percentages occurred in only eleven States. The five States with differences of 2% or more had the lowest percentages of registration completeness in the country. In thirty-two States, method (2) gave a lower percentage of registration completeness than method (1). In only four areas were percentages based on cumulated figures higher than the others, with the largest difference being 0·3%.

(2) Incompleteness of infant death registration could introduce a bias in the same way as underenumeration; i.e. if independence is lacking between the filing of a birth and infant death record. While there is no evidence on the subject, it seems likely that a positive correlation exists. However, the effect of this relationship could not be very great for most sub-divisions of the country. This point may be illustrated as follows: 24,843 infant death records were included in the test. Under the assumption that under-registration in the group was 7–8%, there should have been an additional 1900 death records. If all of these represented unregistered births, the percentage registration completeness would have been reduced from 92·5 to 92·3%. A greater effect would be expected in those areas where the infant mortality rates were higher than for the country as a whole. But, even in such areas, unless the rate was unusually high, it could not introduce a very large relative bias in the completeness figure.

(3) Since it was planned to initiate the mail survey on unmatched infant cards during the summer of 1940, it was essential to reject all birth certificates filed after 31 July 1940. This deadline did not correspond with usual practice in accepting records from State offices for regular tabulations. December 1939 birth certificates were tabulated only if they had reached the Census Bureau by 1 June 1940. January–March 1940 certificates, however, were tabulated if received any time prior to 1 June 1941. Therefore, the completeness estimate for December was biased upward, and that for the other months biased downward.

Somewhat fewer than 6000 test records were counted as unmatched because the corresponding birth certificates had been filed after 31 July 1940. If they had all been accepted, the estimated percentage of completeness would have been increased by only 0·7%. In some States, the deadline was a relatively more important factor than for the country as a whole.

(4) Available information indicates that biases arising from undermatching and overmatching tended to overstate slightly registration completeness for the country as a whole. The former type of error was less likely to occur, since every means possible was utilized in locating a birth record to match an infant card. Despite these efforts, it was estimated that between 1000 and 3000 infant cards remained unmatched at the end of the test because of name difficulties rather than because the birth certificates had not been filed.

On the other hand, clerical errors and fortuitous agreement between test records may have resulted in many more improper matches, although rigid control over the operation and careful supervision tended to minimize these factors. Evaluation of the situation suggested that overmatching affected about 3–4 times as many records as undermatching.

*Registration completeness, 1940–1948*

The results of the 1940 birth-registration test formed the basis for State campaigns directed at attendants and local registrars to improve registration. However, before all of the necessary administrative actions could be taken, State and local vital statistics offices were overwhelmed by the war-time demands made upon them for copies of birth certificates. Furthermore, requirements of the armed forces and war-connected industries rapidly depleted their staffs. Thus, the information derived from the test could not be exploited as fully for promoting registration completeness as had been anticipated.

The factors which diverted efforts from organized promotional activities, at the same time, resulted in making millions of young adults more conscious of the importance of the birth record. Never before was there such a high premium placed on having a birth certificate. Citizenship had to be established to qualify for jobs in defence industry; applications for food ration books frequently had to be accompanied by the birth record of a newly born child; and birth certificates of dependant children often had to be submitted by servicemen in applying for family allowances. It is difficult to estimate how this situation affected the attendants responsible for filing records. But it seems likely that they were influenced by the demonstrated value of the birth record to their patients, neighbours and friends.

Another factor which is believed to have improved registration completeness is the vast increase in the utilization of hospital facilities for confinement. In 1940, 56% of births occurred in hospitals. By 1948, the proportion had increased to over 86%. Practically every area of the country and race group showed a marked rise in hospital confinements. In the non-white race, where registration was poorest, the percentage doubled (from 26·7 to 52·9%).

The effect on registration completeness of increased use of hospitals for delivering babies has been measured under the assumption that the 1940 percentages of registration completeness of births occurring in hospitals and institutions within each State

Table 5. *Estimated percentages of birth-registration completeness: United States, 1935–1948*

| Year | Total | White | Non-white |
|------|-------|-------|-----------|
| 1948 | 95·5 | 97·1 | 85·9 |
| 1947 | 95·5 | 97·0 | 85·3 |
| 1946 | 95·1 | 96·7 | 84·4 |
| 1945 | 94·5 | 96·3 | 83·3 |
| 1944 | 94·1 | 96·0 | 82·7 |
| 1943 | 93·9 | 95·6 | 82·3 |
| 1942 | 93·5 | 95·3 | 81·9 |
| 1941 | 92·8 | 94·5 | 81·6 |
| 1940 | 92·3 | 94·0 | 81·3 |
| 1939 | 91·9 | 93·6 | 81·1 |
| 1938 | 91·6 | 93·4 | 80·8 |
| 1937 | 91·3 | 93·1 | 80·4 |
| 1936 | 91·1 | 92·8 | 80·2 |
| 1935 | 90·7 | 92·4 | 79·9 |

104                              S. SHAPIRO

and race group and the comparable figures for home deliveries remained unchanged.[1] The figures in Table 5 were obtained by applying these percentages to registered birth data classified by State, race and occurrence in or out of hospital for each of the years given. United States totals were then obtained by cumulating State figures corrected for under-registration. The percentages in the table show the steady increase in completeness suggested by this method.

The possibility that war-time factors may have altered the relationships determined in 1940 should not be overlooked. It is also extremely unlikely that they operated exactly the same way each year in all States. Nevertheless, the assumption represents the most reasonable approach to estimating registration completeness for the years in which 'in or out of hospital' statistics are available (1935–48).

*The 1950 test of registration completeness*

Another nation-wide test of birth-registration completeness is being conducted in conjunction with the 1950 Decennial Census of Population and Housing. State interest in carrying out active promotional campaigns to eliminate under-registration has been very high. In the years following the end of World War II, renewed efforts in this direction have been made in some areas, but the lack of information about changes in local situations has retarded these activities.

The Federal offices planning the 1950 test are the Public Health Service (National Office of Vital Statistics),[2] and the Bureau of the Census (Population Division). All State offices of vital statistics are actively participating in various phases of the project. From the standpoint of birth registration, the primary purpose of the test is the same as in 1940: to obtain measures of registration completeness in States and local areas on a comparable basis. The results will help registrars to localize problem areas for registration promotion and to conduct surveys to determine reasons for failure to register births. The test will also make available correction factors for vital statistics based on registered births and provide data for special analytical studies.

The Bureau of the Census will use the 1950 test to determine (1) variations in infant enumeration completeness by social and economic groups in the population and (2) reasons for failure to enumerate infants.

The source of records in the 1950 test is the same as in 1940. Infant cards (Fig. 3) are being filled out for all enumerated infants who were born between 1 January and 31 March 1950. This is 1 month less coverage than in 1940, but the total number of births will probably exceed the total for the 4 months, 1 December 1939 to 31 March 1940. Copies of birth records and infant death records for events occurring during the test period are being furnished by State offices of vital statistics.

Experience gained in the 1940 test is being utilized to control various sources of bias and increase the efficiency of the matching operation. Follow-up of unmatched birth records, a necessary step to obtain measures of underenumeration, will reveal

[1] I. M. Moriyama, *Estimated Completeness of Birth Registration: United States, 1935–1944*, Vital Statistics, Special Reports, vol. XXIII, no. 10, Federal Security Agency, United States Public Health Service, National Office of Vital Statistics, 30 September 1946.

[2] The Division of Vital Statistics was transferred July 1946 from the Bureau of the Census to the Public Health Service, Federal Security Agency, and renamed the National Office of Vital Statistics.

BIRTH REGISTRATION AND STATISTICS IN UNITED STATES    105

CONFIDENTIAL. This inquiry is authorized by Act of Congress (46 Stat. 21; 13 U. S. C. 201–213) which requires that a report be made. The information furnished is accorded confidential treatment. The Census report cannot be used for purposes of taxation, investigation, or regulation.

BUDGET BUREAU NO. 41-5001.
APPROVAL EXPIRES Dec. 31, 1949.

FORM P3    U. S. DEPARTMENT OF COMMERCE
BUREAU OF THE CENSUS

**INFANT CARD**

**1950 CENSUS OF POPULATION AND HOUSING**
(For every child born in January, February, or March 1950)

State _____ County _____
E. D. No. _____ Sheet No. _____ Line No. _____
Enumerated by _____
Date _____

ASK THESE ITEMS

1. Is residence on a farm?
(Copy from Population schedule item 4 for "Head of household.")    Yes ☐    No ☐

2. NAME OF INFANT (Please print)
(Last) _____ (First) _____

3. RACE OF INFANT
(Copy from schedule item 9.)    White ☐    Negro ☐    American Indian ☐    Other ☐

4. SEX OF INFANT
(Copy from schedule item 10.)    Male ☐    Female ☐

5. Is father enumerated in this household?    Yes ☐    No ☐

6. If "YES" in item 5, copy the answers to items 6, 7, 8, and 9, from the Population schedule. If "NO" in item 5, skip to item 10.

6. NAME OF FATHER (Please print)
(Copy from schedule item 7.)
(Last) _____ (First) _____

7. AGE OF FATHER ON LAST BIRTHDAY
(Copy from schedule item 11.)

8. OCCUPATION OF FATHER
(Copy from schedule item 20c, if that item is blank, enter "None.")

9. INDUSTRY OF FATHER
(Copy from schedule item 20b; if that item is blank, enter "None.")

LEAVE BLANK / FEW BLANK

10. DATE OF BIRTH
(Month) _____ (Day) _____ 1950

11. POST OFFICE ADDRESS OF INFANT'S USUAL PLACE OF RESIDENCE
House Number and Street or RFD No. _____
City or Town _____ State _____

12. INFANT'S PLACE OF BIRTH (ACTUAL PLACE—NOT USUAL RESIDENCE)    LEAVE BLANK
City _____ (if outside city limits, write "RURAL.")
County _____ State _____

13. NAME OF HOSPITAL _____

If "NONE" above, type of attendant at birth:
Doctor ☐    Midwife ☐    Other (Specify) _____

14. MAIDEN NAME OF MOTHER (Please print)
(Last) _____ (First) _____

15. AGE OF MOTHER ON LAST BIRTHDAY
(Copy from schedule item 11)

16. EDUCATION OF MOTHER
(Copy from schedule items 26 and 27 or ask questions)
a. What is the highest grade of school that she has attended?
b. Did she finish this grade?    Yes ☐    No ☐

17. ORDER OF BIRTH
Is this the 1st, 2d, etc., child the mother has ever borne?
(Do not count stillbirths but count all live births, including children now deceased.) _____

U. S. GOVERNMENT PRINTING OFFICE    16—55032-1

Fig. 3.

matching errors that remained undetected in 1940. The test provides, as in 1940, for a mail survey to parents to verify and correct information on residual groups of un-matched infant cards and for a final search in State offices. Intensive field work is being planned by many States to determine the reasons for under-registration.

## IV. NATIONAL BIRTH STATISTICS

### Collection of data

With the formation of the B.R.A. in 1915, there began an annual series of birth statistics, which covered the entire United States for the first time in 1933. The course followed in obtaining data from these records has remained unchanged. The geographic unit of registration has been the city, town, county or other civil sub-division which is served by a local registrar of vital statistics who is required to see that each certificate is complete and accurate. When received in the State bureau of vital statistics, the certificates are inspected further for completeness, queried if necessary, numbered, indexed and bound for permanent reference. In the State office, statistical information from the certificates is tabulated for use by the State and local health departments, other branches of the State government, and private organizations.

A copy of each birth certificate received in State offices is sent to the National Office of Vital Statistics. Annual tabulations of birth facts are prepared from these copies for the United States and, in comparable form, for each State included in the B.R.A. Until 1946, only statistical transcripts of the entries on the record were utilized to transmit the data. On 1 January 1946, after several years of experimenta-tion by State offices, microfilm was introduced primarily to eliminate possible errors in transcription and reduce storage space. By 1949, the National Office of Vital Statistics was receiving microfilm copies of over 70% of the year's birth records.

Various methods have been used to ensure the completeness and accuracy of information on the birth record. Since 1939, physicians have received successive issues of the *Physician's Handbook on Birth and Death Registration*. This publication is designed to explain the doctor's responsibility for filing certificates and how to fill them in. A number of States, where midwives attend a relatively large proportion of the births, prepare special handbooks and pamphlets directed at this group and hold classes which include discussions of the items on the birth record.

Of considerable significance in controlling the quality of the data on birth records are the query programmes that have been carried out for years by every State. At one time, queries were concerned only with individual items (e.g. inconsistent entries, obviously incorrect data and missing information). In the past few years, this procedure has been supplemented by a more general type of inquiry. Parents are mailed a form containing information exactly as it appears on the birth record with the request that they review the entries and mail the form back with necessary corrections.

### Comparability of data

Necessary prerequisites for the issuance of comparable national birth statistics have been a uniform definition of live birth and the adoption by States of practically all items recommended on successive issues of the Standard Certificate of Birth. The

definition of live birth has varied only in specificity from the one now in use: 'A child showing any evidence of life (action of heart, breathing, or movement of voluntary muscle) after complete birth should be registered as a live birth. Birth is considered complete when the child is altogether (head, trunk, and limbs) outside the body of the mother, even if the cord is uncut and the placenta still attached.'

Revisions of the Standard Certificate have been carried out periodically with the advice and co-operation of State registrars and organizations working in the fields of public health, social welfare, demography and insurance. Each revision has subjected the old items to a careful review in terms of their current and future usefulness for registration, identification, legal, medical and research purposes. New items have been added when necessary.

Copies of the Standard Certificate of Birth in effect when the B.R.A. was formed and the most recent version (1949) are shown in Fig. 4. Several of the important changes reflected by these certificates and the years in which they were first adopted follow.

(1) Increased prominence for the item on 'usual residence of mother' (1939). The large movement to utilize hospital facilities outside the mother's home area for confinement has made place-of-residence tabulations essential.

(2) Provision of separate Standard Certificates for the reporting of live births and stillbirths (1939). Previously, the general practice was to use the same certificate for both the 'born alive' and 'stillborn' with a death certificate also required in the case of stillbirth.

(3) Establishment of a 'medical and health section' (1949) as an integral part of the Standard Certificate. Items appearing in this section are confidential and are to be omitted when copies are certified for ordinary purposes. This is intended to prevent unnecessary embarrassment to the child or his parents when such facts as illegitimacy or malformations appear on the birth records.

The medical section is used by many States to accommodate various items including: complications of pregnancy, operations for delivery, congenital malformations, birth injuries, and the use of a prophylactic drug in the baby's eyes. Prior to 1949, many States had already adopted these items and placed them in a similar type section.

(4) Improvement of items to ensure better reporting and dropping others which have little or no possibility of being used. An example of improvement is the change in the children 'ever born' item. It was not possible to determine from the entries on the 1915–17 certificate whether the information referred to 'ever born including stillbirths' or 'ever born alive'. The 1918 revised Standard Certificate called for a three-part item which eliminated this ambiguity.

(5) Addition of an item on birth weight and specification of period of gestation in weeks (1949). These will form the basis for studies of premature births.

*Tabulation and publication of data*

From the very beginning, national tabulations of birth data have been extensive, being designed to meet a variety of needs in many fields including demography, health, education and business. Tabulations prior to 1930 were concerned with

Fig. 4*a*. In Effect 1915–1917.



Fig. 4*b*.  In Effect 1949–

the following items: race, age of parents, nativity and country of birth of white parents, legitimacy status, birth order (excluding stillbirths) and number of children 'living'. Occupation of father was tabulated every year between 1923 and 1929, and crossed by several of their items.

After 1930, occupational coding was discontinued because of the unavailability of comparable data for the population as a whole.[1] Country of parent's birth was dropped in 1937, since the foreign-born became less important components of the population in the reproductive age span. One of the most important changes during the 1930's was the shift in emphasis from place of occurrence to place of residence in tabulating data. The first State tables prepared by place of residence were available for 1935 events. The 1939 tabulations carried this concept much further, and most of the data being used to-day for analytical purposes or health programme needs are on a residence basis. Typical cross-tabulations prepared in recent years are indicated in Table 6.

### Table 6. *Summary of 1948 natality tabulations*

I. *Each State by place of occurrence and by place of residence.*
    (X) Each urban place of 10,000+. Totals by county for urban places under 10,000 and rural areas.
    (X) Population groups: urban places of 100,000+, 25,000–100,000, 10,000–25,000, 2500–10,000, rural.
    (X) Race: white, non-white.
    (a) Person in attendance: physician in hospital, physician out of hospital, midwife, other and not stated.
    (b) Legitimacy status:* Illegitimate, legitimate and not stated.

II. *Each State by place of occurrence and by place of residence.*
    (X) Age of mother: Under 15, single units of age (15–49), 50+, not stated.
    (X) Nativity of white mother.
    (X) Race: white, negro, other.
    (X) Sex of child.
    (a) Population groups:† Urban places of 100,000+, 25,000–100,000, 10,000–25,000, 2500–10,000, rural.
    (b) Age of father: 10–54, by 5-year age groups, 55+ and not stated.
    (c) Race: Indian, Chinese, Japanese, other.
    (d) Nativity of father.
    (e) Legitimacy status:* Legitimate, illegitimate, not stated.
    (f) Number of children born alive (mother):‡ 1, 2, 3, ..., 17+, not stated.
    (g) Month of birth.

    *Note.* Separate tabulations of plural births by number born alive, race, number and sex of mates and by age of mother are prepared annually.
    *Explanation of notations.* Subjects noted by symbol 'X' are cross-tabulated with each other and with all lettered subjects. The lettered subjects are not cross-tabulated with each other.

    * Legitimacy status not reported by sixteen States in 1948.
    † By place of residence only.
    ‡ Birth order data available for forty-seven States and the District of Columbia.

Much of the tabulated data have appeared in the annual volume *Vital Statistics of the United States*.[2] A series of reports entitled *Vital Statistics—Special Reports*,

[1] This point is now being reconsidered. Comparability between occupational information recorded on the birth record and the data obtained in the Census will be reviewed on the basis of common entries on the infant card and birth record used in the 1950 study of registration and infant enumeration completeness. Furthermore, the present series of *Current Population Surveys* (Bureau of the Census) provide the opportunity to obtain occupational data for the population in intercensal years.

[2] Prior to 1937, birth data were published in the volumes entitled *Birth, Stillbirth, and Infant Mortality Statistics*.

110                                    S. SHAPIRO

containing selected tables and analyses, was initiated in 1934. There are now three
distinct sets of reports which come under this title: (*a*) 'National Summaries'—an
annual series presenting national data on important aspects of births, deaths,
marriages and divorces, organized in the form of a special report for each subject;
(*b*) 'State Summaries'—an annual series consisting of individual and comparable
reports on each State and territory and a United States summary; (*c*) 'Selected
Studies'—a series of special articles in the field of vital statistics and vital registration
published irregularly.

To provide a basis for judging current changes in the birth rate, monthly tele-
graphic reports on the number of birth records being filed are obtained from the
State offices. These reports are published in the *Monthly Vital Statistics Bulletin*
shortly after they are received.



Fig. 5. Crude birth rate: birth registration area and United States.

While the data tabulated for the expanding B.R.A. have been adequate for many
purposes, close study of changes in the birth rate requires that adjustments be made
for States not included in the B.R.A. prior to 1933 and for underregistration. Fig. 5
indicates, for example, that the decline in the crude birth rate from the post World
War I level to the low point in 1933 was actually somewhat steeper in the adjusted
series[1] than would be judged from registered birth data. It will also be observed
that the 1947 rate based on registered events was the high point for the B.R.A. How-
ever, the corrected data suggest that the rate in the post World War II period did
not quite reach the 1920-1 level.

[1] Correction factors are from the following sources: (*a*) for the years 1915–34, which contain adjust-
ments for States not in the B.R.A. and for under-registration, from a paper by P. K. Whelpton to be
published shortly in *Vital Statistics—Special Reports*, National Office of Vital Statistics; (*b*) for the
years 1935–48, from Table 5. Methods used in preparing the two sets of factors make them consistent
with each other. The 1949 data are preliminary estimates.

*Present statistical requirements*

The ending of registration incompleteness as a practical statistical matter is still one of the most important objectives to-day. In addition, it is necessary to continue subjecting the basic data derived from birth records to tests of reliability and uniformity.

Opportunities for analysing the wealth of data that have been tabulated are present, but the need for new data is acute. The increased complexity of questions in the analysis of fertility has made it essential to obtain information not now available (e.g. duration of marriage, interval between births, socio-economic status). Special surveys which go beyond the confines of the birth record will undoubtedly have a significant part in developing such statistics.

Correlation of facts on the birth record with those on other records is a prerequisite for many new advances in the health and welfare fields. An outstanding example is the gain to be made in relating information on matched birth and death records in studying prematurity. This is not only true on a national level, but even more so on a State and local level. To meet present-day statistical requirements, it will undoubtedly be necessary to go beyond the confines of the birth record.